UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X     Case No.

MARLENE AUGUSTINE, KEISHA BROWN,                    JUDGE OETKEN
LISA CABRERA, IVETTE FRANCIS,
and TAMMY SMITH,                                           **COMPLAINT**

                                    Plaintiffs,

                                                          **PLAINTIFF DEMANDS
                  -against-                               A TRIAL BY JURY**

CORNELL UNIVERSITY, WEILL CORNELL
MEDICAL COLLEGE, and KRISTEN ADAMS,
*Individually,*

                                    Defendants.
-----------------------------------------------------------------X

14 CV 7807

RECEIVED
SEP 26 2014

        Plaintiffs, MARLENE AUGUSTINE, KEISHA BROWN, LISA CABRERA, IVETTE

FRANCIS, and TAMMY SMITH ("Plaintiffs") by and through their attorneys, PHILLIPS &

ASSOCIATES, Attorneys at Law, PLLC, hereby complains of Defendants, upon information and

belief, as follows:

## NATURE OF THE CASE

1.      Plaintiffs complain pursuant to 42 U.S.C. § 1981 and the New York City Human Rights

        Law, New York City Administrative Code § 8-107, *et seq.* ("NYCHRL"), and seek

        damages to redress the injuries they has suffered as a result of being **Discriminated**

        **against on the basis of their respective races (Black; Hispanic).**

## JURISDICTION AND VENUE

2.      Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343.

3.      The Court has supplemental jurisdiction over the claims of Plaintiffs brought under city

        law pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as it is a judicial district

where a substantial part of the events or omissions giving rise to the claims occurred.

## PARTIES

5.    At all times relevant, Plaintiff MARLENE AUGUSTINE ("AUGUSTINE") was and is a resident of the State of New York and the County of Kings.

6.    At all times relevant, Plaintiff KEISHA BROWN ("BROWN") was and is a resident of the State of New York and the County of Kings.

7.    At all times relevant, Plaintiff LISA CABRERA ("CABRERA") was and is a resident of the State of New York and the County of New York.

8.    At all times relevant, Plaintiff IVETTE FRANCIS ("FRANCIS") was and is a resident of the State of New York and the County of Bronx.

9.    At all times relevant, Plaintiff TAMMY SMITH ("SMITH") was and is a resident of the State of New York and the County of Westchester.

10.   Plaintiffs AUGUSTINE, BROWN, CABRERA, FRANCIS, and SMITH shall be herein referred to collectively as "Plaintiffs."

11.   At all times relevant, Defendant CORNELL UNIVERSITY was and is a contract or statutory university located in Ithaca, New York, with the Office of University Counsel located at 300 CCC Building, Garden Avenue, Ithaca, New York 14853.

12.   At all times relevant, Defendant WEILL CORNELL MEDICAL COLLEGE ("WEILL") was and is a research unit and medical school of Defendant CORNELL UNIVERSITY.

13.   At all times relevant, Defendant WEILL operates and/or maintains numerous medical research facilities throughout New York City, including one located at 525 East 68th Street, New York, NY 10065 (the "East 68th Street location").

14.   At all times relevant, Defendant KRISTEN ADAMS is a white female who was and is

employed by Defendants CORNELL UNIVERSITY and WEILL as the Supervisor of the Anesthesiology Department at the East 68th Street location.

15.    At all times relevant, Defendant ADAMS held and/or exercised supervisory authority over Plaintiffs and had the power to hire, fire, promote, demote, and/or directly affect the terms and conditions of their respective employments.

16.    Defendants CORNELL UNIVERSITY, WEILL, and ADAMS are herein referred to collectively as "Defendants."

## MATERIAL FACTS

**Allegations Relating to all Plaintiffs**

17.    This case involves continuous and systematic discrimination against Plaintiffs on the basis of their respective races (Black; Hispanic).

18.    Specifically, Plaintiffs were denied promotional opportunities on the basis of their respective races at the hands of Defendant ADAMS.

19.    Defendant ADAMS repeatedly and habitually promoted Caucasian individuals who were less-qualified, less-experienced, and who had been working at the East 68th Street location for a shorter time than Plaintiffs into management positions for which Plaintiffs had been more qualified.

20.    Further, Plaintiffs had each individually expressed to Defendant ADAMS (and/or her agents) interest in being considered for promotional opportunities, yet were routinely either intentionally not told about promotional opportunities, or, when they applied, were either not considered at all or passed over for less-qualified, less-experienced Caucasian individuals by Defendant ADAMS.

21.    Additionally, Defendant ADAMS had the power to, and did, create positions/ titles at her

discretion, and had the power to fill same. Throughout the creation and filling of these particular positions, Defendant ADAMS repeatedly ignored Plaintiffs' multiple statements that they wanted career advancement opportunities and wanted additional job duties in order to demonstrate their abilities for particular job title creation, while creating jobs/ titles for Caucasian workers.

