**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------X   Case No. 14 cv 7807 (JPO)
MARLENE AUGUSTINE, KEISHA BROWN,
LISA CABRERA, IVETTE FRANCIS,                                                       **SECOND AMENDED**
and TAMMY SMITH,                                                                               **COMPLAINT**

                                                          Plaintiffs,

                                                                                                        **PLAINTIFF DEMANDS**
                                      -against-                                                  **A TRIAL BY JURY**

CORNELL UNIVERSITY, WEILL CORNELL
MEDICAL COLLEGE, and KRISTEN ADAMS,
*Individually*,

                                                          Defendants.
--------------------------------------------------------------------X

        Plaintiffs, MARLENE AUGUSTINE, KEISHA BROWN, LISA CABRERA, IVETTE

FRANCIS, and TAMMY SMITH ("Plaintiffs") by and through their attorneys, PHILLIPS &

ASSOCIATES, Attorneys at Law, PLLC, hereby complains of Defendants, upon information and

belief, as follows:

<u>**NATURE OF THE CASE**</u>

1.      Plaintiffs complain pursuant to <u>42 U.S.C. § 1981</u> and the <u>New York City Human Rights</u>

        <u>Law</u>, New York City Administrative Code § 8-107, *et seq.* ("NYCHRL"), and seek

        damages to redress the injuries they has suffered as a result of being **<u>Discriminated</u>**

        **<u>against on the basis of their respective races (Black; Hispanic).</u>**

<u>**JURISDICTION AND VENUE**</u>

2.      Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343.

3.      The Court has supplemental jurisdiction over the claims of Plaintiffs brought under city

        law pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as it is a judicial district

where a substantial part of the events or omissions giving rise to the claims occurred.

## PARTIES

5.     At all times relevant, Plaintiff MARLENE AUGUSTINE ("AUGUSTINE") was and is a resident of the State of New York and the County of Kings.

6.     At all times relevant, Plaintiff KEISHA BROWN ("BROWN") was and is a resident of the State of New York and the County of Kings.

7.     At all times relevant, Plaintiff LISA CABRERA ("CABRERA") was and is a resident of the State of New York and the County of New York.

8.     At all times relevant, Plaintiff IVETTE FRANCIS ("FRANCIS") was and is a resident of the State of New York and the County of Bronx.

9.     At all times relevant, Plaintiff TAMMY SMITH ("SMITH") was and is a resident of the State of New York and the County of Westchester.

10.    Plaintiffs AUGUSTINE, BROWN, CABRERA, FRANCIS, and SMITH shall be herein referred to collectively as "Plaintiffs."

11.    At all times relevant, Defendant CORNELL UNIVERSITY was and is a contract or statutory university located in Ithaca, New York, with the Office of University Counsel located at 300 CCC Building, Garden Avenue, Ithaca, New York  14853.

12.    At all times relevant, Defendant WEILL CORNELL MEDICAL COLLEGE ("WEILL") was and is a research unit and medical school of Defendant CORNELL UNIVERSITY.

13.    At all times relevant, Defendant WEILL operates and/or maintains numerous medical research facilities throughout New York City, including one located at 525 East 68th Street, New York, NY  10065 (the "East 68th Street location").

14.    At all times relevant, Defendant KRISTEN ADAMS is a white female who was and is

employed by Defendants CORNELL UNIVERSITY and WEILL as the Supervisor of the Anesthesiology Department at the East 68th Street location.

15.    At all times relevant, Defendant ADAMS held and/or exercised supervisory authority over Plaintiffs and had the power to hire, fire, promote, demote, and/or directly affect the terms and conditions of their respective employments.

16.    Defendants CORNELL UNIVERSITY, WEILL, and ADAMS are herein referred to collectively as "Defendants."

## MATERIAL FACTS

**Allegations Relating to all Plaintiffs**

17.    This case involves continuous and systematic discrimination against Plaintiffs on the basis of their respective races (Black; Hispanic).

18.    Specifically, Plaintiffs were denied promotional opportunities on the basis of their respective races at the hands of Defendant ADAMS.

19.    Defendant ADAMS repeatedly and habitually promoted Caucasian individuals who were less-qualified, less-experienced, and who had been working at the East 68th Street location for a shorter time than Plaintiffs into management positions for which Plaintiffs had been more qualified.

20.    Further, Plaintiffs had each individually expressed to Defendant ADAMS (and/or her agents) interest in being considered for promotional opportunities, yet were routinely either intentionally not told about promotional opportunities, or, when they applied, were either not considered at all or passed over for less-qualified, less-experienced Caucasian individuals by Defendant ADAMS.

21.    Additionally, Defendant ADAMS had the power to, and did, create positions/ titles at her

discretion, and had the power to fill same.  Throughout the creation and filling of these particular positions, Defendant ADAMS repeatedly ignored Plaintiffs' multiple statements that they wanted career advancement opportunities and wanted additional job duties in order to demonstrate their abilities for particular job title creation, while creating jobs/ titles for Caucasian workers.

22.    Also, Defendant ADAMS continuously and repeatedly manufactured job duties and tasks for Caucasian employees which were never actually performed.  This was done in an effort to "lay the groundwork" for a promotion she intended to give them, or for a job she was intended to create for them, in the future.  Nevertheless, the job duties and tasks which Caucasian employees were supposedly performing, were actually being performed by Plaintiffs (and other black and Hispanic co-workers) who were being ignored or passed over for the desired promotional opportunities.

23.    Furthermore, despite Plaintiffs (and numerous other black and Hispanic employees) at the East 68th Street location actually performing this work, since they were only informally told to perform these tasks (as opposed to officially recognized), Defendant ADAMS used this in justifying not considering them for promotions, or, passing them over for desired promotions.

**Plaintiff Marlene Augustine**

24.    Plaintiff AUGUSTINE is a black female.

25.    In or around November 1999, Plaintiff AUGUSTINE became employed by Defendants CORNELL UNIVERSITY and WEILL in Defendant WEILL's Anesthesiology Department at the East 68th Street location.  She presently holds the position of "program specialist."

26. Also, in or around 1999, Defendant ADAMS was elevated by Defendants CORNELL UNIVERSITY and WEILL to the position of Administrator of the Anesthesiology Department at the East 68th Street location. Prior to her elevation, Defendant ADAMS held the position of Assistant Administrator of the Anesthesiology Department.

