UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARLENE AUGUSTINE, KEISHA BROWN, LISA CABRERA, IVETTE FRANCIS and TAMMY SMITH, | Case No. 14-cv-7807 (JPO) |
| | ECF CASE |
| Plaintiffs, | ORAL ARGUMENT REQUESTED |
| - against – | |
| CORNELL UNIVERSITY, WEILL CORNELL MEDICAL COLLEGE and KRISTEN ADAMS, Individually. | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE,
TO SEVER AND/OR GRANT SEPARATE TRIALS**

VENABLE LLP
Brian J. Clark
Benjamin E. Stockman
Rockefeller Center
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
t: (212) 307-5500
f: (212) 307-5598

OFFICE OF UNIVERSITY COUNSEL
Sheryl A. Orwel
Associate University Counsel
Weill Cornell Medical College
445 East 69th Street, Suite 405
New York, New York 10021
t: (212) 746-0463

*Attorneys for Defendants Cornell University,
Weill Cornell Medical College, and Kristen
Adams*

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................ 2

        A.      Weill Cornell and the Anesthesiology Department .................................... 2

        B.      Plaintiffs' Internal Complaints and HR's Investigation............................. 3

        C.      Plaintiff Marlene Augustine's Individual Allegations ............................... 4

        D.      Plaintiff Keisha Brown's Individual Allegations....................................... 6

        E.      Plaintiff Lisa Cabrera's Individual Allegations ........................................ 9

        F.      Plaintiff Ivette Francis' Individual Allegations ...................................... 10

        G.      Plaintiff Tammy Smith's Individual Allegations..................................... 14

        H.      The Purported White Comparator Promotions ........................................ 18

        I.      Minority Promotions in the Anesthesiology Department from
                2010 to Present....................................................................................... 19

III.    ARGUMENT........................................................................................................ 20

        A.      Summary Judgment Standard .................................................................. 20

        B.      Plaintiffs' Race-Based Discrimination and Retaliation Claims
                Under Section 1981 Should Be Dismissed .............................................. 21

                i.      Claims Barred by the Statute of Limitations. ............................... 23

                ii.     Absence of Pattern or Practice Allegations and the
                        Insufficiently Established Comparator White Employees ........... 23

                iii.    Plaintiff Marlene Augustine's Claims Should be Dismissed ....... 24

                iv.     Plaintiff Keisha Brown's Claims Should be Dismissed................ 25

                v.      Plaintiff Lisa Cabrera's Claims Should be Dismissed ................. 27

                vi.     Plaintiff Ivette Francis' Claims Should be Dismissed................. 28

                vii.    Plaintiff Tammy Smith's Claims Should be Dismissed................ 29

        C.      In the Alternative, Plaintiffs' Claims Must Be Severed and

Separate Trials Ordered, Due To the Differing Proof Required to
Prove their Dissimilar Claims and the Risk of Prejudice Posed to
Defendants By a Joint Trial ...................................................................................... 32

III.   CONCLUSION.................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdu-Brisson v. Delta Air Lines, Inc.*,
  239 F.3d 456 (2d Cir. 2001)....................................................................20

*Brown v. Coach Stores, Inc.*,
  163 F.3d 706 (2d Cir. 1998)..............................................................21, 23

*Burks v. Union Pac. R.R.*,
  793 F.3d 694 (7th Cir. 2015) ............................................................24, 27

*Bush v. Fordham Univ.*,
  452 F. Supp. 2d 394 (S.D.N.Y. 2006)......................................................30

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
  243 F.3d 93 (2d Cir. 2001)................................................................21, 23

*Cestone v. Gen. Cigar Holdings, Inc.*,
  No. 00 Civ. 3686 (RCC) (DF), 2002 WL 424654 (S.D.N.Y. Mar. 18, 2002) ..................33, 34

*Dickerson v. Novartis Corp.*,
  No. 1:15-cv-1980 (GHW), 2016 WL 1611504 (S.D.N.Y. Apr. 21, 2016)......................33, 34

*El Sayed v. Hilton Hotels Corp.*,
  627 F.3d 931 (2d Cir. 2010)....................................................................20

*Fincher v. Depository Tr. & Clearing Corp.*,
  604 F.3d 712 (2d Cir. 2010)....................................................................22

*Ghorpade v. Metlife, Inc.*,
  No. 14-cv-4379 (JPO), 2016 WL 3951183 (S.D.N.Y. July 20, 2016) ...................................21

*Graham v. Long Island R.R.*,
  230 F.3d 34 (2d Cir. 2000)......................................................................22

*Holcomb v. Powell*,
  433 F.3d 889 (D.C. Cir. 2006) ................................................................23

*Holleman v. Art Crating, Inc.*,
  No. 12 Civ. 2719 (VMS), 2014 WL 4907732 (E.D.N.Y. Sept. 30, 2014) ............................23

*Holtz v. Rockefeller & Co., Inc.*,
  258 F.3d 62 (2d Cir. 2001)......................................................................20

iii

*Johnson v. J. Walter Thompson U.S.A.,*
    LLC, 224 F. Supp. 3d 296 (S.D.N.Y. 2016) ........................................................22

*Mavrommatis v. Carey Limousine Westchester, Inc.,*
    476 F. App'x 462 (2d Cir. 2011) .........................................................................21

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ...........................................................................21, 22, 24

*Meiri v. Dacon,*
    759 F.2d 989 (2d Cir. 1985) ...............................................................................20

*Montgomery v. Chao,*
    495 F. Supp.2d 2 (D.D.C. 2007) .....................................................................24, 27

*Morris v. Northrop Grumman Corp.,*
    37 F. Supp 2d 556 (E.D.N.Y. 1999) .................................................................34, 35

*Preferred Med., P.C. v. Geico Gen. Ins. Co.,*
    No. 03 Civ. 8516, 2005 WL 2777309 (S.D.N.Y. Oct. 26, 2005) ...........................34

*Ricks v. Conde Nast Pubs., Inc.,*
    6 F. App'x 74 (2d Cir. 2001) ...............................................................................21

*Sareen v. Port Auth. of N.Y. & N.J.,*
    No. 12 Civ. 2823 (PAE), 2013 WL 6588435 (S.D.N.Y. Dec. 16, 2013) ................23

*Scotto v. Almenas,*
    143 F.3d 105 (2d Cir. 1998) ...............................................................................20

*Taylor v. PolyGram Records,*
    No. 94 Civ. 7689 (CSH), 1999 WL 124456 (S.D.N.Y. Mar. 5, 1999) ...............26, 29

*Workneh v. Pall Corp.,*
    897 F. Supp.2d 121, 133 (E.D.N.Y. 2012) ...........................................................24

## Other Authorities

42 U.S.C. § 1981 ...................................................................................................21

Fed. R. Civ. P. 56(a) ..............................................................................................20

Federal Rules of Civil Procedure Rules 21 and 42(b) .............................................32

Federal Rules of Civil Procedure 56, 21, and 42(b) ..................................................1

Local Civil Rule 56.1 ..............................................................................................2

Pursuant to Federal Rules of Civil Procedure 56, 21, and 42(b), Defendants Cornell University, Weill Cornell Medical College (collectively "Weill Cornell") and Kristen Adams ("Ms. Adams," and collectively with Weill Cornell, "Defendants"), by their attorneys, Venable LLP, submit this Memorandum of Law in support of Defendants' Motion for Summary Judgment, or, in the Alternative, to Sever and/or Grant Separate Trials.  Defendants respectfully request that the Court dismiss with prejudice all claims asserted against them, or, in the alternative, sever the claims of each named Plaintiff and mandate separate trials.

## I.        <u>PRELIMINARY STATEMENT</u>

Plaintiffs are current and former administrative employees of the Weill Cornell Anesthesiology Department (the "Department") who brought suit based on misconceived and uninformed speculation that white employees received more promotional opportunities than minorities in the Department. The record developed through exhaustive discovery is clear that Plaintiffs' discrimination allegations are premised on purported "comparator" white employees whom the Plaintiffs know virtually nothing about, and who are not similarly situated to the Plaintiffs. Moreover, four of the five employees promoted into the level above the Plaintiffs during the relevant time period were minorities.  The four Plaintiffs who attempt to advance a retaliation claim fail either because they suffered no adverse employment action or because they simply disagree with legitimate, non-discriminatory employment decisions made by management. The Plaintiffs' attempt to have this Court sit as a "super-personnel department" to adjudicate their individual gripes and disagreements with management should be rejected and this case should be dismissed in its entirety.

Should the Court decline to grant summary judgment in this matter, however, it must sever Plaintiffs' claims and mandate separate trials for each of them. This is so because the

circumstances surrounding Plaintiffs' employment are dissimilar, and claims relating to their individual experiences involve different individuals and will necessarily require separate documentary evidence and witnesses. In addition, there is a clear threat of prejudice to Defendants if Plaintiffs' cases remain joined, warranting severance and/or separate trials.