22.     Also, Defendant ADAMS continuously and repeatedly manufactured job duties and tasks for Caucasian employees which were never actually performed. This was done in an effort to "lay the groundwork" for a promotion she intended to give them, or for a job she was intended to create for them, in the future. Nevertheless, the job duties and tasks which Caucasian employees were supposedly performing, were actually being performed by Plaintiffs (and other black and Hispanic co-workers) who were being ignored or passed over for the desired promotional opportunities.

23.     Furthermore, despite Plaintiffs (and numerous other black and Hispanic employees) at the East 68th Street location actually performing this work, since they were only informally told to perform these tasks (as opposed to officially recognized), Defendant ADAMS used this in justifying not considering them for promotions, or, passing them over for desired promotions.

**Plaintiff Marlene Augustine**

24.     Plaintiff AUGUSTINE is a black female.

25.     In or around November 1999, Plaintiff AUGUSTINE became employed by Defendants CORNELL UNIVERSITY and WEILL in Defendant WEILL's Anesthesiology Department at the East 68th Street location. She presently holds the position of "program specialist."

4

26.    Also, in or around 1999, Defendant ADAMS was elevated by Defendants CORNELL UNIVERSITY and WEILL to the position of Administrator of the Anesthesiology Department at the East 68th Street location.  Prior to her elevation, Defendant ADAMS held the position of Assistant Administrator of the Anesthesiology Department.

27.    As the top administrator for the Anesthesiology Department, Defendant ADAMS was, and is, principally responsible for personnel decisions in that department, including, inter alia, the decisions regarding what positions to create, who to consider for promotions, and who to ultimately promote.

28.    Throughout Plaintiff AUGUSTINE's employment, she regularly received good performance reviews and had generally received praise for her work performance.

29.    In or around 2007, Plaintiff AUGUSTINE began noticing a pattern of discrimination at the hands of Defendant ADAMS.  Specifically, Plaintiff AUGUSTINE began noticing that the more-qualified black employees in the Anesthesiology Department were continuously being passed over for promotional opportunities for less-qualified white employees.    Further, she noticed that Defendant ADAMS engaged in a practice of creating positions intending to be filled by Caucasian employees.

30.    In or around October 2010, a Press Ganey satisfaction survey was distributed to employees in various departments of the East 68th Street location.  Plaintiff AUGUSTINE (amongst others) gave the Anesthesiology Department a low rating based, in part, on the racial discrimination exhibited by Defendant ADAMS.

31.    Shortly thereafter, an employee of Defendant WEILL who held the title of "Employee Relations Specialist" informed Plaintiff AUGUSTINE (and others) that he would meet with them to discuss the low ratings they gave the Anesthesiology Department.

32. Prior to their discussions, Plaintiff AUGUSTINE (and others) participated in the creation of a group complaint which stated that Plaintiff AUGUSTINE (and others) had been victims of, and witnessed, racial discrimination while employed by Defendants WEILL and CORNELL UNIVERSITY while under the supervision of Defendant ADAMS.

33. Shortly after making this complaint, employees of Defendant WEILL met with Plaintiff AUGUSTINE individually, and collectively with her and other employees in the Anesthesiology Department who had complained of racial discrimination.

34. Notably, at this meeting, Plaintiff AUGUSTINE explained that Caucasian individuals were being given greater opportunities than non-Caucasians in the Anesthesiology Department. Plaintiff AUGUSTINE further stated that she was not being given the same promotional opportunities as Caucasians.

35. Notably, throughout 2010 and 2011, Plaintiff AUGUSTINE explicitly told her supervisor that she wanted to be informed of any promotional opportunities and to be considered for any and all career advancement opportunities in the Anesthesiology Department. She further stated that she wanted to "grow" in the company.

36. Moreover, throughout this time Plaintiff AUGUSTINE was performing certain tasks which were outside her job description, namely, managing the coordination of staff assigned to the anesthesia control desk.

37. In or around October 2012, a job was posted for the positon of "Manager – Clinical Scheduling and Administrative Support." Accordingly, Plaintiff AUGUSTINE submitted her application electronically (as was standard protocol) and received a confirmation email.

38. Despite Plaintiff AUGUSTINE actually performing this particular job, Plaintiff

AUGUSTINE was passed over for a less-qualified, less-experienced Caucasian co-worker named Maria Killion.

39.     Shortly thereafter, Plaintiff AUGUSTINE (and others) drafted an <u>anonymous</u> letter which was sent to Defendant WEILL's Human Resources Department stating that they believed racism had been involved in Maria Killion's promotion and minorities had been overlooked on account of their race.

40.     Shortly thereafter, in or around March 2013, Plaintiff AUGUSTINE received an unsolicited email mysteriously stating that Defendant WEILL "never received" her application.   Another minority who had applied for the job Maria Killion obtained received a nearly identical unsolicited email (to wit—Lisa Cabrera [see infra]).

41.     This email was sent by Defendant WEILL's Human Resources Department in an attempt to cover up the fact that Plaintiff AUGUSTINE had been disregarded for the promotion on account of her race.