27. As the top administrator for the Anesthesiology Department, Defendant ADAMS was, and is, principally responsible for personnel decisions in that department, including, inter alia, the decisions regarding what positions to create, who to consider for promotions, and who to ultimately promote.

28. Throughout Plaintiff AUGUSTINE's employment, she regularly received good performance reviews and had generally received praise for her work performance.

29. In or around 2007, Plaintiff AUGUSTINE began noticing a pattern of discrimination at the hands of Defendant ADAMS. Specifically, Plaintiff AUGUSTINE began noticing that the more-qualified black employees in the Anesthesiology Department were continuously being passed over for promotional opportunities for less-qualified white employees. Further, she noticed that Defendant ADAMS engaged in a practice of creating positions intending to be filled by Caucasian employees.

30. In or around October 2010, a Press Ganey satisfaction survey was distributed to employees in various departments of the East 68th Street location. Plaintiff AUGUSTINE (amongst others) gave the Anesthesiology Department a low rating based, in part, on the racial discrimination exhibited by Defendant ADAMS.

31. Shortly thereafter, an employee of Defendant WEILL who held the title of "Employee Relations Specialist" informed Plaintiff AUGUSTINE (and others) that he would meet with them to discuss the low ratings they gave the Anesthesiology Department.

32.  Prior to their discussions, Plaintiff AUGUSTINE (and others) participated in the creation of a group complaint which stated that Plaintiff AUGUSTINE (and others) had been victims of, and witnessed, racial discrimination while employed by Defendants WEILL and CORNELL UNIVERSITY while under the supervision of Defendant ADAMS.

33.  Shortly after making this complaint, employees of Defendant WEILL met with Plaintiff AUGUSTINE individually, and collectively with her and other employees in the Anesthesiology Department who had complained of racial discrimination.

34.  Notably, at this meeting, Plaintiff AUGUSTINE explained that Caucasian individuals were being given greater opportunities than non-Caucasians in the Anesthesiology Department.  Plaintiff AUGUSTINE further stated that she was not being given the same promotional opportunities as Caucasians.

35.  Notably, throughout 2010 and 2011, Plaintiff AUGUSTINE explicitly told her supervisor that she wanted to be informed of any promotional opportunities and to be considered for any and all career advancement opportunities in the Anesthesiology Department.  She further stated that she wanted to "grow" in the company.

36.  Moreover, throughout this time Plaintiff AUGUSTINE was performing certain tasks which were outside her job description, namely, managing the coordination of staff assigned to the anesthesia control desk.

37.  In or around October 2012, a job was posted for the positon of "Manager – Clinical Scheduling and Administrative Support."  Accordingly, Plaintiff AUGUSTINE submitted her application electronically (as was standard protocol) and received a confirmation email.

38.  Despite  Plaintiff  AUGUSTINE  actually  performing  this  particular  job,  Plaintiff

AUGUSTINE was passed over for a less-qualified, less-experienced Caucasian co-worker named Maria Killion.

39.    Shortly thereafter, Plaintiff AUGUSTINE (and others) drafted an <u>anonymous</u> letter which was sent to Defendant WEILL's Human Resources Department stating that they believed racism had been involved in Maria Killion's promotion and minorities had been overlooked on account of their race.

40.    Shortly thereafter, in or around March 2013, Plaintiff AUGUSTINE received an unsolicited email mysteriously stating that Defendant WEILL "never received" her application.   Another minority who had applied for the job Maria Killion obtained received a nearly identical unsolicited email (to wit—Lisa Cabrera [see infra]).

41.    This email was sent by Defendant WEILL's Human Resources Department in an attempt to cover up the fact that Plaintiff AUGUSTINE had been disregarded for the promotion on account of her race.

42.    The above are just some of the acts of discrimination that Plaintiff AUGUSTINE experienced on a regular and continual basis while employed by Defendants, which has caused Plaintiff AUGUSTINE significant damages.

**Plaintiff Keisha Brown**

43.    Plaintiff BROWN is a black female.

44.    In or around July 2004, Plaintiff BROWN became employed by Defendants CORNELL UNIVERSITY and WEILL in the Anesthesiology Department of the East 68th Street location.  She presently holds the position of "program specialist."

45.    Upon Plaintiff BROWN's hiring, Defendant ADAMS was already employed by Defendants CORNELL UNIVERSITY and WEILL holding the position of Administrator

of the Anesthesiology Department at the East 68th Street location.

46.   In or around Fall 2007, Defendant ADAMS suggested Plaintiff BROWN (and others) go
      to supervisory training.   In or around Spring 2008, Plaintiff BROWN completed this
      training.

47.   Despite having this new skill, throughout Spring 2008 and into Fall 2010, Plaintiff
      BROWN constantly noticed that Caucasian individuals less-qualified and less-
      experienced were being hired for jobs which were promotions (to them and to her).

48.   Specifically, a Caucasian person by the name of Kathryn Koval was hired in or around
      November 2002 and was promoted in or around May 2008.   This promotion was one that
      Plaintiff BROWN was qualified for and would have wanted if she had been made aware
      of its existence.   Furthermore, Plaintiff BROWN was never made aware that this
      promotional opportunity existed because Defendant ADAMS intentionally secreted its
      availability in order to promote a Caucasian person.

49.   Additionally, a Caucasian person by the name of Deanna Gallavan was hired in or around
      January 2004 and promoted in or around February 2005.   This promotion was one that
      Plaintiff BROWN was qualified for and would have wanted if she had been made aware
      of its existence.   Furthermore, Plaintiff BROWN was never made aware that this
      promotional opportunity existed because Defendant ADAMS intentionally secreted its
      availability in order to promote a Caucasian person.

50.   Also, a Caucasian person by the name of Kelsi Welter was hired in or around August
      2008 and promoted in or around October 2009.   This promotion was one that Plaintiff
      BROWN was qualified for and would have wanted if she had been made aware of its
      existence.   Furthermore, Plaintiff BROWN was never made aware that this promotional

opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

51.  Furthermore, these promotions were never made available to Plaintiff BROWN despite her having constantly and repeatedly telling Defendant ADAMS (and/or her agents) that she wanted to be considered for promotional opportunities.

52.  In or around October 2010, a Press Ganey satisfaction survey was distributed to employees in various departments of the East 68th Street location.   Plaintiff BROWN (amongst others) gave the Anesthesiology Department a low rating based, in part, on the racial discrimination exhibited by Defendant ADAMS.