## II.      STATEMENT OF FACTS

### A.  Weill Cornell and the Anesthesiology Department

Weill Cornell is a world-class medical college and clinical care provider composed of a variety of departments organized by medical sub-specialty, including an Anesthesiology Department ("Anesthesiology Department" or the "Department"). (Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("56.1 Statement"), ¶2). Defendant Kristen Adams has held the position of Administrator of the Department since 2001 and is the most senior administrative employee in the Department.  As Administrator, Ms. Adams is responsible for oversight of the administrative staff of approximately 50 employees. (56.1 Statement, ¶4). Plaintiffs all worked in the Department in a variety of administrative positions. The faculty Chair of the Anesthesiology Department from 1989 to 2013 was Dr. John Savarese, who shared management duties with Ms. Adams. (56.1 Statement, ¶5). Dr. Hugh Hemmings assumed the Chairmanship in 2013. (56.1 Statement, ¶6).

The Weill Cornell Human Resources Department ("HR") employs a compensation grade level range of 1 to 13 to classify its workforce based on the duties and responsibilities of titles and positions. (56.1 Statement, ¶17). Grade levels 1 through 5 are positions with duties that are classified as non-exempt from overtime under state and federal law, whereas grade levels 6 through 13 are positions that are primarily exempt from overtime. (56.1 Statement, ¶18). HR is responsible for approving job descriptions and classifying positions within the compensation

grade level system. (56.1 Statement, ¶19). It is the responsibility of each manager in the Department to update job descriptions as new tasks and new systems create new work for employees. (56.1 Statement, ¶19). When a job description is changed or a new position is created, the HR Compensation Office evaluates the compensation grade level. (56.1 Statement, ¶20). HR has final authority to decide employee salary and compensation matters. (56.1 Statement, ¶26). New positions are typically posted on the Weill Cornell job listing web page. (56.1 Statement, ¶21). However, Weill Cornell policy states that posting may be waived if a qualified internal department candidate is identified for the position. (56.1 Statement, ¶21).

Supervisors in the Department are not required to confer with the Department Administrator about the assignment of new duties or updates to job descriptions. (56.1 Statement, ¶25). Ms. Adams is not directly responsible for terminations or employee discipline for employees who do not directly report to her, as such management is the responsibility of direct supervisors and HR. (56.1 Statement, ¶16).

### B. **Plaintiffs' Internal Complaints and HR's Investigation**

In early 2011, Plaintiffs Augustine, Brown, Cabrera, and Francis met with former HR Employee Relations Specialist Guy Mazza as part of a campus-wide employee satisfaction survey that Weill Cornell undertook in late 2010 and early 2011. (56.1 Statement, ¶¶27, 98, 150). The Plaintiffs used this meeting to voice complaints about their perceived lack of promotional opportunities in the Anesthesiology Department. (56.1 Statement, ¶¶99, 103). At the meeting, Mr. Mazza informed these four Plaintiffs that he would report their complaint to the Associate Director of HR, Angela Charter. (56.1 Statement, ¶100). Plaintiffs followed with a written complaint to HR in February 2011. (56.1 Statement, ¶152). Plaintiffs then met with Ms. Charter and Employee Relations Specialist Randi Glinsky to discuss the complaint. (56.1 Statement,

¶102). Ms. Charter and Ms. Glinsky informed Plaintiffs that they would investigate the matter and an investigation was conducted. (56.1 Statement, ¶104). HR communicated to Ms. Adams that it had received a complaint but did not inform her of the source or nature of the complaint. (56.1 Statement, ¶29).   The investigation revealed that no discrimination had occurred. (56.1 Statement, ¶491).

In August 2012, Plaintiffs Smith and Cabrera drafted an anonymous letter to the Dean of Weill Cornell and President of Cornell University complaining about Kristen Adams and Department supervisors Augustyne Johnson-McLean and Karina Rustia.  (56.1 Statement, ¶406). In response, HR launched another investigation. (56.1 Statement, ¶34). The investigation concluded in December 2012 after 18 witness interviews and found that no discrimination occurred, but made some recommendations to improve communication between Department management and non-exempt staff. (56.1 Statement, ¶34). Ms. Adams did not learn that Plaintiffs were the source of complaints to HR until this lawsuit was filed. (56.1 Statement, ¶29). Ms. Adams implemented the recommendations from the investigation and measures to improve communication, including anti-discrimination training. (56.1 Statement, ¶37). Ms. Smith wrote another anonymous letter to the Dean and President in February 2013. (56.1 Statement, ¶¶156, 406). In this letter, she complained about Ms. Adams and Mr. Mazza, including that Mr. Mazza treated all of the Plaintiffs' complaints to HR as singular when in fact each Plaintiff had individual concerns.  (56.1 Statement, ¶547).

### C.  **Plaintiff Marlene Augustine's Individual Allegations**

Plaintiff Marlene Augustine self identifies her race as black. (56.1 Statement, ¶38). Augustine first became employed in the Anesthesiology Department in 1999. (56.1 Statement, ¶40). Augustine fabricated an Associate Degree on her resume so she would get the job. (56.1

Statement, ¶39). She was hired as an Administrative Secretary by Augustyne Johnson-McLean, who became her supervisor and is black. (56.1 Statement, ¶¶41, 42). Ms. Adams approved Augustine's promotion to Program Specialist in 2007, which raised her compensation grade level from 4 to 5. (56.1 Statement, ¶48). Ms. Adams approved a merit salary increase for Augustine each year. (56.1 Statement, ¶55). Augustine confirmed that Ms. Johnson-McLean and Ms. Adams helped with her professional development and did not obstruct her promotional opportunities. (56.1 Statement, ¶49). Karina Rustia, who self identifies as Asian, became Ms. Augustine's supervisor in or around 2009. (56.1 Statement, ¶¶41, 42). Ms. Adams became Augustine's supervisor in 2015. (56.1 Statement, ¶41).

On October 2, 2016, Augustine applied for the Manager of Clinical Scheduling position on the Weill Cornell career website. (56.1 Statement, ¶87). Augustine was not contacted for an interview because HR Recruiter Nicolle Lesnicki gathered and submitted all 144 of the initial applicants to the hiring manager before Augustine applied, and then accidentally failed to check for new applicants after Augustine applied. (56.1 Statement, ¶¶88, 90, 91). Ms. Lesnicki sent Augustine an email apologizing for the oversight and offering to meet to consider her for other opportunities. (*Id.*). Augustine does not doubt the veracity of Ms. Lesnicki's email and does not accuse her of discrimination, yet Augustine declined Ms. Lesnicki's offer to meet. (56.1 Statement, ¶¶92, 93).

Augustine admitted that she has no personal knowledge to support the allegation in the Second Amended Complaint ("SAC") that Kristen Adams engaged in a practice of creating positions intending to fill them with white employees. (56.1 Statement, ¶108). Augustine has no independent knowledge that Kristen Adams promoted white people for discriminatory reasons. (56.1 Statement, ¶109). Neither Kristen Adams, nor Augustine's supervisors, Ms. Johnson-

5

McLean or Ms. Rustia, ever discouraged Augustine from applying for a promotional opportunity. (56.1 Statement, ¶110). Kristen Adams approved all of Augustine's performance appraisals and was the primary evaluator for her 2015 appraisal, which lauded Augustine for her excellent work.  (56.1 Statement, ¶117). Augustine does not allege retaliation. (56.1 Statement, ¶114).

### D.  Plaintiff Keisha Brown's Individual Allegations

Plaintiff Keisha Brown self identifies her race as black. She was hired as an Administrative Secretary in the Anesthesiology Department at Weill Cornell in 2004. (56.1 Statement, ¶¶118, 119). Brown does not have any complaints or allegations that relate to her time employed as Administrative Secretary for Weill Cornell. (56.1 Statement, ¶124).  In 2008, Brown was promoted to the position of Program Specialist, which included an increase in her compensation grade level from 4 to 5 and an increase in duties.  (56.1 Statement, ¶125).

Brown did not take any steps whatsoever to seek a promotion in 2011 or 2012 and no one obstructed her from doing so. (56.1 Statement, ¶195). No employee, manager, supervisor, or executive ever made any racially derogatory comment toward Brown, or did anything to make her think that she would not receive a promotion due to her race during her employment at Weill Cornell. (56.1 Statement, ¶134). Brown never witnessed Kristen Adams manufacture job duties or tasks for white Employees and has no knowledge to support the allegation in the SAC that Ms. Adams "intentionally secreted" promotional opportunities for white employees. (56.1 Statement, ¶144). The only promotional opportunity that Plaintiff Brown alleges she was discriminatorily denied was the Manager of Clinical Scheduling position. (56.1 Statement, ¶138). But Brown did not apply for the Manager of Clinical Scheduling position and no one prevented her from doing so. (56.1 Statement, ¶139-140). Brown does not know who made the decision to promote Maria

Killion to the Manager of Clinical Scheduling position or why she got the job. (56.1 Statement, ¶141).