42.     The above are just some of the acts of discrimination that Plaintiff AUGUSTINE experienced on a regular and continual basis while employed by Defendants, which has caused Plaintiff AUGUSTINE significant damages.

**Plaintiff Keisha Brown**

43.     Plaintiff BROWN is a black female.

44.     In or around July 2004, Plaintiff BROWN became employed by Defendants CORNELL UNIVERSITY and WEILL in the Anesthesiology Department of the East 68th Street location.   She presently holds the position of "program specialist."

45.     Upon Plaintiff BROWN's hiring, Defendant ADAMS was already employed by Defendants CORNELL UNIVERSITY and WEILL holding the position of Administrator

of the Anesthesiology Department at the East 68th Street location.

46.     In or around Fall 2007, Defendant ADAMS suggested Plaintiff BROWN (and others) go to supervisory training.  In or around Spring 2008, Plaintiff BROWN completed this training.

47.     Despite having this new skill, throughout Spring 2008 and into Fall 2010, Plaintiff BROWN constantly noticed that Caucasian individuals less-qualified and less-experienced were being hired for jobs which were promotions (to them and to her).

48.     Specifically, a Caucasian person by the name of Kathryn Koval was hired in or around November 2002 and was promoted in or around May 2008.  This promotion was one that Plaintiff BROWN was qualified for and would have wanted if she had been made aware of its existence.  Furthermore, Plaintiff BROWN was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

49.     Additionally, a Caucasian person by the name of Deanna Gallavan was hired in or around January 2004 and promoted in or around February 2005.  This promotion was one that Plaintiff BROWN was qualified for and would have wanted if she had been made aware of its existence.  Furthermore, Plaintiff BROWN was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

50.     Also, a Caucasian person by the name of Kelsi Welter was hired in or around August 2008 and promoted in or around October 2009.  This promotion was one that Plaintiff BROWN was qualified for and would have wanted if she had been made aware of its existence.  Furthermore, Plaintiff BROWN was never made aware that this promotional

opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

51.  Furthermore, these promotions were never made available to Plaintiff BROWN despite her having constantly and repeatedly telling Defendant ADAMS (and/or her agents) that she wanted to be considered for promotional opportunities.

52.  In or around October 2010, a Press Ganey satisfaction survey was distributed to employees in various departments of the East 68th Street location. Plaintiff BROWN (amongst others) gave the Anesthesiology Department a low rating based, in part, on the racial discrimination exhibited by Defendant ADAMS.

53.  Shortly thereafter, an employee of Defendant WEILL who held the title of Employee Relations Specialist informed Plaintiff BROWN (and others) that he would meet with them to discuss the low ratings they gave the Anesthesiology Department.

54.  Prior to their discussions, Plaintiff BROWN (and others) participated in the creation of a group complaint which stated that Plaintiff BROWN (and others) had been victims of, and witnessed, racial discrimination while employed by Defendants WEILL and CORNELL UNIVERSITY while under the supervision of Defendant ADAMS.

55.  Shortly after making this complaint, employees of Defendant WEILL met with Plaintiff BROWN individually, and collectively with her and other employees in the Anesthesiology Department who had complained of racial discrimination.

56.  Notably, at this meeting, Plaintiff BROWN explained that Caucasian individuals were being "favored" over non-Caucasians in the Anesthesiology Department. Plaintiff BROWN further stated that she was not being given the same promotional opportunities as Caucasians, that promotions received by Caucasians were for jobs that were never

posted, and that generally, that only Caucasians were being given the opportunity to advance at the East 68th Street location.

57. Following these meetings, Plaintiff BROWN explicitly told a supervisor that she feared retaliation in light of giving the Anesthesiology Department such a low rating and for complaining about racial discrimination.

58. Shortly thereafter, in or around Spring 2011, Defendant ADAMS (and/or her agents) began retaliating against Plaintiff BROWN. Specifically, Defendant ADAMS began singling Plaintiff BROWN out and reprimanding her for conduct in which others engaged. Further, Defendant ADAMS began making new and unwarranted demands regarding Plaintiff BROWN's job duties and tasks. Defendant ADAMS had not done this prior to Plaintiff BROWN's complaint of racial discrimination.

59. Additionally, Defendant ADAMS began giving Plaintiff BROWN menial tasks in an effort to get her quit.

60. Also, Defendant ADAMS (and/or her agents) began giving Plaintiff BROWN low performance reviews. Notably, prior to Plaintiff BROWN's complaint of racial discrimination, she had habitually received good performance reviews and was meeting performance standards. However, beginning in 2011, Plaintiff BROWN's performance reviews were noticeably and obviously lower and she was not meeting expectations.

61. In or around January 2013, Plaintiff BROWN applied for a promotional position (which had been posted).

62. Plaintiff BROWN did not receive call back nor receive an invitation for an interview, only to learn that a less-qualified, less-experienced Caucasian named Maria Killion received the promotion. Notably, Plaintiff BROWN had a bachelor's degree (Killion did

10

not) and had twelve to thirteen years' experience in the medical field (Killion had barely any).