53.  Shortly thereafter, an employee of Defendant WEILL who held the title of Employee Relations Specialist informed Plaintiff BROWN (and others) that he would meet with them to discuss the low ratings they gave the Anesthesiology Department.

54.  Prior to their discussions, Plaintiff BROWN (and others) participated in the creation of a group complaint which stated that Plaintiff BROWN (and others) had been victims of, and witnessed, racial discrimination while employed by Defendants WEILL and CORNELL UNIVERSITY while under the supervision of Defendant ADAMS.

55.  Shortly after making this complaint, employees of Defendant WEILL met with Plaintiff BROWN individually, and collectively with her and other employees in the Anesthesiology Department who had complained of racial discrimination.

56.  Notably, at this meeting, Plaintiff BROWN explained that Caucasian individuals were being "favored" over non-Caucasians in the Anesthesiology Department.   Plaintiff BROWN further stated that she was not being given the same promotional opportunities as Caucasians, that promotions received by Caucasians were for jobs that were never

posted, and that generally, that only Caucasians were being given the opportunity to advance at the East 68th Street location.

57.    Following these meetings, Plaintiff BROWN explicitly told a supervisor that she feared retaliation in light of giving the Anesthesiology Department such a low rating and for complaining about racial discrimination.

58.    Shortly thereafter, in or around Spring 2011, Defendant ADAMS (and/or her agents) began retaliating against Plaintiff BROWN.    Specifically, Defendant ADAMS began singling Plaintiff BROWN out and reprimanding her for conduct in which others engaged.    Further, Defendant ADAMS began making new and unwarranted demands regarding Plaintiff BROWN's job duties and tasks.    Defendant ADAMS had not done this prior to Plaintiff BROWN's complaint of racial discrimination.

59.    Additionally, Defendant ADAMS began giving Plaintiff BROWN menial tasks in an effort to get her quit.

60.    Also, Defendant ADAMS (and/or her agents) began giving Plaintiff BROWN low performance reviews.    Notably, prior to Plaintiff BROWN's complaint of racial discrimination, she had habitually received good performance reviews and was meeting performance standards.    However, beginning in 2011, Plaintiff BROWN's performance reviews were noticeably and obviously lower and she was not meeting expectations.

61.    In or around January 2013, Plaintiff BROWN applied for a promotional position (which had been posted).

62.    Plaintiff BROWN did not receive call back nor receive an invitation for an interview, only to learn that a less-qualified, less-experienced Caucasian named Maria Killion received the promotion.    Notably, Plaintiff BROWN had a bachelor's degree (Killion did

not) and had twelve to thirteen years' experience in the medical field (Killion had barely any).

63.    Further, in or around October 2013, Defendant ADAMS began giving Plaintiff BROWN corrective action plans criticizing her work performance.

64.    Unable to tolerate the unwarranted and unexplained work load, constant criticism, discrimination and retaliation, Plaintiff BROWN discontinued employment with Defendants on or about December 7, 2013.    Accordingly, Plaintiff BROWN's employment with Defendants was constructively terminated.

65.    The above are just some of the acts of discrimination and retaliation that Plaintiff BROWN experienced on a regular and continual basis while employed by Defendants, which has caused Plaintiff BROWN significant damages.

**Plaintiff Lisa Cabrera**

66.    Plaintiff CABRERA is a Hispanic female.

67.    In or around 1993, Plaintiff CABRERA became employed by Defendants CORNELL UNIVERSITY and WEILL in the Anesthesiology Department of the East 68th Street location.    She presently holds the position of "Program Specialist – Residency."

68.    In or around 1999, Defendant ADAMS was elevated by Defendants CORNELL UNIVERSITY and WEILL to the position of Administrator of the Anesthesiology Department at the East 68th Street location.

69.    Shortly after Defendant ADAMS' elevation, Plaintiff CABRERA began noticing that Defendant ADAMS continuously assigned to her (Plaintiff CABRERA), and other minority employees in the Anesthesiology Department, additional tasks and duties that they had not previously had before Defendant ADAMS' elevation, yet they were not

earning more money or obtaining any sort of promotion.

70.     Further, each and every year after Defendant ADAMS' elevation, Plaintiff CABRERA requested a promotion and personally made Defendant ADAMS aware (and/or Defendant ADAMS' agent(s) aware) that she was interested in promotional opportunities if/ when they were/ became available.

71.     Nevertheless, Plaintiff CABRERA witnessed numerous Caucasian co-workers receive promotions despite being less-qualified, less-experienced, and having been at the East 68th Street location for a shorter time that Plaintiff CABRERA had.

72.     Specifically, a Caucasian person by the name of Kathryn Koval was hired in or around November 2002 and was promoted in or around May 2008. This promotion was one that Plaintiff CABRERA was qualified for and would have wanted if she had been made aware of its existence. Furthermore, Plaintiff CABRERA was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

73.     Additionally, a Caucasian person by the name of Deanna Gallavan was hired in or around January 2004 and promoted in or around February 2005. This promotion was one that Plaintiff CABRERA was qualified for and would have wanted if she had been made aware of its existence. Furthermore, Plaintiff CABRERA was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

74.     Also, a Caucasian person by the name of Kelsi Welter was hired in or around August 2008 and promoted in or around October 2009. This promotion was one that Plaintiff CABRERA was qualified for and would have wanted if she had been made aware of its

existence.    Furthermore, Plaintiff CABRERA was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

75.    Moreover, in or around Fall 2007, Defendant ADAMS suggested Plaintiff CABRERA (and others) go to supervisory training.  In or around Spring 2008, Plaintiff CABRERA completed this training, yet was still passed over for promotional opportunities despite having this skill.

76.    In or around October 2010, a Press Ganey satisfaction survey was distributed to employees in various departments of the East 68th Street location.   Plaintiff CABRERA (amongst others) gave the Anesthesiology Department a low rating based, in part, on the racial discrimination exhibited by Defendant ADAMS.

77.    Shortly thereafter, an employee of Defendant WEILL who held the title of Employee Relations Specialist informed Plaintiff CABRERA (and others) that he would meet with them to discuss the low ratings they gave the Anesthesiology Department.

78.    Prior to their discussions, Plaintiff CABRERA (and others) participated in the creation of a group complaint which stated that Plaintiff CABRERA (and others) had been victims of racial discrimination while employed by Defendants WEILL and CORNELL UNIVERSITY while under the supervision of Defendant ADAMS.