Brown alleges that she received emails from her manager, Ms. Rustia, regarding overtime approvals that she had never received before she lodged the complaint with HR. However, Ms. Rustia was merely acting pursuant to Weill Cornell's policy requiring advanced approval of all overtime and requiring Brown's compliance with the policy, and Brown's employment was unaffected. (56.1 Statement, ¶¶169, 170). As part of her duties, Brown submitted check requisitions for doctors and Ms. Adams' returned some of Brown's draft check requisitions for errors. (56.1 Statement, ¶171). Brown alleges that some of the returned check requisitions did not in fact contain errors, but was always able to resolve the issues Ms. Adams had with her check requisitions and never received any discipline related to them. (56.1 Statement, ¶172).

Brown received a "needs improvement" rating on her 2010 performance appraisal. (56.1 Statement, ¶173). Brown's 2010 Performance Appraisal was completed before the Plaintiffs made their first complaint to Human Resources. (56.1 Statement, ¶173). Brown's supervisor, Ms. Rustia, confirmed that everything in the evaluation was fair, true, and accurate. (56.1 Statement, ¶177). Brown's 2011 Performance Appraisal was equal to her 2010 Appraisal and she received an overall rating of 3 out of 5 in 2011. (56.1 Statement, ¶174). Ms. Rustia confirmed that everything in the 2011 evaluation was fair, true, and accurate. (56.1 Statement, ¶174). In 2012, the year following the Plaintiffs' complaint to Human Resources, Brown's Appraisal improved to an overall rating of 3.75 out of 5. (56.1 Statement, ¶175). Ms. Rustia confirmed that everything in the evaluation was fair, true, and accurate. (56.1 Statement, ¶176). Brown's 2013 Appraisal decreased and noted several areas where she needed improvement based on feedback from some faculty, her failure to fully participate with the scheduling desk support rotation, and

her failure to keep time management assessments of her work as requested. (56.1 Statement, ¶177). Brown's manager, Ms. Rustia, confirmed the criticism about failure to support the scheduling desk and about faculty voicing concerns. (56.1 Statement, ¶178). Brown admitted she was overwhelmed by her workload. (56.1 Statement, ¶180).

In 2013, Brown had a heated confrontation with Ms. Killion in the workplace, which Ms. Rustia witnessed. (56.1 Statement, ¶158). Ms. Brown and Ms. Killion almost came to fisticuffs and Ms. Rustia was forced to pull them into a room and tell them to calm down and act more professionally. (56.1 Statement, ¶159). Ms. Rustia informed Ms. Adams of the confrontation and they all met to discuss it. (56.1 Statement, ¶160). Brown secretly recorded the meeting. (56.1 Statement, ¶161). Brown admits that she acted unprofessionally by engaging in the confrontation. (56.1 Statement, ¶163).

In 2013, Brown was put on a Corrective Action Plan ("CAP") pursuant to Weill Cornell policy, which triggers a CAP for any employee with an overall performance rating below 3 out of 5. (56.1 Statement, ¶182). Ms. Rustia drafted it with input from Guy Mazza in HR. (56.1 Statement, ¶183). Ms. Rustia did not voice disagreement or discomfort to Ms. Adams regarding Brown's CAP. (56.1 Statement, ¶184). Ms. Rustia agreed with everything that was in Brown's CAP. (56.1 Statement, ¶183). Brown never spoke with Ms. Adams about her CAP. (56.1 Statement, ¶180). Neither race nor retaliation factored into any employment decision related to Brown.  (56.1 Statement, ¶181).

Brown voluntarily resigned from her position as Program Specialist in December 2014. (56.1 Statement, ¶187). Brown does not allege that Ms. Adams intentionally overwhelmed her with her workload, and Brown was never told that she was going to be terminated. (56.1 Statement, ¶190). By the time she resigned, Brown had accepted a new job with higher pay at a

hospital, a position she searched for and applied to using Weill Cornell resources. (56.1 Statement, ¶192).

### E.  <u>Plaintiff Lisa Cabrera's Individual Allegations</u>

Plaintiff Lisa Cabrera self identifies as Hispanic. (56.1 Statement, ¶196). Cabrera began working in the Anesthesiology Department in December 1993 as a secretary. (56.1 Statement, ¶197).  Ms. Johnson-McLean was Cabrera's supervisor from 1995 until approximately 2009, when Karina Rustia became her supervisor. (56.1 Statement, ¶199). In 2008, Ms. Adams nominated Cabrera to participate in a career skills development program which she completed. (56.1 Statement, ¶200). Shortly after, Ms. Adams promoted Cabrera to Residency Program Specialist.  (56.1 Statement, ¶201). Between 2008 and 2012, Cabrera was happy with her position and did not apply for any positions. (56.1 Statement, ¶¶208, 210.).

In 2013, Cabrera applied for the Manager of Clinical Scheduling position on the Weill Cornell career website.  Cabrera was not contacted for an interview because Nicolle Lesnicki, the HR Recruiter responsible for managing online applications, gathered and submitted all of the applicants to the hiring manager prior to Ms. Cabrera's submission and then failed to check for new applicants after Cabrera applied. (56.1 Statement, ¶¶232, 235). Ms. Lesnicki sent Cabrera the same email she sent Plaintiff Augustine apologizing for the oversight and offering to meet to consider her for other opportunities. (56.1 Statement, ¶233).Cabrera has no personal knowledge that Ms. Lesnicki was untruthful in the email and yet declined her offer to meet. (56.1 Statement, ¶240). Cabrera alleges that she heard a rumor that the position was a "lock" for Ms. Killion. (56.1 Statement, ¶236). Cabrera has no knowledge as to who approved Ms. Killion's promotion or why Ms. Killion got the job.  (56.1 Statement, ¶141).

Meanwhile, Cabrera's duties as a Program Specialist evolved as her supervisors assigned her new duties. (56.1 Statement, ¶¶204, 205). Cabrera does not believe that the additional duties were assigned for discriminatory purposes. (56.1 Statement, ¶206). In September 2014, Kristen Adams informed Cabrera that her Program Specialist position was being phased out and that she should apply for promotion into the Residency Program Coordinator position. (56.1 Statement, ¶243). Ms. Adams promoted Cabrera into the Coordinator position in early 2015, which included a raise in compensation to grade level 6, and additional duties. (56.1 Statement, ¶245). Kristen Adams became Cabrera's supervisor. (56.1 Statement, ¶248). Cabrera described Ms. Adams as professional but did not like that Ms. Adams required bi-weekly meetings, or that Ms. Adams required Cabrera to track her work on nights and weekends. (56.1 Statement, ¶250). Ms. Adams did so to help Cabrera work more efficiently and reduce her hours. (56.1 Statement, ¶251).

In 2010, Cabrera met all expectations on her Performance Appraisal. (56.1 Statement, ¶257). Cabrera alleges that her 2011 overall rating of 3.5 out of 5 was lower than her 2010 Appraisal, but acknowledges that there is no evidence that this is so. (56.1 Statement, ¶259). Cabrera does not allege that her Appraisals from 2012-2016 evidence retaliation. In fact, once Ms. Adams became Cabrera's direct supervisor in 2015, Cabrera received the two highest Appraisals she had ever received, including a near perfect 4.75 out of 5 in 2016. (56.1 Statement, ¶264). Kristen Adams never made any racial derogatory comments to Cabrera. (56.1 Statement, ¶252).

**F. <u>Plaintiff Ivette Francis' Individual Allegations</u>**

Plaintiff Ivette Francis self identifies her race as black. (56.1 Statement, ¶275). Francis began employment in the Anesthesiology Department as a Scheduling Coordinator in 2007. (56.1 Statement, ¶276). Ms. Johnson-McLean was Francis' supervisor when she started working

in the Department. (56.1 Statement, ¶277). At the time of hire, Francis was required to pass a drug test. (56.1 Statement, ¶279). Ms. Johnson-McLean and Francis had a cordial relationship with periods of conflict starting in 2010. (56.1 Statement, ¶280). Francis' responsibilities included working on a scheduling desk answering telephones to assist in the scheduling of anesthesiologists to operating rooms. (56.1 Statement, ¶281). Francis required coverage if she left the desk for any reason. (56.1 Statement, ¶282). Francis had a professional relationship with Ms. Adams on the rare occasions that they interacted. (56.1 Statement, ¶284). Francis never requested a promotion and had no issue with the merit pay increases she received.   (56.1 Statement, ¶288).