63.   Further, in or around October 2013, Defendant ADAMS began giving Plaintiff BROWN corrective action plans criticizing her work performance.

64.   Unable to tolerate the unwarranted and unexplained work load, constant criticism, discrimination and retaliation, Plaintiff BROWN discontinued employment with Defendants on or about December 7, 2013.   Accordingly, Plaintiff BROWN's employment with Defendants was constructively terminated.

65.   The above are just some of the acts of discrimination and retaliation that Plaintiff BROWN experienced on a regular and continual basis while employed by Defendants, which has caused Plaintiff BROWN significant damages.

**Plaintiff Lisa Cabrera**

66.   Plaintiff CABRERA is a Hispanic female.

67.   In or around 1993, Plaintiff CABRERA became employed by Defendants CORNELL UNIVERSITY and WEILL in the Anesthesiology Department of the East 68th Street location.  She presently holds the position of "Program Specialist – Residency."

68.   In or around 1999, Defendant ADAMS was elevated by Defendants CORNELL UNIVERSITY and WEILL to the position of Administrator of the Anesthesiology Department at the East 68th Street location.

69.   Shortly after Defendant ADAMS' elevation, Plaintiff CABRERA began noticing that Defendant ADAMS continuously assigned to her (Plaintiff CABRERA), and other minority employees in the Anesthesiology Department, additional tasks and duties that they had not previously had before Defendant ADAMS' elevation, yet they were not

earning more money or obtaining any sort of promotion.

70. Further, each and every year after Defendant ADAMS' elevation, Plaintiff CABRERA requested a promotion and personally made Defendant ADAMS aware (and/or Defendant ADAMS' agent(s) aware) that she was interested in promotional opportunities if/ when they were/ became available.

71. Nevertheless, Plaintiff CABRERA witnessed numerous Caucasian co-workers receive promotions despite being less-qualified, less-experienced, and having been at the East 68th Street location for a shorter time that Plaintiff CABRERA had.

72. Specifically, a Caucasian person by the name of Kathryn Koval was hired in or around November 2002 and was promoted in or around May 2008. This promotion was one that Plaintiff CABRERA was qualified for and would have wanted if she had been made aware of its existence. Furthermore, Plaintiff CABRERA was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

73. Additionally, a Caucasian person by the name of Deanna Gallavan was hired in or around January 2004 and promoted in or around February 2005. This promotion was one that Plaintiff CABRERA was qualified for and would have wanted if she had been made aware of its existence. Furthermore, Plaintiff CABRERA was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

74. Also, a Caucasian person by the name of Kelsi Welter was hired in or around August 2008 and promoted in or around October 2009. This promotion was one that Plaintiff CABRERA was qualified for and would have wanted if she had been made aware of its

existence.    Furthermore, Plaintiff CABRERA was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

75.    Moreover, in or around Fall 2007, Defendant ADAMS suggested Plaintiff CABRERA (and others) go to supervisory training.  In or around Spring 2008, Plaintiff CABRERA completed this training, yet was still passed over for promotional opportunities despite having this skill.

76.    In or around October 2010, a Press Ganey satisfaction survey was distributed to employees in various departments of the East 68th Street location.   Plaintiff CABRERA (amongst others) gave the Anesthesiology Department a low rating based, in part, on the racial discrimination exhibited by Defendant ADAMS.

77.    Shortly thereafter, an employee of Defendant WEILL who held the title of Employee Relations Specialist informed Plaintiff CABRERA (and others) that he would meet with them to discuss the low ratings they gave the Anesthesiology Department.

78.    Prior to their discussions, Plaintiff CABRERA (and others) participated in the creation of a group complaint which stated that Plaintiff CABRERA (and others) had been victims of racial discrimination while employed by Defendants WEILL and CORNELL UNIVERSITY while under the supervision of Defendant ADAMS.

79.    Shortly after making this complaint, employees of Defendants WEILL met with Plaintiff CABRERA individually, and collectively with her and other employees in the Anesthesiology Department who had complained of racial discrimination.

80.    Notably, at this meeting, Plaintiff CABRERA explained that racial discrimination was "apparent" in the Anesthesiology Department and that she had not been given the same

13

promotional opportunities as Caucasian employees.

81.    Shortly thereafter, in or around Spring 2011, Defendant ADAMS began giving Plaintiff
CABRERA a significantly larger amount of work than before she complained. Further,
additional pressure to complete tasks was placed on her by Defendant ADAMS.

82.    Plaintiff CABRERA noticed that her work conditions had changed and inquired with her
supervisor as to the reasoning. In reply, Plaintiff CABRERA's supervisor stated that the
directions as to increased work and pressure were coming directly from Defendant
ADAMS.