79.    Shortly after making this complaint, employees of Defendants WEILL met with Plaintiff CABRERA individually, and collectively with her and other employees in the Anesthesiology Department who had complained of racial discrimination.

80.    Notably, at this meeting, Plaintiff CABRERA explained that racial discrimination was "apparent" in the Anesthesiology Department and that she had not been given the same

promotional opportunities as Caucasian employees.

81.  Shortly thereafter, in or around Spring 2011, Defendant ADAMS began giving Plaintiff CABRERA a significantly larger amount of work than before she complained.  Further, additional pressure to complete tasks was placed on her by Defendant ADAMS.

82.  Plaintiff CABRERA noticed that her work conditions had changed and inquired with her supervisor as to the reasoning.  In reply, Plaintiff CABRERA's supervisor stated that the directions as to increased work and pressure were coming directly from Defendant ADAMS.

83.  This was done by Defendant ADAMS in retaliation for complaining of racial discrimination and in an effort to get Plaintiff CABRERA to quit and/or to set her up to fail in order to justify her employment termination.

84.  Furthermore, in Spring 2011, Plaintiff CABRERA began receiving performance evaluations with lower scores than she had habitually received prior to complaining.  Plaintiff CABRERA inquired with her supervisor as to why her performance evaluation scores were suddenly becoming lower, to which her supervisor replied that Defendant ADAMS was directing her (the supervisor) to lower her scores and that if she (the supervisor) had the power, her scores would have been higher.

85.  Throughout 2012 and 2013, jobs began being posted for the Anesthesiology Department and other Departments at the East 68th Street location.  Plaintiff CABRERA applied for no fewer than five positions which would have been promotions for her and for which she was qualified.  However, she never heard back regarding these five positions nor did she receive an invitation for an interview for any position for which she applied.

86.  In or around January 2013, Plaintiff CABRERA applied for a promotional opportunity in

the Anesthesiology Department for which she was qualified. However, the position was given to a less-qualified and less-experienced Caucasian individual named Maria Killion. Plaintiff CABRERA never received a call back nor an interview despite submitting her application online (as was standard protocol).

87.    Shortly thereafter, Plaintiff CABRERA (and others) sent to Defendant WEILL's Human Resources Department an <u>anonymous</u> letter stating that they believed racism had been involved in Maria Killion's promotion and minorities had been overlooked on account of their race.

88.    Approximately three months later, Plaintiff CABRERA mysteriously received an unsolicited email from Defendant WEILL's Human Resources Department that her application for the job Maria Killion had obtained was never received. This email was nearly identical to the one received by Plaintiff AUGUSTINE.

89.    This email was sent by Defendant WEILL's Human Resources Department in an attempt to cover up the fact that Plaintiff CABRERA had been disregarded for the promotion on account of her race.

90.    The above are just some of the acts of discrimination and retaliation that Plaintiff CABRERA experienced on a regular and continual basis while employed by Defendants.

**Plaintiff Ivette Francis**

91.    Plaintiff FRANCIS is a black female.

92.    In or around 2007, Plaintiff FRANCIS became employed by Defendants CORNELL UNIVERSITY and WEILL in the Anesthesiology Department of the East 68th Street location as a "scheduling coordinator."

93.    Shortly after Plaintiff FRANCIS began work, she made Defendant ADAMS aware

(and/or Defendant ADAMS' agent(s) aware) that she was interested in promotional opportunities if/ when they were/ became available.

94.    Nevertheless, Plaintiff FRANCIS witnessed numerous Caucasian co-workers receive promotions. In fact, numerous promotional opportunities for which Plaintiff FRANCIS was qualified were given to and/or created for Caucasian individuals without so much as Plaintiff FRANCIS even being made aware of their existences/ potential existences.

95.    Specifically, a Caucasian person by the name of Kathryn Koval was promoted in or around May 2008. This promotion was one that Plaintiff FRANCIS was qualified for and would have wanted if she had been made aware of its existence. Furthermore, Plaintiff FRANCIS was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

96.    Additionally, a Caucasian person by the name of Deanna Gallavan was hired in or around January 2004 and promoted in or around February 2005. This promotion was one that Plaintiff FRANCIS was qualified for and would have wanted if she had been made aware of its existence. Furthermore, Plaintiff FRANCIS was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in order to promote a Caucasian person.

97.    Also, a Caucasian person by the name of Kelsi Welter was hired in or around August 2008 and promoted in or around October 2009. This promotion was one that Plaintiff FRANCIS was qualified for and would have wanted if she had been made aware of its existence. Furthermore, Plaintiff FRANCIS was never made aware that this promotional opportunity existed because Defendant ADAMS intentionally secreted its availability in

order to promote a Caucasian person.

98. In or around October 2010, a Press Ganey satisfaction survey was distributed to employees in various departments of the East 68th Street location. Plaintiff FRANCIS (amongst others) gave the Anesthesiology Department a low rating based, in part, on the racial discrimination exhibited by Defendant ADAMS.

99. Shortly thereafter, an employee of Defendant WEILL who held the title of Employee Relations Specialist informed Plaintiff FRANCIS (and others) that he would meet with them to discuss the low ratings they gave the Anesthesiology Department.

100. Prior to their discussions, Plaintiff FRANCIS (and others) participated in the creation of a group complaint which stated that Plaintiff FRANCIS (and others) had been victims of racial discrimination while employed by Defendants WEILL and CORNELL UNIVERSITY while under the supervision of Defendant ADAMS.

101. Shortly after making this complaint, employees of Defendants WEILL met with Plaintiff FRANCIS individually, and collectively with her and other employees in the Anesthesiology Department who had complained of racial discrimination.

102. Notably, at this meeting, Plaintiff FRANCIS explained that she had been subjected to racial discrimination in the promotion process of the Anesthesiology Department and that Defendant ADAMS did not want black individuals to attain higher positions in the Department.

103. Thereafter, in or around Spring 2011, Plaintiff FRANCIS began being retaliated against for her complaints of racial discrimination.

104. Specifically, Plaintiff FRANCIS began receiving harassing emails nitpicking at her work. These emails were made by her supervisors under the direction and control of Defendant

ADAMS.   Plaintiff FRANCIS had not received emails of this nature prior to her complaint of racial discrimination.   Further, she began receiving emails containing falsehoods about her work performance.   Notably, these emails falsely claimed she was frequently late to work and in the emails, Defendant FRANCIS was wrongly accused of excessively making personal phone calls at work.   Essentially, these emails were being sent to lay the ground work to justify the denial of future promotions and/or future adverse employment determinations.