In 2011, Francis resigned her position at Weill Cornell but asked for her job back a week or two after her resignation. (56.1 Statement, ¶290). Francis does not allege that anyone made her quit and her decision to resign was not for any reason related to Kristen Adams. (56.1 Statement, ¶291). Ms. Adams hired Francis back into her former position in 2011. (56.1 Statement, ¶292). Upon rehire, Francis was subject to a drug test. (56.1 Statement, ¶293). Francis has no basis to believe that her drug test was required for discriminatory or retaliatory purpose. (56.1 Statement, ¶293).   Ms. Adams welcomed Francis back in an email and set out specific expectations for her, to which Francis agreed. (56.1 Statement, ¶294). Due to punctuality problems, Francis' probation period was extended by Ms. Johnson-McLean. Francis has no knowledge that Ms. Adams was involved in the decision to extend her probation or that the extension was for improper purpose.   (56.1 Statement, ¶295). Maria Killion became Francis' supervisor in or around 2012. (56.1 Statement, ¶296).

Francis' relationship with Maria Killion began friendly but by the time Ms. Killion became Francis' supervisor, the relationship was hostile. (56.1 Statement, ¶297). On social

media, Francis referred to Ms. Killion as her enemy, evil, corrupt, and nasty. (56.1 Statement, ¶300).  Francis also had interpersonal problems with her co-worker on the scheduling desk, Louisa Charles, who was a black woman. (56.1 Statement, ¶298). Francis took no responsibility for her poor relationships with Ms. Charles and Ms. Killion. (56.1 Statement, ¶299).

Francis is not claiming discrimination in promotional opportunities and is only alleging that her termination was discriminatory and/or retaliatory. (56.1 Statement, ¶303). Neither Ms. Adams, nor any managers or employees ever made any racially derogatory comments to Francis. (56.1 Statement, ¶¶335, 336). Francis does not allege that her supervisors Ms. Johnson-McLean or Ms. Killion retaliated against her. (56.1 Statement, ¶376). Francis' alleges that she received nit-picking emails from Ms. Johnson-McLean. (56.1 Statement, ¶358). These emails contain correspondence between Ms. Johnson-McLean and Francis regarding her job performance, including lateness, failure to use time management tools, and complaints of unprofessional behavior. (56.1 Statement, ¶359). Francis admitted that she had punctuality issues, failed to use the time management tools, and had conflict with her supervisors and a colleague. (56.1 Statement, ¶373).  There is no evidence that Ms. Adams directed Ms. Johnson-McLean to send these emails. (56.1 Statement, ¶371).

Francis' only allegation of Kristen Adams' involvement in an alleged nit-picking email was a single email response from Ms. Adams to Ms. Johnson-McLean (with Francis copied) informing Ms. Johnson-McLean about bathroom break protocol. (56.1 Statement, ¶361). Ms. Adams sent her email in response to an email Francis' sent to Ms. Johnson-McLean (with Ms. Adams copied) requesting clarification on the break protocol. (56.1 Statement, ¶361).

The next email Francis believes to be nit-picking is correspondence she had with Maria Killion in 2013 regarding time management. (56.1 Statement, ¶373).  Francis not only admitted

12

that she had punctuality issues, but also admitted that she failed to finish her duties during normal working hours. (56.1 Statement, ¶374). Francis did not necessarily dispute Killion's criticisms of her job performance, but took issue with Killion's communication. (56.1 Statement, ¶302). Francis does not blame Ms. Adams for the deterioration of her relationship with Ms. Killion. (56.1 Statement, ¶303). Francis was not disciplined as a result of the nit-picking emails. (56.1 Statement, ¶380). Francis is not alleging that her annual performance appraisals were retaliatory, which corroborate the performance critiques in the emails.  (56.1 Statement, ¶381).

Prior to filing this lawsuit, Francis filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), the contents of which she swore to be true under penalty of perjury. (56.1 Statement, ¶339). In her EEOC complaint, Francis stated that she spoke with Ms. Adams in July 2013 about the phasing out of Francis' position on the scheduling desk. (56.1 Statement, ¶340). Ms. Adams told Francis to obtain a coding certification so she would be qualified to apply for the new position. (56.1 Statement, ¶¶342, 343). Ms. Killion also encouraged Francis to take the coding test, yet Ms. Francis did not take the coding exam until October 2013, after her position was phased out. (56.1 Statement, ¶¶344, 345). Francis' co-worker on the scheduling desk, Ms. Charles, who is black, obtained the coding certification and continued her employment at Weill Cornell. (56.1 Statement, ¶347). The position that replaced Francis' scheduling coordinator position was posted on the Weill Cornell career website in August 2013, and Ms. Adams and Ms. Killion met with Francis to inform her. (56.1 Statement, ¶347). After that meeting, Ms. Adams and Ms. Killion received complaints from several faculty and staff members that Francis was upset and behaving unprofessionally. (56.1 Statement, ¶348). Francis met with HR Manager Guy Mazza and Ms. Killion on September 6, 2013 to discuss her unprofessional behavior and to give her a written warning. (56.1 Statement, ¶349). Francis was

upset at this meeting, accused Ms. Killion and Mr. Mazza of falsifying the written warning, and refused to sign acknowledgment of receipt of the warning. (56.1 Statement, ¶353). Approximately a month prior to this meeting, Francis' had had a "very heated" altercation with Ms. Killion. (56.1 Statement, ¶351). Due to Francis' unprofessional behavior in the meeting, Mr. Mazza removed Francis' work badge and sent her home. (56.1 Statement, ¶354). He then made the decision to terminate Francis' employment on September 10, 2013 since Francis' job was being phased out and her behavior at work had deteriorated. (56.1 Statement, ¶355). Francis does not believe that Mr. Mazza discriminated against her. (56.1 Statement, ¶356). Amber Wright, a black employee, temporarily filled her position after she left. (56.1 Statement, ¶566).

## G. Plaintiff Tammy Smith's Individual Allegations

Plaintiff Tammy Smith self identifies as black. (56.1 Statement, ¶386). Smith was hired in 1993 and has spent her entire career in the Anesthesiology Department. (56.1 Statement, ¶387). Ms. Adams directly supervised Smith from 1999 until 2016 and they interacted daily during these years. (56.1 Statement, ¶388, 392). Smith's current position, Senior Administrative Secretary, is in compensation level 5. (56.1 Statement, ¶395).

As Administrative Secretary to Ms. Adams, Smith was entrusted with access to confidential information such as employee salaries, titles, job descriptions, and personnel files. (56.1 Statement, ¶396). Smith violated this trust and Weill Cornell policy for personal gain by removing confidential documents and information from the Weill Cornell server and Ms. Adams' office to support her lawsuit.  (56.1 Statement, ¶397-401).  Smith's duties in her position as Senior Administrative Secretary evolved over time as she performed new duties and stopped performing others. (56.1 Statement, ¶403). Ms. Adams approved merit pay increases for Smith

each year except for 2008, due to the national economic crisis. (56.1 Statement, ¶404). Smith's current supervisor, Cindy Bravo-Sanchez, is Hispanic. (56.1 Statement, ¶405).

No Weill Cornell employee ever made any racially derogatory comment to Smith. (56.1 Statement, ¶409). Moreover, Smith is aware that the following employees, who are all racial minorities, were promoted within the Anesthesiology Department from 2010 to the present: Plaintiff Lisa Cabrera, Amanda Carr, Latrice Goss, and Shenella Bourn. (56.1 Statement, ¶410). Smith never asked Ms. Adams to promote her into a position that was posted on the Weill Cornell jobs site or any other position that was open to all employees. (56.1 Statement, ¶412). Smith did not request that Ms. Adams review her job duties and description for a promotional opportunity after 2008. (56.1 Statement, ¶471).  In 2012, Ms. Adams offered Ms. Smith a transfer position in the Department with a 10% pay increase but Ms. Smith refused the offer in part because she believed that anything less than a 20% pay increase was unfair. (56.1 Statement, ¶497-509).

In 2013, Ms. Adams helped Smith update her job description and submit it to Jane Hopkins in HR to evaluate whether her duties warranted a promotion to compensation level 6. (56.1 Statement, ¶472-478). Based on a review of Smith's updated job duties, Ms. Hopkins determined that her position continued to warrant compensation level 5 and Ms. Adams relayed the determination to Smith.  (56.1 Statement, ¶479).  On May 10, 2013, Smith sent Ms. Hopkins an email stating her disagreement with Ms. Hopkins' determination. (56.1 Statement, ¶480). On June 10, 2013, Smith again emailed Ms. Hopkins and accused her of race discrimination for predetermining and underreporting her job description. (56.1 Statement, ¶481). The only basis for Smith's allegation that Ms. Hopkins discriminated against her is the fact that Ms. Hopkins did not provide her with a written explanation of her job evaluation. (56.1 Statement, ¶482). Ms.