83.    This was done by Defendant ADAMS in retaliation for complaining of racial
discrimination and in an effort to get Plaintiff CABRERA to quit and/or to set her up to
fail in order to justify her employment termination.

84.    Furthermore, in Spring 2011, Plaintiff CABRERA began receiving performance
evaluations with lower scores than she had habitually received prior to complaining.
Plaintiff CABRERA inquired with her supervisor as to why her performance evaluation
scores were suddenly becoming lower, to which her supervisor replied that Defendant
ADAMS was directing her (the supervisor) to lower her scores and that if she (the
supervisor) had the power, her scores would have been higher.

85.    Throughout 2012 and 2013, jobs began being posted for the Anesthesiology Department
and other Departments at the East 68th Street location. Plaintiff CABRERA applied for
no fewer than five positions which would have been promotions for her and for which she
was qualified. However, she never heard back regarding these five positions nor did she
receive an invitation for an interview for any position for which she applied.

86.    In or around January 2013, Plaintiff CABRERA applied for a promotional opportunity in

the Anesthesiology Department for which she was qualified. However, the position was given to a less-qualified and less-experienced Caucasian individual named Maria Killion. Plaintiff CABRERA never received a call back nor an interview despite submitting her application online (as was standard protocol).

87. Shortly thereafter, Plaintiff CABRERA (and others) sent to Defendant WEILL's Human Resources Department an anonymous letter stating that they believed racism had been involved in Maria Killion's promotion and minorities had been overlooked on account of their race.

88. Approximately three months later, Plaintiff CABRERA mysteriously received an unsolicited email from Defendant WEILL's Human Resources Department that her application for the job Maria Killion had obtained was never received. This email was nearly identical to the one received by Plaintiff AUGUSTINE.

89. This email was sent by Defendant WEILL's Human Resources Department in an attempt to cover up the fact that Plaintiff CABRERA had been disregarded for the promotion on account of her race.

90. The above are just some of the acts of discrimination and retaliation that Plaintiff CABRERA experienced on a regular and continual basis while employed by Defendants.

**Plaintiff Ivette Francis**

91. Plaintiff FRANCIS is a black female.

92. In or around 2007, Plaintiff FRANCIS became employed by Defendants CORNELL UNIVERSITY and WEILL in the Anesthesiology Department of the East 68th Street location as a "scheduling coordinator."

93. Shortly after Plaintiff FRANCIS began work, she made Defendant ADAMS aware

(and/or Defendant ADAMS' agent(s) aware) that she was interested in promotional opportunities if/ when they were/ became available.

94.   Nevertheless, Plaintiff FRANCIS witnessed numerous Caucasian co-workers receive promotions.  In fact, numerous promotional opportunities for which Plaintiff FRANCIS was qualified were given to and/or created for Caucasian individuals without so much as Plaintiff FRANCIS even being made aware of their existences/ potential existences.

95.   Specifically, a Caucasian person by the name of Kathryn Koval was promoted in or around May 2008.  This promotion was one that Plaintiff FRANCIS was qualified for and would have wanted if she had been made aware of its existence.  Furthermore, Plaintiff FRANCIS was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

96.   Additionally, a Caucasian person by the name of Deanna Gallavan was hired in or around January 2004 and promoted in or around February 2005.  This promotion was one that Plaintiff FRANCIS was qualified for and would have wanted if she had been made aware of its existence.  Furthermore, Plaintiff FRANCIS was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

97.   Also, a Caucasian person by the name of Kelsi Welter was hired in or around August 2008 and promoted in or around October 2009.  This promotion was one that Plaintiff FRANCIS was qualified for and would have wanted if she had been made aware of its existence.  Furthermore, Plaintiff FRANCIS was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in

order to promote a Caucasian person.

98.    In or around October 2010, a Press Ganey satisfaction survey was distributed to employees in various departments of the East 68th Street location.    Plaintiff FRANCIS (amongst others) gave the Anesthesiology Department a low rating based, in part, on the racial discrimination exhibited by Defendant ADAMS.

99.    Shortly thereafter, an employee of Defendant WEILL who held the title of Employee Relations Specialist informed Plaintiff FRANCIS (and others) that he would meet with them to discuss the low ratings they gave the Anesthesiology Department.

100.    Prior to their discussions, Plaintiff FRANCIS (and others) participated in the creation of a group complaint which stated that Plaintiff FRANCIS (and others) had been victims of racial discrimination while employed by Defendants WEILL and CORNELL UNIVERSITY while under the supervision of Defendant ADAMS.

101.    Shortly after making this complaint, employees of Defendants WEILL met with Plaintiff FRANCIS individually, and collectively with her and other employees in the Anesthesiology Department who had complained of racial discrimination.

102.    Notably, at this meeting, Plaintiff FRANCIS explained that she had been subjected to racial discrimination in the promotion process of the Anesthesiology Department and that Defendant ADAMS did not want black individuals to attain higher positions in the Department.

103.    Thereafter, in or around Spring 2011, Plaintiff FRANCIS began being retaliated against for her complaints of racial discrimination.