105.    Unable to tolerate the retaliation any longer, Plaintiff FRANCIS was forced to quit in or around September 2011.   However, in need to money, she returned two weeks later.

106.    After returning, Plaintiff FRANCIS was continuously retaliated against for her earlier complaints of racial discrimination.   Notably, Plaintiff FRANCIS was inexplicably punished and forced to do the same job but as a "new hire," which also required her to take certain unnecessary tests.   She had not had to do this in years past.   Further, Plaintiff FRANCIS was required to sign in to work as well as come to her supervisor's office on a daily basis to show her that she was present at work.   No other employee was required to do this and this was required of Plaintiff FRANCIS by Defendant ADAMS in retaliation for her complaints.

107.    In or around December 2011, Plaintiff FRANCIS' probationary period was inexplicably extended.

108.    The aforementioned retaliation continued throughout 2012 and into 2013.

109.    In or around January 2013, Plaintiff FRANCIS' immediate supervisor became Maria Killion, a Caucasian individual hand-picked by Defendant ADAMS, and Killion continued the retaliation against Plaintiff FRANCIS.   This was at the behest of Defendant

ADAMS.  Specifically, Killion subjected Plaintiff FRANCIS to constant and pervasive verbal abuse and "singling out."

110.    In or around September 2013, Plaintiff FRANCIS received a write-up and met with a supervisor of the Anesthesiology Department.  Upon meeting him, Plaintiff FRANCIS refused to sign the write-up, explaining that it contained numerous falsehoods.  This supervisor then told Plaintiff FRANCIS that unless she signed, she would be retroactively written up for "everything" going back to 2010.  Plaintiff FRANCIS still refused to sign.

111.    Shortly thereafter, Plaintiff FRANCIS' employment was terminated by Defendants. Accordingly, it was in retaliation for complaining of racial discrimination and for refusing to sign a write-up containing false accusations.

112.    The above are just some of the acts of discrimination and retaliation that Plaintiff FRANCIS experienced on a regular and continual basis while employed by Defendants.

**Plaintiff Tammy Smith**

113.    Plaintiff SMITH is a black female.

114.    At all times relevant, Plaintiff SMITH was and is qualified for the position(s) she held/ holds.

115.    In or around January 1993, Plaintiff SMITH became employed by Defendants CORNELL UNIVERSITY and WEILL in the Anesthesiology Department of the East 68th Street location.  She presently holds the position of "Senior Administrative Secretary."

116.    In or around 1999, Defendant ADAMS was elevated by Defendants CORNELL UNIVERSITY and WEILL to the position of Administrator of the Anesthesiology Department at the East 68th Street location.  Prior to her elevation, Defendant ADAMS held the position of Assistant Administrator of the Anesthesiology Department.

117.    As the top administrator for the Anesthesiology Department, Defendant ADAMS was, and is, principally responsible for personnel decisions in that department, including, inter alia, the decisions regarding what positions to create, who to consider for promotions, and who to ultimately promote.

118.    Upon Defendant ADAMS' elevation and upon supervising Plaintiff SMITH, Defendant ADAMS began subjecting Plaintiff SMITH to disparate treatment on the basis of her race (black).  Specifically, despite being qualified for promotions and being given added job duties and/or tasks, Defendant ADAMS refused to promote Plaintiff SMITH, causing her to suffer an adverse employment action by virtue of not being able to gain promotions (resulting in denials of increased pay/ opportunities to be further promoted).

119.    In fact, shortly after Defendant ADAMS' elevation, Plaintiff SMITH began noticing that numerous minority employees at the 68th Street location were doing the work of multiple individuals yet were not earning more money or obtaining promotions commensurate with their job responsibilities.  Plaintiff SMITH was one of these people.  Further, Plaintiff SMITH generally noticed a disproportionate number of Caucasian individuals being promoted by Defendant ADAMS in the Anesthesiology Department.

120.    Notably, from Defendant ADAMS' arrival to the present, Defendant ADAMS had/has the power to review the duties performed by employees in the Anesthesiology Department and assign new duties and alter job descriptions in order to make workers eligible for promotions (i.e., with added duties and altered job descriptions, employees become eligible for promotions).

121.    More specifically, job opportunities and promotions (and as part of the promotion there is an increase in pay) are within the discretion of Defendant ADAMS as an administrator for

Defendants.  By virtue of Defendant ADAMS creating job duties and/or tasks and updating job descriptions to reflect "performance" of these duties and/or tasks, Defendant ADAMS was/ is able to effectuate how promotions are handed out.

122.    Defendant ADAMS had the power to create a promotional opportunity for Plaintiff SMITH yet refused to do so despite Plaintiff SMITH's repeated and ardent requests for the consideration and for the promotion to be created (i.e., by way of level increase, etc.) by Defendant ADAMS.  Yet, Defendant ADAMS continuously did so for Caucasian employees and, in fact, gave them job duties/ tasks which she knew they never performed, all in an effort to have them further promoted.

123.    Throughout Defendant ADAMS employment and supervision of employees in the Anesthesiology Department, she has consistently created job duties and/or tasks as well as updated job descriptions in a discriminatory manner so as to disproportionately benefit Caucasian employees and to the detriment of Defendant SMITH (amongst other minorities).

124.    Furthermore, Defendant ADAMS had the power to, and routinely did, give promotions (which included an increase in pay) by virtue of having enhanced that person's job duties. This was regularly and habitually done in a disparate manner to the benefit of Caucasians. Further, oftentimes, the Caucasians were given job duties/ tasks which Defendant ADAMS never intended them to perform (and which they never did perform) in an effort to accelerate their opportunities for further promotions.  This was done on the basis of their race (Caucasian).  However, as for Defendant SMITH (and other minorities), Defendant ADAMS repeatedly enhanced her duties but refused to consider her for concomitant promotions by virtue of their race (black, in Plaintiff SMITH's case).

125.    By way of examples, Maria Killion (a Caucasian) benefitted from this discriminatory practice in February 2011, as well as January 2013; Lacey Ferraro (a Caucasian) benefitted from this in March 2013.  As for both, Defendant ADAMS enhanced each persons' duties to make them more promotable.  However, as to both, they were not required to perform the added job duties and such tasks were merely "added" in an effort to increase their salaries and to further enhance their promotability.