Hopkins replied to Smith the next day and reiterated that Smith's duties were consistent with a non-exempt level 5 classification. (56.1 Statement, ¶483). Ms. Adams helped Smith revise her job description in 2014 and 2015 as well but Smith was unsatisfied because it did not result in her receiving a promotion to compensation level 6. (56.1 Statement, ¶485-486). Smith admitted that her satisfaction with the job review process by Ms. Hopkins depended entirely on the outcome resulting in promotion to level 6. (56.1 Statement, ¶487).

Smith arrived at work one day and found an empty space where some binder books had been on her cabinet and interpreted the removal as an indication that she would be terminated. (56.1 Statement, ¶514). Ms. Adams had removed the books because they contained employee social security numbers and salary information and Ms. Adams left Smith a voicemail informing her that she removed the books for this reason and not to be alarmed. (56.1 Statement, ¶515). After hearing the voicemail from Ms. Adams, Smith called HR Director Angela Charter to complain of retaliation. (56.1 Statement, ¶516). Smith does not dispute the legitimate business reason for removing the books from her shelf. (56.1 Statement, ¶516). Smith admitted that she does not know who moved a fly glue trap that was on top of the binders and confirmed that the trap had to be moved to remove the binder books. (56.1 Statement, ¶517).

Smith received two emails, one from Ms. Johnson-McLean and another from Kristen Adams, asking her why she had put certain meetings on the calendar. (56.1 Statement, ¶518). Smith does not recall whether she discussed these issues with Ms. Adams and her employment was not impacted in any way by the emails. (56.1 Statement, ¶519). Ms. Adams inadvertently scheduled a group meeting for employees to review the results of the employee satisfaction survey on a day that Smith was absent. (56.1 Statement, ¶521). When Smith brought it to Ms. Adams' attention, Ms. Adams apologized to Smith for the oversight and indicated she would

have another opportunity to speak to Mr. Mazza about the results. (56.1 Statement, ¶522). Smith

was afforded an opportunity to speak with Mr. Mazza about the satisfaction survey.   (56.1

Statement, ¶522).

On September 30, 2011, Ms. Adams sent an email to staff with instructions for coverage

of paycheck duties during an unscheduled absence by Smith. (56.1 Statement, ¶523-524). Smith

responded to Ms. Adams by email in which she castigated Adams for describing the absence as

"unscheduled" even though Smith's absence was in fact unscheduled. (56.1 Statement, ¶524-

525, 527). In her email, Smith referred to a previous email Ms. Adams sent in February 2011 in

which Ms. Adams indicated that "due to a death in the family Tammy is not in today to complete

time sheets. Please send updates or adjustments to Marlene". (56.1 Statement, ¶525). Smith

informed Ms. Adams that she would prefer that Ms. Adams not "broadcast" such details of her

absences. (56.1 Statement, ¶525). Ms. Adams responded to Smith's email indicating that she

specified "unscheduled" absence due to Weill Cornell policy, and apologizing for inadvertently

hurting her feelings. (56.1 Statement, ¶526).

Ms. Adams assigned Smith new duties from time to time. (56.1 Statement, ¶528). Smith

was able to perform the new duties she was assigned. (56.1 Statement, ¶528). Smith was

assigned to support Dr. Savarese and Smith was able to perform the duties required for support

of Dr. Savarese and never complained to anyone about being overwhelmed by them. (56.1

Statement, ¶529). Ms. Adams implemented meetings with Smith on a weekly basis to review her

work progress and time management because it assisted Ms. Adams to keep projects moving

forward. (56.1 Statement, ¶530-532). Smith does not contest Ms. Adams' reasons for

implementing the meetings and admitted that the meetings were worthwhile. (*Id.*).

17

Smith received a "needs improvement" rating in 2011 because Smith was unable to account for files that she was responsible for and she agreed that missing files was a fair criticism of work performance. (56.1 Statement, ¶535). Smith's 2011 performance evaluation noted "Overall, fiscal 2011 was another successful year for Tammy", and the "needs improvement" rating in the Vision section did not affect her overall rating for the year. (56.1 Statement, ¶537). Smith received an overall rating of 3.5 out of 5 on her 2011 performance evaluation. (56.1 Statement, ¶539). In 2012, the year after Plaintiffs complained to Human Resources, Smith again received an overall rating of 3.5 on her Performance Appraisal and noted that she was pleased with the evaluation. (56.1 Statement, ¶540). In her 2013 evaluation, Smith again received an overall rating of 3.5 out of 5. (56.1 Statement, ¶545). She received a "needs improvement" on the Teamwork section for attributing negative motivation to staff because of a false rumor she spread after the improper vacation scheduling, and she does not dispute the basis for this criticism of her job performance. (56.1 Statement, ¶541-544). In addition, Smith exhibited unprofessional behavior toward Ms. Adams on several occasions, yet Ms. Adams never took any punitive action. (56.1 Statement, ¶546).

### H.  The Purported White Comparator Promotions

Plaintiffs all allege that certain white employees were promoted due to their race, but all testified that they knew virtually nothing about the promotions of these employees or their qualifications. (56.1 Statement, ¶¶ 63-83, 136-148, 269-275, 309-317, 414-469.)  In fact, these alleged "comparators" are as follows: Kathryn Koval - promoted in 2008 to Research Coordinator, exempt level 6. (*Id.*, ¶553.)  Deanna Gallavan - promoted in 2005 to Administrative Secretary, level 4. (*Id.*, ¶554.) Kelsi Welter - promoted in 2009 to Administrative Specialist, level 5. (*Id.*, ¶555.) Rachel Reese - promoted in 2015 to Senior Administrative Secretary, level 5.

(*Id.*, ¶556.) Lacey Ferraro - promoted in 2009 to Administrative Specialist, level 5. (*Id.*, ¶557.) Alexandra Iosso - promoted in 2016 to Administrative Specialist, level 5. (*Id.*, ¶558.) Kerry Donahue - promoted in 2016 to Administrative Specialist, level 5. (*Id.*, ¶559.) Marissa Matarazzo - never promoted in the Department. (*Id.*, ¶560.) The position of Manager of Clinical Scheduling was posted to the Weill Cornell career website on September and HR received 144 applications. (*Id.*, ¶561.) Plaintiffs Augustine and Cabrera would have been interviewed had Ms. Adams been made aware that they had applied. (*Id.*, ¶562.) Maria Killion was promoted to Manager of Clinical Scheduling, level 6, because she had demonstrated proficiency creating spreadsheet formulas that eased the administrative burden of clinical scheduling, and Dr. Maholtra, who had worked with her for approximately three years, preferred her for the position over other candidates. (*Id.*, ¶563.) Thus, with the exception of the promotions given to Ms. Koval and Ms. Killion, all the other alleged "comparator" promotions were to positions at or below the Level 5 positons held by the Plaintiffs.

### I.   Minority Promotions in the Anesthesiology Department from 2010 to Present

Plaintiffs Augustine, Brown, Cabrera, and Smith allege that they were discriminated in promotional opportunities, and Plaintiff Francis does not make any such allegation.  All four Plaintiffs alleging promotional discrimination were in compensation level 5 from 2010 to the Present. (56.1 Statement, ¶¶48, 125, 201, 395.) From 2010 to the present, there were five employees promoted into a level 6 position in the Department and four of those employees were minorities.  Besides Ms. Killion's promotion in 2016, noted above, who was white, they were: Amanda Carr, who is black and was promoted to Compliance Systems Specialist, exempt Level 6 in 2016; Shanella Bourne, who is black and was promoted to Staff Nurse, exempt level 6 in 2012, and received a second promotion to level 7 in 2017; Jose Daniel Abueg, who is Hispanic

19

and was promoted to Billing Compliance Manager, exempt level 6, in 2016; and Plaintiff Cabrera, who is Hispanic and was promoted to Residency Coordinator, level 6, in 2015.  (*Id.*, ¶¶245-246, 564, 566, 568.)

## III.   ARGUMENT

Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss Plaintiffs' claims in their entirety.  In the alternative, Defendants respectfully request that the Court sever Plaintiffs' claims and/or require separate trials of such claims.