104.    Specifically, Plaintiff FRANCIS began receiving harassing emails nitpicking at her work. These emails were made by her supervisors under the direction and control of Defendant

ADAMS.   Plaintiff FRANCIS had not received emails of this nature prior to her complaint of racial discrimination.   Further, she began receiving emails containing falsehoods about her work performance.   Notably, these emails falsely claimed she was frequently late to work and in the emails, Defendant FRANCIS was wrongly accused of excessively making personal phone calls at work.   Essentially, these emails were being sent to lay the ground work to justify the denial of future promotions and/or future adverse employment determinations.

105.   Unable to tolerate the retaliation any longer, Plaintiff FRANCIS was forced to quit in or around September 2011.  However, in need to money, she returned two weeks later.

106.   After returning, Plaintiff FRANCIS was continuously retaliated against for her earlier complaints of racial discrimination.   Notably, Plaintiff FRANCIS was inexplicably punished and forced to do the same job but as a "new hire," which also required her to take certain unnecessary tests.  She had not had to do this in years past.  Further, Plaintiff FRANCIS was required to sign in to work as well as come to her supervisor's office on a daily basis to show her that she was present at work.  No other employee was required to do this and this was required of Plaintiff FRANCIS by Defendant ADAMS in retaliation for her complaints.

107.   In or around December 2011, Plaintiff FRANCIS' probationary period was inexplicably extended.

108.   The aforementioned retaliation continued throughout 2012 and into 2013.

109.   In or around January 2013, Plaintiff FRANCIS' immediate supervisor became Maria Killion, a Caucasian individual hand-picked by Defendant ADAMS, and Killion continued the retaliation against Plaintiff FRANCIS. This was at the behest of Defendant

18

ADAMS. Specifically, Killion subjected Plaintiff FRANCIS to constant and pervasive verbal abuse and "singling out."

110. In or around September 2013, Plaintiff FRANCIS received a write-up and met with a supervisor of the Anesthesiology Department. Upon meeting him, Plaintiff FRANCIS refused to sign the write-up, explaining that it contained numerous falsehoods. This supervisor then told Plaintiff FRANCIS that unless she signed, she would be retroactively written up for "everything" going back to 2010. Plaintiff FRANCIS still refused to sign.

111. Shortly thereafter, Plaintiff FRANCIS' employment was terminated by Defendants. Accordingly, it was in retaliation for complaining of racial discrimination and for refusing to sign a write-up containing false accusations.

112. The above are just some of the acts of discrimination and retaliation that Plaintiff FRANCIS experienced on a regular and continual basis while employed by Defendants.

**Plaintiff Tammy Smith**

113. Plaintiff SMITH is a black female.

114. In or around January 1993, Plaintiff SMITH became employed by Defendants CORNELL UNIVERSITY and WEILL in the Anesthesiology Department of the East 68th Street location. She presently holds the position of "Senior Administrative Secretary."

115. In or around 1999, Defendant ADAMS was elevated by Defendants CORNELL UNIVERSITY and WEILL to the position of Administrator of the Anesthesiology Department at the East 68th Street location. Prior to her elevation, Defendant ADAMS held the position of Assistant Administrator of the Anesthesiology Department.

116. As the top administrator for the Anesthesiology Department, Defendant ADAMS was, and is, principally responsible for personnel decisions in that department, including, inter

alia, the decisions regarding what positions to create, who to consider for promotions, and who to ultimately promote.

117.  Shortly after Defendant ADAMS' elevation, Plaintiff SMITH began noticing that numerous minority employees in the 68th Street location were doing the work of multiple individuals yet were not earning more money or obtaining promotions commensurate with their job responsibilities.  Plaintiff SMITH was one of these people.  Further, Plaintiff SMITH generally noticed a disproportionate number of Caucasian individuals being promoted by Defendant ADAMS in the Anesthesiology Department.

118.  Throughout 2008 and into 2009, Plaintiff SMITH constantly and repeatedly asked Defendant ADAMS to review her (Plaintiff SMITH's) job duties in order to evaluate whether Plaintiff SMITH could be considered for a promotion. Despite Plaintiff SMITH's most ardent attempts, Defendant ADAMS never did.

119.  Following the promotion of a Caucasian individual named Kelsi Welter, which was in or around October 2009, Plaintiff SMITH complained to a member of Defendant WEILL's Human Resources Department named Randi Glinsky in November 2009.  At their meeting, Ms. Glinsky told Plaintiff SMITH "not [to] take this matter any further" and stated that Defendant ADAMS would retaliate against her if she did.

120.  In or around October 2010, a Press Ganey satisfaction survey was distributed to employees in various departments of the East 68th Street location.   Plaintiff SMITH (amongst others) gave the Anesthesiology Department a low rating based, in part, on the racial discrimination exhibited by Defendant ADAMS.