126.    Throughout 2008 and into 2009, Plaintiff SMITH constantly and repeatedly asked Defendant ADAMS to review her (Plaintiff SMITH's) job duties in order to evaluate whether Plaintiff SMITH could be considered for a promotion. Despite Plaintiff SMITH's most ardent attempts, Defendant ADAMS never did.  This continued throughout the 2010's and into 2013.

127.    Following the promotion of a Caucasian individual named Kelsi Welter, which was in or around October 2009, Plaintiff SMITH complained to a member of Defendant WEILL's Human Resources Department named Randi Glinsky in November 2009.  At their meeting, Ms. Glinsky told Plaintiff SMITH "not [to] take this matter any further" and stated that Defendant ADAMS would retaliate against her if she did.

128.    In or around October 2010, a Press Ganey satisfaction survey was distributed to employees in various departments of the East 68th Street location.  Plaintiff SMITH (amongst others) gave the Anesthesiology Department a low rating based, in part, on the racial discrimination exhibited by Defendant ADAMS.

129.    Shortly thereafter, an employee of Defendant WEILL who held the title of Employee Relations Specialist informed Plaintiff SMITH (and others) that he would meet with them to discuss the low ratings they gave the Anesthesiology Department.

130.    Prior to their discussions, Plaintiff SMITH (and others) participated in the creation of a group complaint which stated that Plaintiff SMITH (and others) had been victims of racial discrimination while employed by Defendants WEILL and CORNELL UNIVERSITY while under the supervision of Defendant ADAMS.

131.    Shortly after making this complaint, employees of Defendants WEILL met with Plaintiff SMITH individually, and collectively with her and other employees in the Anesthesiology Department who had complained of racial discrimination.

132.    On or about February 16, 2011, Plaintiff SMITH (and others) met with members of Defendant WEILL's Human Resources team.  There, Plaintiff SMITH explained that she felt that Defendant ADAMS promoted Caucasian employees in the Anesthesiology Department at a faster and higher rate than the minority employees.  Further, Plaintiff SMITH stated that she (and other minority employees) were continuously receiving low annual merit increases and were paid less for the amount of work they performed in comparison to their Caucasian counterparts.  They also requested from members of Human Resources to have their job descriptions reviewed for promotions or additional compensation.

133.    Upon information and belief, such complaints by Defendant SMITH were communicated to Defendant ADAMS.

134.    Approximately two days later, on or about February 18, 2011, Plaintiff SMITH arrived at work to see that her employee information log books (which contained employee salary information) had been removed, and a fly glue trap had been intentionally placed on her metal files holder.

135.    These acts were directed by Defendant ADAMS in retaliation for Plaintiff SMITH's

complaint of racial discrimination.  In fact, Defendant ADAMS even left Plaintiff SMITH a voicemail acknowledging removal of her employee log books.

136.   These acts were performed/ directed at Plaintiff SMITH solely in retaliation for her complaints which were made against Defendant ADAMS from October 2010 through February 2011.  Further, such actions are of the nature that they would reasonably deter an individual from engaging in such action.

137.   Shortly thereafter, Plaintiff SMITH complained to a member of Defendant WEILL's Human Resources Department.

138.   Nevertheless, Defendant ADAMS continued retaliating against Plaintiff SMITH.  By way of example, Defendant ADAMS began sabotaging Plaintiff SMITH's work.  She did this by having certain information either added or deleted which would normally have been performed by Plaintiff SMITH and Plaintiff SMITH alone.  Not only did this complicate Plaintiff SMITH's job to perform her employment tasks, but it laid the groundwork for Defendant ADAMS to reprimand Plaintiff SMITH and continue deny her promotional opportunities.  Notably, after having the information deleted, Defendant ADAMS then regularly questioned Plaintiff SMITH regarding these entries and reprimanded her.

139.   In or around May 2012, Defendant ADAMS tried to have Plaintiff SMITH transferred from the fiscal division of the Anesthesiology Department to the "Chairman's Suite" division of that department by offering her a position.  However, this position had a much larger work load and a larger amount of duties, yet no increase in pay.  Plaintiff SMITH informed Defendant ADAMS that she was not interested in the position if it were a lateral one but would be if it were a promotion (i.e., an increase from a level 5 to a level 6).  Defendant ADAMS told her it would be a lateral, to which Plaintiff SMITH told her that

she was not interested.  When Plaintiff SMITH declined to take the position, Defendant ADAMS threatened to have her fired.

140.    In or around September 2012, Plaintiff SMITH contacted a representative from Defendant WEILL's Human Resources Department about a Caucasian individual she had noticed being groomed for a promotion in a managerial position named Maria Killion (despite the position not even posted yet).

141.    Accordingly, Plaintiff SMITH again requested from Defendant WEILL's Human Resources Department that her own job title and responsibilities be evaluated in order to be considered for a promotion in light of her work performed and the responsibilities undertaken.

142.    In or around January 2013, members of the Anesthesiology Department (Plaintiff SMITH included) learned that Maria Killion did indeed receive a promotion, to the disappointment of other more-qualified minorities.  Accordingly, Plaintiff SMITH complained to members of the management for Defendants WEILL and CORNELL UNIVERSITY.

143.    Throughout Spring 2013, Plaintiff SMITH continued to perform tasks outside the scope of her everyday job responsibilities yet this was not being acknowledged in Plaintiff SMITH's official job description.  One example of this was performing "editing, payroll and writing policies duties," yet not getting credit for performing these tasks on her official job description (which is utilized in determining promotions by Defendant ADAMS).

144.    Furthermore, on instances whereby Plaintiff SMITH had her job description updated, Defendant ADAMS refused to pass along Plaintiff SMITH's credentials to Defendant

WEILL's Human Resources department for consideration of promotions. This was done solely on the basis of Plaintiff SMITH's race (black) while she steadfastly pushed to have Caucasians promoted (Maria Killion and Lacey Ferraro are two examples).

145. Shortly thereafter, Plaintiff SMITH contacted Defendant WEILL's Human Resources Compensation Director regarding consideration for a promotion in light of the tasks and responsibilities she had. In response, Plaintiff SMITH was informed that she was not eligible. This was because the HR Compensation Director had an outdated job description for Plaintiff SMITH which did not include all the tasks and duties Plaintiff SMITH was performing at that time. Defendant ADAMS was responsible for this.