### A.  Summary Judgment Standard

Summary judgment is granted when the moving party "shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); *see also El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute as to a material fact occurs when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Holtz*, 258 F.3d at 69 (quoting *Anderson*, 477 U.S. at 248)). The non-moving party cannot simply rely upon "conclusory allegations or unsubstantiated speculation" to defeat a summary judgment motion.  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

Summary judgment is appropriate in discrimination cases that lack genuine issues of material fact.  *See Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("[T]he salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation."); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

**B.** **Plaintiffs' Race-Based Discrimination and Retaliation Claims Under Section 1981 Should Be Dismissed.**

To set forth a *prima facie* case of discrimination based on race under Section 1981, a plaintiff must demonstrate that: (1) she was a member of the protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  For a claim based on a failure to promote, a plaintiff must allege that (1) she is a member of a protected class; (2) she "applied and was qualified for a job for which the employer was seeking applicants"; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications. *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  As this Court noted in its decision on Defendants' motion to dismiss, "The second element … cannot be established merely with evidence that a plaintiff generally requested promotion consideration.  A specific application is required . . . ." (Decision on Motion to Dismiss dated June 3, 2015, Dkt. #18, citing *Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004)). Claims under 42 U.S.C. § 1981 ("Section 1981") are analyzed in the same fashion as Title VII claims.  *See Mavrommatis v. Carey Limousine Westchester, Inc.*, 476 F. App'x 462, 464 (2d Cir. 2011) (analyzing Title VII and Section 1981 under the same burden-shifting framework).   Under the Supreme Court's burden-shifting framework articulated in *McDonnell Douglas*, if a plaintiff sets forth a *prima facie* case of discrimination, the burden then shifts to the defendant to establish a legitimate, non-discriminatory reason for the adverse employment action; if the defendant does so, the plaintiff must establish that the non-discriminatory reason is but a pretext.  *McDonnell Douglas*, 411 U.S. at 802, 804.

The Court must not "act as a super personnel department that second guesses employers' business judgments." *Ghorpade v. Metlife, Inc.*, No. 14-cv-4379 (JPO), 2016 WL 3951183, at *6 (S.D.N.Y. July 20, 2016) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001)) (internal quotations omitted). Errors in performance evaluation or lack of wisdom in personnel decisions are not evidence, without more, of discrimination. *See Ghorpade*, 2016 WL 3951183, at *6. A plaintiff's "subjective disagreement with the employer's assessment of [his] performance" is therefore not a viable basis for a discrimination claim. *Holleman v. Art Crating, Inc.*, No. 12 Civ. 2719 (VMS), 2014 WL 4907732, at *41 (E.D.N.Y. Sept. 30, 2014)*; see also Ricks v. Conde Nast Pubs., Inc*., 6 F. App'x 74, 78 (2d Cir. 2001) (deeming insufficient "claims that the defendants' assessment of [the plaintiff's] work was simply inaccurate").

Under a disparate treatment theory of discrimination, a plaintiff must prove that she was treated less favorably than a similarly situated employee outside her protected class. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). A similarly situated comparator must be similarly situated in all material respects. *Id.*

To set forth a retaliation claim, a plaintiff must show (1) that she engaged in a protected activity, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). Retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework, and the "adverse action" element is analyzed objectively to determine if it would dissuade a reasonable employee from making a charge of discrimination. *See Johnson v. J. Walter Thompson U.S.A.*, LLC, 224 F. Supp. 3d 296, 312 (S.D.N.Y. 2016).

### i.    <u>Claims Barred by the Statute of Limitations</u>.

As an initial matter, the Court granted Defendants' motion to dismiss as to all of Plaintiffs' claims premised on the promotions of Deanna Gallavan (promoted in 2005), Kathryn Koval (promoted in 2008), and Kelsi Welter (promoted in 2009), as barred by the statute of limitations. Moreover, the Court dismissed all of Plaintiffs' New York City Human Rights Law ("NYCHRL") claims based on facts that occurred prior to September 26, 2011, which includes any retaliation or discrimination claims arising out of Plaintiffs' 2010 or 2011 Performance Appraisals. (Decision dated June 3, 2015, Dkt. # 18, n. 1)

### ii.    <u>Absence of Pattern or Practice Allegations and the Insufficiently Established Comparator White Employees</u>

The Plaintiffs failed to establish a *prima facie* claim of a pattern or practice of discrimination by Weill Cornell.   Importantly, *more minorities were promoted to level 6 positions than white employees*. Moreover, Plaintiffs failed to establish that the purported white comparator employees were similarly situated to the Plaintiffs, or that they possessed qualifications so inferior to the Plaintiffs as to raise an inference of discrimination. *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 711 (2d Cir. 1998) (requiring proof of history of systematic discrimination by the defendant employer to establish pattern or practice). Other than Ms. Koval[1] and Ms. Killion, all of the other white employees identified by Plaintiffs were promoted into positions that were at or below Plaintiffs' compensation levels and would have been lateral moves for the Plaintiffs. Moreover, from 2010 to the present, there were five employees promoted from compensation level 5 to level 6, and of these five employees, four were minorities and the other one was Ms. Killion.  *Workneh v. Pall Corp.*, 897 F. Supp.2d 121, 133 (E.D.N.Y. 2012) (evidence of minority employees in promotional positions indicative that race

---

[1] Ms. Koval was promoted in 2008, outside the statute of limitations.

was not a factor in promotions). Based on the controlling case law, Plaintiffs' attempt to show discrimination through the alleged comparators is clearly insufficient to support a *prima facie* claim under both failure to promote and disparate treatment theories. *See Sareen v. Port Auth. of N.Y. & N.J.*, No. 12 Civ. 2823 (PAE), 2013 WL 6588435, at **9-10 (S.D.N.Y. Dec. 16, 2013) (rejecting disparate treatment theory based on conclusory allegations about comparator qualifications); *see also Byrnie*, 243 F.3d at 103 (to survive summary judgment on comparator qualifications requires a showing that a plaintiff's credentials are so superior to another that no reasonable person would have failed to hire the plaintiff); *Holcomb v. Powell*, 433 F.3d 889, 900 (D.C. Cir. 2006) (granting summary judgment for employer because plaintiff's allegations about comparator employees lacked data providing demographic context for the workforce overall). Plaintiffs have failed to make a *prima facie* showing of a pattern or practice of discrimination in promotions.

### iii.   Plaintiff Marlene Augustine's Claims Should Be Dismissed.

Plaintiff Augustine's discrimination claims under Section 1981 and NYCHRL fail because there is a legitimate, non-discriminatory reason why her application for the Manager of Clinical Scheduling position was not considered. As noted in Point II(C) *supra*, Plaintiff Augustine applied for only one promotional opportunity at Weill Cornell, which was the Manager of Clinical Scheduling position in 2013. It is undisputed that Augustine's application was not rejected, rather it was accidentally overlooked by HR Recruiter Nicolle Lesnicki. Ms. Adams was unaware that Augustine had applied for the position at the time the hiring decision was made, otherwise she would have considered her for the position. Augustine admitted in her deposition testimony that she had no reason to doubt the truth of Ms. Lesnicki's explanation and is not accusing Ms. Lesnicki of discrimination.  Inadvertent misplacement of a job application or

irregular hiring procedures, without more, are not sufficient grounds to establish a discrimination claim. *Burks v. Union Pac. R.R. Co.*, 793 F.3d 694, 703 (7th Cir. 2015) (suppositions about lost or scuttled applications insufficient to support claim); *Montgomery v. Chao*, 495 F. Supp. 2d 2, 16 (D.D.C. 2007) (undisputed record of inadvertent misplacement of application mandated summary judgment against plaintiff). Moreover, it is undisputed that Ms. Killion was hired for a non-discriminatory reason – Dr. Malhotra preferred her advanced spreadsheet formula skills.

There is no evidence to support the conclusory allegation in the SAC that Ms. Adams created positions with the intention of filling them with white employees. Augustine never saw a job description created by Ms. Adams and job opportunities were regularly posted on the Weill Cornell career website. Augustine was never discouraged from applying. Augustine was not interested in any of the promotions of the purported comparators because they were all lateral moves for her. Moreover, minority employees were promoted by Ms. Adams during the relevant time period, including Plaintiff Cabrera into a management position. Augustine's discrimination claim should be dismissed.

### iv.   **Plaintiff Keisha Brown's Claims Should be Dismissed**

Plaintiff Brown's claims for discrimination and retaliation should be dismissed because she never applied for a promotional opportunity and all of the corrective actions taken in response to her job performance were justified by legitimate, non-discriminatory facts.

Although she alleges she was denied promotional opportunities, she took no steps to seek a promotion in 2011 or 2012, and she does not allege that anyone prevented her from doing so. Brown's claim that she would have applied to promotions had she known of them is undermined by the fact that she never checked the career website despite knowing it existed. Brown never witnessed Ms. Adams "manufacture" job duties for white employees and has no knowledge to

support an allegation that Ms. Adams "intentionally secreted" promotional opportunities. The only promotional opportunity Brown identifies as discriminatorily denied to her was the Manager of Clinical Scheduling position, but Brown did not apply for this promotion.