121.  Shortly thereafter, an employee of Defendant WEILL who held the title of Employee Relations Specialist informed Plaintiff SMITH (and others) that he would meet with them

to discuss the low ratings they gave the Anesthesiology Department.

122.   Prior to their discussions, Plaintiff SMITH (and others) participated in the creation of a group complaint which stated that Plaintiff SMITH (and others) had been victims of racial discrimination while employed by Defendants WEILL and CORNELL UNIVERSITY while under the supervision of Defendant ADAMS.

123.   Shortly after making this complaint, employees of Defendants WEILL met with Plaintiff SMITH individually, and collectively with her and other employees in the Anesthesiology Department who had complained of racial discrimination.

124.   On or about February 16, 2011, Plaintiff SMITH (and others) met with members of Defendant WEILL's Human Resources team.  There, Plaintiff SMITH explained that she felt that Defendant ADAMS promoted Caucasian employees in the Anesthesiology Department at a faster and higher rate than the minority employees.  Further, Plaintiff SMITH stated that she (and other minority employees) were continuously receiving low annual merit increases and were paid less for the amount of work they performed in comparison to their Caucasian counterparts.  They also requested from members of Human Resources to have their job descriptions reviewed for promotions or additional compensation.

125.   Approximately two days later, on or about February 18, 2011, Plaintiff SMITH arrived at work to see that her employee information log books (which contained employee salary information) had been removed, and a fly glue trap had been intentionally placed on her metal files holder.

126.   These acts were directed by Defendant ADAMS in retaliation for Plaintiff SMITH's complaint of racial discrimination.  In fact, Defendant ADAMS even left Plaintiff SMITH

a voicemail acknowledging removal of her employee log books.

127.  Shortly thereafter, Plaintiff SMITH complained to a member of Defendant WEILL's Human Resources Department.

128.  Nevertheless, Defendant ADAMS continued retaliating against Plaintiff SMITH. By way of example, Defendant ADAMS began sabotaging Plaintiff SMITH's work. She did this by having certain information either added or deleted which would normally have been performed by Plaintiff SMITH and Plaintiff SMITH alone. Defendant ADAMS then questioned Plaintiff SMITH regarding these entries and reprimanded her.

129.  In or around May 2012, Defendant ADAMS tried to have Plaintiff SMITH transferred from the fiscal division of the Anesthesiology Department to the "Chairman's Suite" division of that department by offering her a position. However, this position had a much larger work load and a larger amount of duties. When Plaintiff SMITH asked Defendant ADAMS if the new position was a promotion (i.e., an increase from a level 5 to a level 6), Defendant ADAMS told her no. When Plaintiff SMITH declined to take the position, Defendant ADAMS threatened to have her fired.

130.  In or around September 2012, Plaintiff SMITH contacted a representative from Defendant WEILL's Human Resources Department about a Caucasian individual being groomed for a promotion in a managerial positions named Maria Killion (despite the position not even posted yet).

131.  Accordingly, Plaintiff SMITH requested from Defendant WEILL's Human Resources Department that her own job title and responsibilities be evaluated in order to be considered for a promotion in light of her work performed and the responsibilities undertaken.

132.   In or around January 2013, members of the Anesthesiology Department (Plaintiff SMITH included) learned that Maria Killion did indeed received the promotion, to the disappointment of other more-qualified minorities.    Accordingly, Plaintiff SMITH complained to members of the management for Defendants WEILL and CORNELL UNIVERSITY.

133.   Throughout Spring 2013, Plaintiff SMITH continued to perform tasks outside the scope of her everyday job responsibilities yet this was not being acknowledged in Plaintiff SMITH's official job description.  One example of this was performing "editing, payroll and writing policies duties," yet not getting credit for performing these tasks on her official job description (which is utilized in determining promotions).

134.   Shortly thereafter, Plaintiff SMITH contacted Defendant WEILL's Human Resources Compensation Director regarding consideration for a promotion in light of the tasks and responsibilities she had.  In response, Plaintiff SMITH was informed that she was not eligible.    This was because the HR Compensation Director had an outdated job description for Plaintiff SMITH which did not include all the tasks and duties Plaintiff SMITH was performing at that time.

135.   In Fall 2013, Plaintiff SMITH applied for two promotional positions in order to transfer out of the Anesthesiology Department, however, she was not contacted for an interview.

136.   In or around December 2013, Plaintiff SMITH learned that a Caucasian individual had been hired as a "Senior Administrative Specialist" to work in the "Chairman's Suite," and that this individual was a "level 6."

137.   Plaintiff SMITH was qualified and noticed that the position was posted as a level 6, and one major duty (processing appointments and reappointments for faculty) was what

Defendant ADAMS had wanted Plaintiff SMITH to perform when she was trying to have Plaintiff SMITH transferred to the "Chairman's Suite," yet still keep her at a "level 5." However, when that opportunity came available, Plaintiff SMITH was again overlooked for a Caucasian employee of Defendant ADAMS' choosing.