146. Thereafter, in or around December 2013, Plaintiff SMITH learned that a Caucasian individual had been hired as a "Senior Administrative Specialist" to work in the "Chairman's Suite," and that this individual was a "level 6" (and would have been a promotion had Plaintiff SMITH been given the job). This individual was named Marissa Matarazzo.

147. Plaintiff SMITH was more qualified as Marissa Matarazzo had never worked at the East 68th Street location. Plaintiff SMITH noticed that the position posted was for a level 6, and one major duty (processing appointments and reappointments for faculty) was what Defendant ADAMS had wanted Plaintiff SMITH to perform when she was trying to have Plaintiff SMITH transferred to the "Chairman's Suite," yet still keep her at a "level 5." However, when that opportunity came available, Plaintiff SMITH was overlooked for a Caucasian employee of Defendant ADAMS' choosing on the basis of Plaintiff SMITH's race (black).

148. The above are just some of the acts of discrimination and retaliation that Plaintiff SMITH

experienced on a regular and continual basis while employed by Defendants.

**Retaliation Against Plaintiff Tammy Smith**

149.    Plaintiff SMITH suffered unlawful retaliation at the hands of Defendant ADAMS following her complaints in or around mid-February 2011 of race discrimination and Defendant ADAMS' favoritism towards Caucasian employees in the Anesthesiology Department, as touched upon above and as more fully described below.

150.    Less than one week after Plaintiff SMITH's complaint of unequal treatment on account of her race, on or about Friday, February 18, 2011, Plaintiff arrived to work to find that her employee information log books (which contained employee salary information) had been removed, and a fly glue trap had been intentionally placed on her metal files holder.

151.    The removal of these books was conducted by Defendant ADAMS as she admitted this to Plaintiff SMITH.  Upon information and belief, this was done in an effort to intimidate Plaintiff SMITH for her discrimination complaints and further, in an effort to scare Plaintiff SMITH to make it seem as though Plaintiff may be fired due to her now having her desk somewhat cleared off as the appearance of a partially cleared off desk following a complaint had that effect on her (especially since the clearing was done by the person about whom she complained and further, these books took up a considerable amount of room on her shelf).

152.    Also, a fly glue trap had previously sat on top of these books.  However, upon Plaintiff SMITH noticing that the books had been removed, she also noticed that the fly glue trap had been stuck on her metal cabinet rather than being placed on the now-empty shelf or in the trash.  Upon information and belief, it was stuck there by Defendant ADAMS at the same time she had removed the books in an effort to express her displeasure with

Plaintiff's discrimination complaints about her and was not done in a manner to increase the chances of "trapping flies."

153.    That same day, Plaintiff SMITH complained about Defendant ADAMS' actions to another manager named Angela Charter.  Specifically, Plaintiff SMITH told Charter that she believed she was being retaliated against for her prior complaints.  In response, Charter reprimanded Plaintiff SMITH and said that Defendant ADAMS could have taken disciplinary action against her for having the log books on the shelf (even though they had been in that location for years with Defendant ADAMS' knowledge).

154.    Thereafter, Defendant ADAMS scheduled Plaintiff SMITH's group (to wit—the Fiscal Group) to meet with another manager named Guy Mazza in order to discuss the Press Ganey satisfaction survey results on March 8, 2011 specifically because she knew that Plaintiff SMITH had requested off on that day for vacation.  This was done intentionally to exclude Plaintiff SMITH in retaliation for her prior complaints of discrimination.

155.    On April 8, 2011, Defendant ADAMS emailed Plaintiff SMITH to alert her that managing the Emergency Management Planning tool (an online system which organizes contact information) would be an additional duty for which she (Plaintiff SMITH) was responsible.

156.    Thereafter, on or about May 25, 2011, Plaintiff SMITH received a performance evaluation which contained a "Needs Improvement" rating in a particular category. Defendant ADAMS was the "evaluator" and wrote the evaluation.  Prior to Plaintiff SMITH's complaints of race discrimination at the hands of Defendant ADAMS she had never received a "Needs Improvement" rating for any category during her employment with Defendants.  This "Needs Improvement" rating was retaliatory for her prior

complaints.

157. Also, in or around October 2011, Plaintiff SMITH suffered a death in the family. Defendant ADAMS broadcast Plaintiff's loss to support staff several times. Plaintiff SMITH had previously had deaths in her family and had asked Defendant ADAMS not to broadcast same, a request which Defendant ADAMS had always respected. However, after Plaintiff SMITH's complaints, Defendant ADAMS no longer respected this request.

158. Also, following Plaintiff SMITH's complaints about Defendant ADAMS, she began sabotaging Plaintiff SMITH's work and her ability to perform her job adequately. Specifically, Defendant ADAMS assigned Plaintiff an increased workload and tasks which were beyond her expertise and which Defendant ADAMS knew would be time consuming. Plaintiff had not experienced treatment like this prior to her complaints.

159. Notably, in or around the Winter of late 2011/ early 2012, Defendant ADAMS assigned Plaintiff SMITH to begin writing up "policies and procedures" and tasked her with updating and maintaining an "emergency management tool" (which is essentially an online database containing contact information which needs to be constantly edited and updated).

160. Also, Defendant ADAMS assigned Plaintiff SMITH to design, create, and edit a newsletter. Plaintiff SMITH did not have any experience in journalism or print design when she assigned her this task. This occurred in or around the Fall of 2012. When Plaintiff SMITH told Defendant ADAMS that this job was outside her level of experience, Defendant ADAMS replied smugly, "You'll learn."

161. In or around late September 2012, Defendant ADAMS assigned Plaintiff SMITH to work for a doctor who was the Director of the Regional Fellowship program. To work for this

person required Plaintiff SMITH to collect applicant applications, contact those applicants for missing documents, contacting faculty interviewers and applicants to coordinate interview dates, as well as arranging breakfast and lunch and escorting applicants to the interviewers' offices.

162. Assignment of the aforementioned tasks and additional jobs was done in a manner to "set Plaintiff SMITH up to fail" as Defendant ADAMS fully knew that Plaintiff SMITH lacked the requisite skillset to successfully perform these tasks appropriately and/or the time commitment to perform these tasks/ jobs adequately was overwhelming.

163. The increase of additional tasks and duties required Plaintiff SMITH to meet with Defendant ADAMS on a once-weekly basis in order to review the newly-assigned projects and tasks. Prior to Plaintiff SMITH's complaints in February 2011, she was not required to meet with Defendant ADAMS at this frequency; in fact, prior to her complaints, one-on-one meetings occurred at a frequency of once every month or once every two months.