Brown's retaliation claim similarly is unsupported by the record. Brown alleges that she was singled out and assigned menial tasks, poorly rated on performance evaluations, and placed on a CAP due to retaliation. Notably, all of the management decisions related to these allegations were made by her supervisor at the time, Karina Rustia.[2] Despite harboring ill will toward Ms. Adams related to her own termination, Ms. Rustia confirmed that Ms. Brown was not singled out or assigned menial tasks as retaliation. Moreover, Ms. Rustia confirmed that Ms. Brown received positive, fair, and accurate performance evaluations in 2010 through 2012. Ms. Rustia further confirmed Brown's performance-related problems in 2013 that led to her poor Performance Appraisal, namely, Brown's failure to support the scheduling desk and concerns from some faculty that Brown was not sufficiently supporting them.

In 2013, Brown almost come to fisticuffs with Ms. Killion in the workplace and Brown admits she acted unprofessionally. A plaintiff cannot survive summary judgment by casting blame on others for workplace incidents that actually occurred. "[F]aulting others for, or otherwise rationalizing, problems legitimately perceived by her employer does not establish pretext." *Taylor v. PolyGram Records*, No. 94 Civ. 7689 (CSH), 1999 WL 124456, at *10 (S.D.N.Y. Mar. 5, 1999). It is undisputed that Brown had performance issues that resulted in a poor performance evaluation, and Brown's CAP was automatically triggered by her evaluation and not as a result of retaliation.

---

[2] Ms. Rustia was later terminated from employment at Weill Cornell and was a hostile witness to Weill Cornell at her deposition in this matter.

**v.**     **Plaintiff Lisa Cabrera's Claims Should be Dismissed**

Plaintiff Cabrera fails to set forth any facts to support a claim for discrimination or retaliation. Cabrera identifies only a single promotional opportunity she claims was improperly denied, but it is undisputed that the reason she was not considered for the opportunity had nothing to do with race. Ms. Adams promoted Cabrera twice, including to a manager position in 2015 and gave Cabrera the two highest performance appraisals Cabrera ever received at Weill Cornell.

Cabrera alleges that she was discriminatorily denied a promotion to the Manager of Clinical Scheduling position in 2013. As noted in Point II(E) *supra*, Cabrera only applied for one promotional opportunity that she did not receive, which was the Manager of Clinical Scheduling position in 2013 (and she received a subsequent promotion). Like Augustine's application, it is undisputed that Cabrera's application was not rejected, rather it was accidentally overlooked by HR Recruiter Nicolle Lesnicki. Ms. Adams was unaware that Cabrera had applied for the position at the time the hiring decision was made, otherwise she would have considered her for the position. *See Burks*, 793 F.3d at 703 (inadvertently lost applications insufficient to support claim); *Montgomery*, 495 F. Supp. 2d at 16 (inadvertent misplacement of application not evidence of discrimination). Unlike Augustine, Cabrera concludes that Ms. Lesnicki's explanation for the accidental oversight is pretext for discrimination. Cabrera admitted, however, that her conclusion is pure speculation based on an unattributed (and inadmissible) rumor that Ms. Killion was a "lock" for the position. It is undisputed that other candidates interviewed for the position and Ms. Killion was hired because Dr. Malhotra valued her spreadsheet skills.

Cabrera's allegations of retaliation in the form of micromanaging by Ms. Adams and a decrease in her performance evaluations are conclusory and contradicted by the record. The

record is undisputed that Ms. Adams scheduled bi-weekly meetings with Cabrera and requested that she record her time management in an effort to improve Cabrera's efficiency and reduce her hours worked. Finally, Cabrera's performance appraisals show that after she made her various complaints, her appraisals improved and she was promoted. Cabrera received near perfect evaluations in 2015 and 2016, the two years that Ms. Adams was her direct supervisor. There is no support in the record for Cabrera's retaliation claim.

### vi.   Plaintiff Ivette Francis' Claims Should be Dismissed

Francis is not alleging discrimination in promotional opportunities, she is alleging only that she was "nit-picked" (by definition for minor issues) and terminated for discriminatory or retaliatory reasons. At her deposition, Francis was not clear as to whether she was asserting discrimination or retaliation, but her claim fails either way because her termination was for legitimate reasons. (*See* Francis Tr: 131:16-24, 346:23-25 – 347:2-20, 347:21-25 – 348:2-6.)

Francis can point to no facts to support her conclusory allegation that she was terminated due to race or because she voiced a complaint to HR in 2011. After Francis' voluntary resignation, Ms. Adams hired Ms. Francis back into her position in 2011. Francis' probation upon rehire was extended by Ms. Johnson-McLean, who is black, due to her undisputed punctuality problems.

Francis' allegations that Ms. Adams directed Francis' supervisors to nit-pick her performance also are unsupported speculation. The emails identified by Francis as retaliatory were regarding performance issues that Francis admitted she had, including lateness, failure to document her time management, and unprofessional interactions with co-workers. Francis admitted that she had interpersonal conflict with both of her supervisors and her co-worker over a number of years, two of whom were minorities. Ms. Francis admitted to recurring punctuality

problems and unprofessional behavior.  The emails in question did not result in any discipline and Ms. Francis does not alleging anything retaliatory about her performance appraisals.

Her termination was legitimate and non-pretextual. Francis was warned in July 2013 that she needed a coding certification to continue employment as her position was being eliminated. Francis reacted unprofessionally, causing complaints from faculty and staff. Francis also had a "very heated" altercation with her supervisor Ms. Killion. As a result of this conduct, Francis received a written warning on September 6, 2013.  Francis again reacted unprofessionally and was sent home.  She admittedly still had not obtained the coding certification at this time.  Her unacceptable conduct and lack of certification led Mr. Mazza in HR to recommend termination of her employment. Francis argued at her deposition that she was treated unfairly, but "faulting others for, or otherwise rationalizing, problems legitimately perceived by her employer does not establish pretext." *Taylor*, 1999 WL 124456, at *10 (casting blame on others insufficient to survive summary judgment).  Francis admits that she failed to get the coding certification in a timely manner and had on-going conflict with both of her supervisors.  In contrast, her co-worker on the scheduling desk, Louisa Charles, a black woman, obtained the coding certification in a timely manner and kept her job.

### vii.   Plaintiff Tammy Smith's Claims Should be Dismissed

Plaintiff Smith's claims of discrimination and retaliation fail because Weill Cornell HR reviewed Smith's job duties and made a good faith assessment that they did not warrant a promotion to exempt level 6.  Moreover, her allegations of retaliation are based on unreasonable subjective paranoia about objectively innocuous interactions with management. Additionally, Smith's theft of confidential electronic and hard-copy data from the Department should cause the Court to view her unsupported allegations warily.

Smith never applied for or asked Ms. Adams to promote her into a position that was posted on the Weill Cornell career website or open to other employees.  Rather, Smith alleges that the duties she was performing as Administrative Secretary warranted a promotion to an exempt classification level 6 position. Although Smith had not requested a review of her job duties for upgrade since 2008, Ms. Adams assisted Smith to update her job description and submit it to Jane Hopkins in the HR Compensation Office for review in 2013. Ms. Hopkins reviewed Smith's updated duties and found that her secretarial duties did not qualify for a promotion to compensation level 6. Smith's subjective disagreement with Ms. Hopkins' determination is insufficient to support a claim for discrimination.  *See Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 411 (S.D.N.Y. 2006) (granting summary judgment for employer absent evidence that decision to deny employee promotion to next compensation level was made in bad faith).

Smith's conclusory allegations that Ms. Ferraro and Ms. Matarazzo were assigned supervisory duties which they did not perform for discriminatory purpose are meritless.  Ferraro was promoted to a level 5 position, the same level as Smith, because she had relevant research experience and no other internal candidate applied for the job. Moreover, Matarrazo was hired externally (not promoted) into a position that was posted for six months because no internal applicants applied and she had extensive experience working as an executive assistant to a faculty Chief in an academic medical center. Smith was not interested in and did not apply for this position. Finally, Smith admits that her job description contained duties that she did not perform at times so allegations about Ferraro and Matarazzo are conclusory.

Additional undisputed facts underscore the bad faith nature of Smith's allegations in this case. For example, Smith accused Ms. Hopkins of race discrimination in 2013 based on her

failure to respond to one particular email Smith sent to her. The content of Smith's angry, conspiratorial, and unprofessional email to Hopkins provides a good example of why Smith was a poor candidate for promotion. Significantly, Smith was offered and rejected a position transfer with a 10% pay raise in 2012 that would have afforded her the opportunity to be free from direct supervision by Ms. Adams, the very person she accuses of discrimination and retaliation. Smith declined the transfer because she felt that anything less than a 20% raise was unfair.