138.   The above are just some of the acts of discrimination and retaliation that Plaintiff SMITH experienced on a regular and continual basis while employed by Defendants.

**Allegations Relating to all Plaintiffs**

139.   Defendants' actions and conduct were intentional and intended to harm Plaintiffs.

140.   As a result of the acts and conduct complained of, Plaintiffs have individually (and collectively) suffered emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.  Plaintiffs have further experienced severe emotional distress.

141.   Plaintiffs have suffered a loss of income, the loss of a salary, bonus, benefits, and other compensation which such employment entails, and Plaintiffs have also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.  As a result of the above, Plaintiffs have been damaged in an amount which exceeds the jurisdictional limits of the Court.

142.   Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.  As such, Plaintiffs demands Punitive Damages as against all Defendants, jointly and severally.

### AS A FIRST CAUSE OF ACTION
### FOR DISCRIMINATION UNDER 42 U.S.C. § 1981

143.   Plaintiffs repeat, reiterate and reallege each and every paragraph above as if said paragraph was more fully set forth herein at length.

144.   42 U.S.C. § 1981 states in relevant part as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

145.   Plaintiffs were discriminated against on the basis of their respective races (black; Hispanic) as provided under 42 U.S.C. § 1981 and have suffered damages as set forth herein.

## AS A SECOND CAUSE OF ACTION
## FOR RETALIATION UNDER 42 U.S.C. § 1981

146.   Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH repeat and reallege each and every paragraph above as if said paragraph was more fully set forth herein at length.

147.   By the acts and practices described above, Defendants retaliated against Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH for their opposition to unlawful discrimination under 42 U.S.C. § 1981.

148.   Defendants acted with malice and/or reckless indifference to the statutorily protected rights of Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH.

149.   As a result of Defendants' discriminatory acts, Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH have suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

150.   Plaintiffs repeat, reiterate and reallege each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

151.   The New York City Administrative Code § 8-107(1) provides that "It shall be an

unlawful discriminatory practice: (a) For an employer or an employee or agent thereof,

because of the actual or perceived age, race, creed, color, national origin, gender,

disability, marital status, sexual orientation or alienage or citizenship status of any person,

to refuse to hire or employ or to bar or to discharge from employment such person or to

discriminate against such person in compensation or in terms, conditions or privileges of

employment."

152.   Defendants engaged in an unlawful discriminatory practice in violation of New York City

Administrative Code § 8-107(1)(a) by discriminating against Plaintiffs because of their

race (black; Hispanic).

## AS A FOURTH CAUSE OF ACTION FOR RETALIATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

153.   Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH repeat, reiterate and reallege

each and every allegation made in the above paragraphs of this Complaint as if more fully

set forth herein at length.

154.   The New York City Administrative Code § 8-107(7) provides that it shall be unlawful

discriminatory practice: "For an employer . . . to discriminate against any person because

such person has opposed any practices forbidden under this chapter. . ."

155.   Defendants engaged in an unlawful discriminatory practice in violation of New York City

Administrative Code § 8-107(7) by discriminating against Plaintiffs BROWN,

CABRERA, FRANCIS, and SMITH because of their opposition to the unlawful employment practices of Defendants.

### AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

156. Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

157. The New York City Administrative Code § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

158. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory and unlawful conduct.

### AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

159. Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

160. The New York City Administrative Code § 8-107(13) Employer liability for discriminatory conduct by employee, agent or independent contractor.

   a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

   b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

1.    the employee or agent exercised managerial or supervisory responsibility; or

2.    the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

3.    the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c.  An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

161.  Defendants violated the section cited herein as set forth.

### JURY DEMAND

162.  Plaintiffs request a jury trial on all issues to be tried.

**WHEREFORE,** Plaintiffs respectfully request a judgment against the Defendants:

A.  Declaring that Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. § 1981 and the NYCHRL in that Defendants discriminated against Plaintiffs due

28

to their race (<u>black; Hispanic</u>), and <u>retaliating against</u> Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH for opposing Defendants' harassment;

B.    Awarding damages to Plaintiffs resulting from Defendants' unlawful discrimination and retaliation and to otherwise make them whole for any losses suffered as a result of such unlawful employment practices;

C.    Awarding Plaintiffs compensatory damages for loss of wages, salary, and benefits, as well as mental, emotional and physical injury, distress, pain and suffering and injury to their reputation in an amount to be proven;

D.    Awarding Plaintiffs punitive damages;

E.    Awarding Plaintiffs attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F.    Awarding Plaintiffs such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
       September 24, 2014

                                 **PHILLIPS & ASSOCIATES,**
                                 **ATTORNEYS AT LAW, PLLC**

                       By:    _____
                                   Casey Wolnowski, Esq.
                                 *Attorneys for Plaintiff*
                                 PHILLIPS & ASSOCIATES,
                                 ATTORNEYS AT LAW, PLLC
                                 45 Broadway, Suite 620
                                 New York, New York 10006
                                 (212) 248-7431
                                 cwolnowski@tpglaws.com