164. Then, on or about June 12, 2013, Defendant ADAMS gave Plaintiff SMITH another performance evaluation with a "Needs Improvement" rating. This was done in further retaliation for her complaints of discrimination and in an effort to justify any denials of promotion opportunities (as well as a product of the intentional increased workload).

165. On or about July 1, 2013, Defendant ADAMS assigned Plaintiff SMITH to assist a doctor who was heavily involved in research and very dependent upon the administrators assigned to him. Accordingly, this was another instance of an assignment that Defendant ADAMS knew would be extremely time-consuming for Plaintiff SMITH in an effort to punish Plaintiff SMITH for her complaints and so that any deficient performance would

further justify Defendant ADAMS denying Plaintiff SMITH promotion opportunities.

166.    Also, in or around January 2015, Defendant ADAMS conducted Plaintiff SMITH's

annual mid-year review.  However, she informed Plaintiff SMITH that she was unable to

inform her regarding positive feedback from doctors as they had not responded to her

with their comments in time for the meeting.  Plaintiff SMITH learned soon thereafter

that Defendant ADAMS had sent requests for feedback late and only to six doctors (as

opposed to the customary twelve).  This was done intentionally.

**Allegations Relating to all Plaintiffs**

167.    Defendants' actions and conduct were intentional and intended to harm Plaintiffs.

168.    As a result of the acts and conduct complained of, Plaintiffs have individually (and

collectively) suffered emotional pain, suffering, inconvenience, loss of enjoyment of life,

and other non-pecuniary losses.  Plaintiffs have further experienced severe emotional

distress.

169.    Plaintiffs have suffered a loss of income, the loss of a salary, bonus, benefits, and other

compensation which such employment entails, and Plaintiffs have also suffered future

pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and

other non-pecuniary losses.  As a result of the above, Plaintiffs have been damaged in an

amount which exceeds the jurisdictional limits of the Court.

170.    Defendants' conduct has been malicious, willful, outrageous, and conducted with full

knowledge of the law.  As such, Plaintiffs demands Punitive Damages as against all

Defendants, jointly and severally.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER 42 U.S.C. § 1981

171.    Plaintiffs repeat, reiterate and reallege each and every paragraph above as if said

paragraph was more fully set forth herein at length.

172.    42 U.S.C. § 1981 states in relevant part as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

173.    Plaintiffs were discriminated against on the basis of their respective races (<u>black;</u> <u>Hispanic</u>) as provided under 42 U.S.C. § 1981 and have suffered damages as set forth herein.

### AS A SECOND CAUSE OF ACTION
### <u>FOR RETALIATION UNDER 42 U.S.C. § 1981</u>

174.    Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH repeat and reallege each and every paragraph above as if said paragraph was more fully set forth herein at length.

175.    By the acts and practices described above, Defendants retaliated against Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH for their opposition to unlawful discrimination under 42 U.S.C. § 1981.

176.    Defendants acted with malice and/or reckless indifference to the statutorily protected rights of Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH.

177.    As a result of Defendants' discriminatory acts, Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH have suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants

relief.

### AS A THIRD CAUSE OF ACTION FOR DISCRIMINATION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

178.   Plaintiffs repeat, reiterate and reallege each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

179.   The New York City Administrative Code § 8-107(1) provides that "It shall be an

unlawful discriminatory practice: (a) For an employer or an employee or agent thereof,

because of the actual or perceived age, race, creed, color, national origin, gender,

disability, marital status, sexual orientation or alienage or citizenship status of any person,

to refuse to hire or employ or to bar or to discharge from employment such person or to

discriminate against such person in compensation or in terms, conditions or privileges of

employment."

180.   Defendants engaged in an unlawful discriminatory practice in violation of New York City

Administrative Code § 8-107(1)(a) by discriminating against Plaintiffs because of their

race (black; Hispanic).

### AS A FOURTH CAUSE OF ACTION FOR RETALIATION
### UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

181.   Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH repeat, reiterate and reallege

each and every allegation made in the above paragraphs of this Complaint as if more fully

set forth herein at length.

182.   The New York City Administrative Code § 8-107(7) provides that it shall be unlawful

discriminatory practice: "For an employer . . . to discriminate against any person because

such person has opposed any practices forbidden under this chapter. . ."

183.   Defendants engaged in an unlawful discriminatory practice in violation of New York City

Administrative Code § 8-107(7) by discriminating against Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH because of their opposition to the unlawful employment practices of Defendants.

## AS A FIFTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

184.    Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

185.    The New York City Administrative Code § 8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

186.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory and unlawful conduct.

## AS A SIXTH CAUSE OF ACTION FOR DISCRIMINATION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

187.    Plaintiffs repeat, reiterate and reallege each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

188.    The New York City Administrative Code § 8-107(13) Employer liability for discriminatory conduct by employee, agent or independent contractor.

  a.    An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

  b.    An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or

34

two of this section only where:

1.  the employee or agent exercised managerial or supervisory responsibility; or

2.  the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or

3.  the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c.  An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

189.  Defendants violated the section cited herein as set forth.

## JURY DEMAND

190.  Plaintiffs request a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiffs respectfully request a judgment against the Defendants:

A.  Declaring that Defendants engaged in unlawful employment practices prohibited by 42

U.S.C. § 1981 and the NYCHRL in that Defendants <u>discriminated against</u> Plaintiffs due to their race (<u>black; Hispanic</u>), and <u>retaliating against</u> Plaintiffs BROWN, CABRERA, FRANCIS, and SMITH for opposing Defendants' harassment;

B.    Awarding damages to Plaintiffs resulting from Defendants' unlawful discrimination and retaliation and to otherwise make them whole for any losses suffered as a result of such unlawful employment practices;

C.    Awarding Plaintiffs compensatory damages for loss of wages, salary, and benefits, as well as mental, emotional and physical injury, distress, pain and suffering and injury to their reputation in an amount to be proven;

D.    Awarding Plaintiffs punitive damages;

E.    Awarding Plaintiffs attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

F.    Awarding Plaintiffs such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

Dated: New York, New York
July 10, 2015

**PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC**

By:  _____
Casey Wolnowski, Esq.
*Attorneys for Plaintiff*
PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC
45 Broadway, Suite 620
New York, New York 10006
(212) 248-7431
cwolnowski@tpglaws.com