Smith's allegations about retaliation also are objectively unreasonable. The SAC alleges that the removal of binders from her desk amounted to retaliation. There is no dispute that Adams removed them because they contained social security numbers and left Smith a voicemail to that effect. After listening to the voicemail, Smith still called HR to complain about Ms. Adams.[3]

The remainder of Smith's retaliation allegations are nothing more than petty, vindictive complaints about indisputably legitimate management actions. Smith cites emails from Ms. Johnson-McLean and Adams about meeting scheduling as evidence of retaliation but admits that the emails did not impact her employment in any way. Smith alleges that Adams intentionally scheduled an HR meeting about the employee satisfaction survey for a day Smith was out of work, but that Ms. Adams apologized to Smith for the oversight and provided Smith with another opportunity to discuss the survey with HR. Smith takes further issue with an email Adams sent to staff providing instructions for coverage during an "unscheduled absence" by Smith. Smith admitted the absence was unscheduled and Ms. Adams explained to Smith that the reference to "unscheduled" was for business purposes.

---

[3] Similarly, Smith has no idea who moved the fly glue trap to her cabinet and admitted that the trap was sitting on top of the binder books and had to be moved to remove the binders.

Smith further alleges that Adams set her up to fail by assigning her new duties and commencing biweekly progress meetings. Smith was able to perform the new duties assigned to her and gained new skills through their performance. Smith also confirmed that the biweekly meetings were worthwhile and they were instituted as much for Ms. Adams' benefit as for Smith's benefit. Smith alleges that her performance appraisals amounted to retaliation but admits that the ratings of "needs improvement" in 2011 and 2013 were based on legitimate grounds. She received a rating of 3.5 out of 5 for each of those years, a rating she indicated she was pleased with in 2012. Ms. Smith exhibited extremely unprofessional behavior toward Ms. Adams on several occasions in those years and Ms. Adams never took any punitive action against Smith based on this behavior.  There also is not dispute that Smith removed confidential electronic and hard-copy information from the Weill Cornell computer system and Ms. Adams' office – conduct that would justify immediate termination.

## C. **In the Alternative, Plaintiffs' Claims Must Be Severed and Separate Trials Ordered, Due To the Differing Proof Required to Prove their Dissimilar Claims and the Risk of Prejudice Posed to Defendants By a Joint Trial.**

In the event that the Court declines to grant Defendants' summary judgment motion, it should sever Plaintiffs' claims, and/or order separate trials, pursuant to Rules 21 and 42(b) of the Federal Rules of Civil Procedure.  Such outcome is warranted where the plaintiffs' claims lack "common questions of law or fact," require "different witnesses and documentary proof," or pose a threat of prejudice to the defendants absent severance.  *See*, *e.g.*, *Dickerson v. Novartis Corp.*, No. 1:15-cv-1980 (GHW), 2016 WL 1611504, at *3 (S.D.N.Y. Apr. 21, 2016).  Only one of these factors need be present to merit severance and/or separate trials, and the Court has "broad discretion" to grant such relief.  *See Cestone v. Gen. Cigar Holdings, Inc.*, No. 00 Civ. 3686 (RCC) (DF), 2002 WL 424654, at *2 (S.D.N.Y. Mar. 18, 2002).

Plaintiffs' discrimination and retaliation claims are fundamentally dissimilar, and are premised on wholly differing legal theories. Indeed, Plaintiff Smith conceded as much in her anonymous February 2013 letter to the Dean and President when she complained that HR had treated the Plaintiffs' complaints singularly and had not addressed them individually. For example, Plaintiffs Augustine and Cabrera claim discriminatory failure to hire based upon applications that they *actually submitted* during the course of their employment; the remaining three Plaintiffs do not advance such a theory.  Plaintiffs Brown, Cabrera, and Francis assert conclusory allegations that positions existed to which they *would have applied* had they known about the vacancies—although two of them contradict this statement in their deposition testimony—while Plaintiffs Augustine and Smith make no such assertions.  Instead, Plaintiff Smith's discrimination claims are uniquely premised on a theory that she *should have received a promotion based on tasks she was already performing* during her period of employment. Plaintiffs' retaliation claims fare no better.  While three Plaintiffs do not raise termination-based claims, Plaintiff Brown alleges that she was *constructively discharged* in retaliation for a protected activity—which claim carries its own evidentiary burdens—and Plaintiff Francis alleges that Defendants retaliated against her by *actually terminating* her employment.  Four Plaintiffs raise retaliation claims, but Plaintiff Augustine does not.  Recognizing the inherent issues in such a disjointed patchwork of legal claims, this Court has held that severance is warranted when particular plaintiffs posit causes of action based on unlawful termination and retaliation, while others complain of discrimination in promotions and job assignments.  *See Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 581 (E.D.N.Y. 1999) (granting severance where one plaintiff posited "claims of failure to promote, while . . . [the other

advanced] a claim of unlawful termination"). The same result must follow here, due to Plaintiffs' differing claims and the variety of legal theories undergirding these causes of action.[4]

Predictably, these varying claims necessarily require separate documentary evidence and involve different witnesses, further meriting severance and/or separate trials. *See*, *e.g.*, *Dickerson*, 2016 WL 1611504, at *4 (granting severance where one plaintiff's "individual claims" required evidence regarding her "individual performance" and "the basis for . . . [her] termination"); *Preferred Med., P.C. v. Geico Gen. Ins. Co.*, No. 03 Civ. 8516 (DCF), 2005 WL 2777309, at *4 (S.D.N.Y. Oct. 26, 2005) (ordering severance where the "relevant details" of the circumstances affecting each individual plaintiff "remain[ed] distinct"). To the extent that some Plaintiffs seek to premise retaliation claims upon their performance-based evaluations or critiques, an assessment of Defendants' legitimate, non-retaliatory rationale for their issuance stands to involve an individualized inquiry into each Plaintiff's performance deficiencies. Given that some Plaintiffs claim that Defendants retaliated against them by assigning them new duties or additional work, a jury may also be asked to examine their individual duties and workload prior to and following the protected activity, an exercise unique to each individual Plaintiff that involves differing facts and proof. Further, Plaintiff Brown alone alleges constructive discharge; whether the unique conduct purportedly directed toward her amounted to a constructive discharge is a separate inquiry requiring an examination of facts independent from those alleged by the other four Plaintiffs. Plaintiffs' claims also would require the input of differing witnesses. For example, while Plaintiff Francis complains of conduct directed toward her by Ms. Johnson-McLean and Ms. Killion in their supervisory capacities, Plaintiff Smith's allegations concern

---

[4] While Plaintiffs may argue that severance or separate trials are inappropriate remedies, because several of them advance a claim of discriminatory failure to promote, this shared cause of action—based on individualized facts and legal theories—does not bar the Court from granting such relief. *See Dickerson*, 2016 WL 1611504, at *3 (the existence of "*some* common question of law and fact" does not require denial of severance (emphasis added)).

Ms. Hopkins, who is absent from the allegations of the other four Plaintiffs. As each of Plaintiffs' claims rest on factually specific assertions unique to them, and implicate differing witnesses, they must be severed and/or separate trials ordered.

Allowing Plaintiffs to proceed in a single action also poses a significant risk of prejudice to Defendants. Without giving credence to any of the causes of action set forth by Plaintiffs whatsoever—due to their wholesale lack of merit, as outlined at length above—to the extent the jury might find the claims of one Plaintiff to be stronger or more persuasive, there is a risk that it might unfairly impute those findings to the claims of the other four, warranting severance. *See*, *e.g.*, *Morris*, 37 F. Supp. 2d at 581.  That is to say nothing of the jury confusion that will likely result from the variety of untethered facts and allegations that Plaintiffs attempt to collectivize in an effort to fabricate instances of discrimination and retaliation where none exist. Given the disparate facts, varying claims and legal theories, and risk of prejudice in the instant matter, the Court should sever Plaintiffs' claims and order separate trials in the event that it denies the summary judgment motion.

## IV.    CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Court grant their Motion for Summary Judgment in its entirety, dismiss the SAC in its entirety, with prejudice, and grant them such other and further relief that this Court deems just and proper. Should the Court decline to do so, Defendants respectfully request that this Court sever Plaintiffs' claims and order separate trials for such claims.

Dated:  July 24, 2017
      New York, New York

                         VENABLE LLP
                         Rockefeller Center
                         1270 Avenue of the Americas, 24th Floor
                         New York, New York 10020
                         t: (212) 307-5500
                         f: (212) 307-5598

By:    /s/
                         Brian J. Clark
                         Benjamin E. Stockman
                         *Attorneys for Defendants Cornell University,*
                         *Weill Cornell Medical College, and Kristen*
                         *Adams*

By:    /s/
                         Sheryl A. Orwel
                         Associate University Counsel
                         Office of University Counsel
                         Weill Cornell Medical College
                         445 East 69th Street, Suite 405
                         New York, New York 10021
                         t: (212) 746-0463