UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARLENE AUGUSTINE, et al.,
                                    Plaintiffs,

                    -v-

CORNELL UNIVERSITY, et al.,
                                    Defendants.

14-CV-7807 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiffs Marlene Augustine, Keisha Brown, Lisa Cabrera, Ivette Francis, and Tammy

Smith bring this action against Cornell University, Weill Cornell Medical College (collectively,

"WCMC"), and Kristen Adams, alleging discrimination on the basis of race and retaliation in

violation of 42 U.S.C. § 1981 and the New York City Human Rights Law ("NYCHRL"), N.Y.C.

Admin. Code § 8-107 *et seq.* Defendants move for summary judgment. For the reasons that

follow, the motion is granted.

## I.      Background

The following facts are taken from the parties' statements of undisputed facts and are not

subject to a genuine dispute unless otherwise noted.

Plaintiffs are current and former administrative employees of the anesthesiology

department at Weill Cornell Medical College. Augustine, Brown, Francis, and Smith identify as

black, and Cabrera identifies as Hispanic. (Dkt. No. 72 ("SUF") ¶¶ 570–575.) Defendant

Kristen Adams has served as department administrator, the most senior administrative position in

the anesthesiology department, since 2001. (SUF ¶ 3.)

Weill Cornell's human resources department ("HR") classifies all employees, based on

their job duties and responsibilities, on a compensation scale with thirteen grades (with 1 being

the lowest). (SUF ¶ 17–18.) If the duties or responsibilities in a job description are altered, or a new position is created, HR decides what compensation grade is appropriate for the position. (SUF ¶ 20.) In effect, by performing extra duties and then updating one's job description, it is possible for an employee to qualify for a higher pay grade. (SUF ¶¶ 22, 24, 586.) As the administrator, Adams had the power to increase duties and responsibilities for employees in the department. (SUF ¶ 588.)

Employees could also receive a more traditional promotion by applying for a different position with a higher pay level: new positions are posted on the Weill Cornell job-listing website by HR, though WCMC policy provides that public posting may be waived if a qualified internal candidate is identified for the position. (SUF ¶¶ 21–22.)

A.     **Plaintiff Augustine**

Augustine has worked at WCMC since November 1999, when she was hired as an administrative secretary in the anesthesiology department, with a pay grade of 4. (SUF ¶ 40.) In 2007, she was promoted to program specialist, and her pay grade was increased to 5. (SUF ¶ 48.) Each year that she worked at WCMC, Augustine received merit-based salary increases, all of which were approved by Adams. (SUF ¶ 55.)

Augustine alleges that she was denied promotional opportunities on the basis of her race. Starting around 2010 or 2011, she allegedly noticed that white staff were being promoted while black staff were not. (SUF ¶ 59.) In October of 2012, Augustine applied for the position of manager of clinical scheduling, which was posted on the WCMC jobs website. (SUF ¶ 87.) The following March, she received an e-mail from Nicolle Lesnicki, an HR recruiter, apologizing for inadvertently forwarding the 144-person applicant pool to the hiring manager before Augustine's application had been received, and without ever checking to see whether more applications had been sent. (SUF ¶ 88.) Because Lesnicki did not realize her mistake until March 2013,

Augustine's application was never considered before the position was filled. (Dkt. No. 65-8; SUF ¶¶ 88–92.) Maria Killion, a white woman, was ultimately promoted into that position. (SUF ¶¶ 97, 575.)

### B. Plaintiff Brown

Brown was hired in 2004 as an administrative secretary in the anesthesiology department. (SUF ¶ 119.) In 2008, Brown was promoted, with Adams's approval, to Program Specialist, a level-5 position. (SUF ¶ 125.) Brown's job duties remained consistent from the time of this promotion through the end of her employment at WCMC, and she received an annual merit pay increase each year except 2014. (SUF ¶¶ 127–28.)

Brown alleges that, starting in 2012, she was discriminatorily denied opportunities to apply for promotions or was not notified that such opportunities existed. (SUF ¶ 130.) Brown believes that several white employees, including Killion, were promoted on the basis of race. (SUF ¶¶ 136, 138.)

### C. Plaintiff Cabrera

Cabrera starting working at WCMC in December 1993 as a temporary employee. In August of 1994, she was promoted to senior administrative secretary, a permanent position, in the anesthesiology department. (SUF ¶ 197.) In August 2008, Cabrera was promoted to residency program specialist, a level-5 position. (SUF ¶201.) In 2010 and 2011, Cabrera began taking on more responsibilities at the behest of her direct supervisor, Karina Rustia. (SUF ¶ 629.) Between 2008 and 2012, Cabrera did not apply for any other position at WCMC, but checked the job website for opportunities between four and six times each year. (SUF ¶¶ 210–11.) When Cabrera expressed her interest in obtaining a promotion in light of her additional duties, Adams told her to seek employment elsewhere if she was unhappy. (SUF ¶ 632.)

In October of 2012, Cabrera, like Augustine, applied for the position of manager of clinical scheduling. But due to Lesnicki's oversight, Cabrera's application was never considered, just like Augustine's. (SUF ¶¶ 232–35.) Cabrera alleges that Killion was promoted to the manager position for racially discriminatory reasons. In 2013, Cabrera applied for a position as a senior administrative specialist, but withdrew her application because she did not think she would be able to manage that job while also attending school. (SUF ¶ 229.)

In 2014, Adams told Cabrera that her position would be phased out and that two new replacement positions would be created. (SUF ¶ 243.) Adams also encouraged Cabrera to apply for a promotion into one of these two new positions. (SUF ¶ 243.) Cabrera applied and was promoted to residency program coordinator, a level-6 position, in 2015. (SUF ¶¶ 245–46.) Adams was on the panel that interviewed Cabrera for this position. (SUF ¶ 247.)

### D. Plaintiff Francis

Francis was originally hired as temporary employee in the anesthesiology department, but in 2007 was elevated to scheduling coordinator, a level-4 position that she retained throughout her employment at WCMC. (SUF ¶¶ 277, 279, 288.) Francis's job duties never changed during her employment, though she did receive merit pay increases. (SUF ¶¶ 286–89.) She resigned in 2011, but asked for her job back a week or two later; Adams agreed to hire her back. (SUF ¶¶ 291, 293.)

Francis does not allege any discriminatory failure to promote by Defendants, but claims that she never applied for any promotions because she was not made aware of any opportunities. (SUF ¶¶ 304–05.) She never visited the WCMC jobs website, despite being aware of its existence, nor did she ever ask a supervisor for a promotion. (SUF ¶¶ 306–07.)

In 2013, Adams told Francis that her position would be phased out and replaced by a new position, which required a certification in insurance coding. (SUF ¶¶ 341–43.) Adams

encouraged Francis to obtain the coding certification so that she would be qualified to apply for the new position. (SUF ¶ 344.) The following month, Killion and Adams told Francis that the new position that would replace hers had been posted on the WCMC career website. (SUF ¶ 348.) After that meeting, Adams and Killion received complaints from faculty and staff members that Francis was behaving disruptively at work. (SUF ¶ 349.) Francis also had a heated altercation with Killion. (SUF ¶ 352.)

Francis did not take the coding exam until October of 2013, after her original position had been phased out. (SUF ¶ 346.) Francis was fired on September 10, 2013, after receiving a warning about her behavior. (SUF ¶ 356.) She claims that Adams fired her for discriminatory and/or retaliatory reasons. (SUF ¶¶ 333–34.)

### E.   Plaintiff Smith

Smith has been an employee of the anesthesiology department since 1993. (SUF ¶ 387.) She has held a level-5 position since 1997, and worked under the direct supervision of Adams from 1999 until 2016. (SUF ¶¶ 388, 395.) With the exception of 2008, she received a pay increase every year. (SUF ¶ 404.) Smith never requested that Adams promote her into a new position (SUF ¶ 408), but did request a promotion twice in 2008 on the basis of increased job duties. (SUF ¶ 642.)

Smith alleges that several white employees were promoted due to racial discrimination starting in 2010, and that Adams enhanced their job descriptions to make these promotions possible. (SUF ¶¶ 414–15.) Smith claims that she deserved a promotion based on extra duties she was assigned starting in 2011. (SUF ¶ 470.) In 2013, Adams helped Smith update her job description and submit it to HR to evaluate whether these duties warranted a promotion to level 6. (SUF ¶ 472.) HR reviewed Smith's updated job duties and determined that a promotion to level 6 was not appropriate. (SUF ¶ 479.)

## F.      Retaliation Claims

Around autumn of 2010, anesthesiology employees participated in a survey seeking their feedback about their overall work experience.  (SUF ¶ 664.)  All five plaintiffs participated in the survey, and met with HR to discuss the low ratings that the anesthesiology department received.  (SUF ¶ 667.)

In 2011, Augustine, Brown, Cabrera, and Francis met with HR and complained about white employees being promoted faster than minorities.  (SUF ¶¶ 98, 671–72.)  HR never communicated the nature of these grievances to Adams.  (SUF ¶ 674.)  Around August of 2012, all five plaintiffs drafted an anonymous letter, which outlined their grievances about Adams and perceived discrimination in the department.  (SUF ¶ 676; Dkt. No. 68-10.)  They sent the letter to the President of Cornell University, the Dean of WCMC, and the President and CEO of New York Presbyterian Hospital.  (SUF ¶ 678.)  In December 2012 or January 2013, Adams became aware of the allegations against her, but not the identities of the anonymous complainants.  (Dkt. No. 65-30 at 142–43; Dkt No. 65-28 at 45–46).  In February of 2013, Brown and Smith participated in drafting another anonymous complaint letter.  (SUF ¶¶ 156, 407; Dkt. No. 68–13.)

Plaintiffs allege that Adams retaliated against them for making these complaints.  Brown alleges that Adams "heavily edited" her performance evaluation for fiscal year 2013,[1] and that as a result, her evaluation score was lower than it should have been.  (SUF ¶ 695.)  Although the evaluation was drafted by Karina Rustia, Brown's direct supervisor, Adams instructed Rustia to edit the draft to emphasize administrative protocol rather than faculty feedback.  (SUF ¶ 703.)  While Brown's 2012 evaluation score was 3.75 out of 5, her 2013 score was 2.5, which

---

[1]      Fiscal Year 2013 at WCMC lasted from July 2012 through June 2013.  (SUF ¶ 694.)

precluded her from receiving a merit pay increase and resulted in issuance of a "corrective action plan." (SUF ¶ 711; Dkt. No. 68-18; Dkt. No. 68-19.)

Francis alleges that she received two more "needs improvement" ratings in 2013 than in 2012, and that her score decreased from 3.5 to 3.25. (Dkt. No. 68-21; SUF ¶ 723.) Francis was also eventually fired, and she attributes her firing to retaliation by Adams.

Smith received a less positive evaluation in 2013 compared to 2012, when she received "meets expectations" ratings in all seven categories. (SUF ¶ 738–741.) Smith was also assigned to support a different doctor, which was a particularly time-consuming assignment, and she was subjected to weekly meetings with Adams starting in 2013. (SUF ¶¶ 743, 745, 746.)

Plaintiffs filed this lawsuit in 2014, alleging discrimination and retaliation in violation of 42 U.S.C. § 1981 and the NYCHRL. Defendants now move for summary judgment.

## II.     Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014)

(citing Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250–51).  The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting *Lunds, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

## III.  Discussion

### A.  Race Discrimination Claims

Plaintiffs claim that Defendants discriminated against them on the basis of race in violation of § 1981 and the NYCHRL.  Their § 1981 claim is subject to the familiar burden-shifting evidentiary framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).  "Under this framework, a plaintiff must first establish a *prima facie* case of discrimination," *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010), which consists of the following elements:

> (i) she was a member of "a protected class"; (ii) she was qualified "for the job benefit at issue"; (iii) "she was subjected to adverse employment actions"; and (iv) "these actions were taken under circumstances giving rise to an inference of discrimination."

*Crawley v. Macy's Retail Holdings, Inc.*, No. 15 Civ. 2228, 2016 WL 6993777, at *7 (S.D.N.Y. Nov. 29, 2016) (quoting *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001)).  If the plaintiff satisfies her burden of production as to the *prima facie* case, then "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (quoting *McDonnell Douglas,* 411 U.S. at 802).  "If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for race discrimination."  *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014).  At that point, "the [employee's] admissible evidence must show

circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)) (alterations in original).

Plaintiffs' NYCHRL claims must be construed "independently from and more liberally" than their federal claims. *Ben–Levy v. Bloomberg L.P.*, 518 F. App'x 17, 19–20 (2d Cir. 2013) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)). The NYCHRL analysis, which is guided by the Second Circuit's decision in *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102 (2d Cir. 2013), "mirrors the *McDonnell Douglas* framework, but accords Plaintiff a lesser burden of showing only that Defendants' actions were based, in part, on discrimination." *Allen v. A.R.E.B.A. Casriel, Inc.*, No. 15 Civ. 9965, 2017 WL 4046127, at *12 (S.D.N.Y. Sept. 12, 2017). The plaintiff must introduce sufficient evidence to show that her employer treated her "less well," and did so "at least in part for a discriminatory reason." *Id.* at *9 (quoting *Mihalik*, 715 F.3d at 110 n.8.). "The burden then shifts to Defendants to present 'legitimate non-discriminatory motives to show the conduct was not caused by discrimination, but [they are] entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played *no* role' in its actions.'" *Id.* (quoting *Mihalik*, 715 F.3d at 110 n.8.)

The briefing on this motion is afflicted by the same lack of clarity that the Court previously observed in the Complaint. *See Augustine v. Cornell Univ.*, No. 14 Civ. 7807, 2015 WL 3740077, at *3 (S.D.N.Y. June 15, 2015). It remains unclear whether Plaintiffs, whose discrimination allegations take various forms, are alleging a failure to promote or are alleging disparate treatment in the drafting of their job descriptions (which in turn affect their eligibility

for an increase in pay grade).  Consequently, the Court addresses all of Plaintiffs' various theories of discrimination, insofar as each is relevant to the allegations of the respective Plaintiffs.

### 1.      Failure to Promote

Plaintiffs allege that Adams denied them promotional opportunities on the basis of race by promoting white employees who were less qualified and less experienced than Plaintiffs were. (Dkt. No. 21 ¶ 18 ("SAC").)[2]

### a.      Augustine's and Cabrera's Failure-to-Promote Claims

To establish a *prima facie* case of discriminatory failure to promote, a plaintiff must establish that "(1) she is a member of a protected class; (2) she 'applied and was qualified for a job for which the employer was seeking applicants'; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's qualifications." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998) (quoting *McDonnell Douglas*, 411 U.S. at 802)).

Augustine and Cabrera have provided sufficient evidence to meet their low burden at this step of the *McDonnell Douglas* framework.  *See id.* at 709.  It is undisputed that both are members of a protected class.  It is undisputed that both applied and were qualified for the

---

[2]      As a threshold matter, Defendants contend that Plaintiffs have abandoned any failure-to-promote theory.  (Dkt. No. 71 at 1 n.1.)  The Court is inclined to agree, but ultimately finds the relevant statements in Plaintiffs' opposition brief to be ambiguous.  (*See* Dkt. No. 69 at 4 ("It is submitted that a failure-to-promote theory employs a different inquiry than disparate treatment, and so much of Defendants' motion of summary judgment analyzed through a failure-to-promote lens is a misguided approach of their own creation.")  Nonetheless, later in their brief, Plaintiffs intimate that Augustine and Cabrera were not promoted to a manager position for discriminatory reasons.  (Dkt. No. 69 at 10.)  Given this ambiguity, and considering that this failure-to-promote theory is perhaps the most robust of the several forms of discrimination claims put forth by Plaintiffs, the Court addresses this theory on its merits.

position of "Manager, Clinical Scheduling & Administrative Support." And it is undisputed that Maria Killion, a white woman, was eventually promoted into that position instead. (SUF ¶¶ 570, 572, 575, 608–09, 618.) Cabrera had more experience in the department (15 years) and just as much education as Killion. (SUF ¶ 612.) And Augustine also had performed scheduling-desk work from 2008 to 2011. (SUF ¶ 619.)

Because Plaintiffs have established their *prima facie* case, the burden shifts to Defendants to demonstrate that Killion was promoted over Plaintiffs for a legitimate nondiscriminatory reason. Defendants have offered two such reasons. First, it is undisputed that Killion was promoted because of her "proficiency using advanced [E]xcel tools that eased the burden of clinical scheduling." (SUF ¶ 97.) Augustine did not have any experience writing Excel formulas. (SUF ¶ 94.) Courts have recognized similar rationales as sufficient to satisfy the employer's burden at step two. *See, e.g.*, *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 310, 312 (2d Cir. 1997) (explaining that employer met its burden at step two of *McDonnell Douglas* with evidence that it hired faculty member based on "superior administrative and teaching skills").

Second, it is undisputed that Augustine and Cabrera were never even considered for the manager position because of an oversight by Nicolle Lesnicki, an HR recruiter at Weill Cornell: After the manager position was posted on September 24, 2012, Lesnicki forwarded 144 applications to Adams before either Augustine or Cabrera submitted their applications. (SUF ¶¶ 90–91, 234, 235.) Lesnicki did not realize her error until March of 2013, after the position had been filled. (SUF ¶ 235.)

Augustine neither disputes Lesnicki's explanation nor alleges that her actions were discriminatory rather than inadvertent. (SUF ¶¶ 91–92.) Absent evidence in the record

"indicat[ing] that the selecting official(s) were aware that the plaintiff had applied for the . . . position and then took steps to 'lose' [her] application, or to otherwise weaken [her] chances of getting the position," Lesnicki's error is sufficient to sustain Defendants' burden at step two. *Montgomery v. Chao*, 495 F. Supp. 2d 2, 16 (D.D.C. 2007), *aff'd*, 546 F.3d 703 (D.C. Cir. 2008).

Cabrera seems to disagree with Augustine's conclusion that Lesnicki's mistake was not racially motivated, and instead contends that it was a *post hoc*, pretextual explanation for the racially discriminatory promotion process. (*See* Dkt No. 69 at 10.) Because Defendants have introduced two legitimate nondiscriminatory reasons for hiring Killion, Cabrera has the burden to adduce sufficient "evidence from which a reasonable jury could infer that the legitimate, nondiscriminatory reason for discharge offered by defendants . . .was a pretext for discrimination." *Chukwurah v. Stop & Shop Supermarket Co.*, 354 F. App'x 492, 495 (2d Cir. 2009). Cabrera points to the fact that "[Killion] was bragging" that "she had the job before [she] even interviewed" and that she was "just basically going through the HR and [Adams] interview." (Dkt. No. 69 at 10.) Cabrera also cites Plaintiff Francis' testimony that: (1) Killion told Francis she had been "hand picked" for the Manager position, and (2) "[Killion] told [Francis] that [Adams] had a position for her and had to wait a little while to go through the red tape of it but the position was hers." (*Id.*)

Even assuming that the testimony about Killion's (and Adams's) statements are admissible, they are insufficient to rebut Defendants' legitimate nondiscriminatory reasons for hiring Killion rather than Cabrera.[3] Even if Killion had been "handpicked" for the position

---

[3]    "A plaintiff 'can demonstrate pretext with direct evidence . . . or with indirect or circumstantial evidence.'" *Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 272 (E.D.N.Y. 2013) (quoting *Bagley v. J.P. Morgan Chase & Co.*, No. 10 Civ. 1592, 2012 WL 2866266, at *12 (S.D.N.Y. July 12, 2012)). It is undisputed that no direct evidence of pretext or discriminatory intent exists with respect to Killion's promotion. (SUF ¶ 237.)

ahead of time, there is no evidence that she was picked for any reason other than her exceptional Excel skills. The mere fact that Killion's skills were recognized before her interview, without more, does not support a reasonable inference that Defendants' proffered reason for promoting her rather than Cabrera, including Lesnicki's mistakes and Killion's skills, were "unworthy of credence" or otherwise motivated, even in part, by racial animus. *See Crawford v. Dep't of Investigation*, 324 F. App'x 139, 142 (2d Cir. 2009) (concluding that irregularities or mismanagement in layoff process was not sufficient to raise an inference of discrimination.) Cabrera's case for discriminatory failure to promote is also especially weak in light of the fact that she was eventually promoted to residency program coordinator in 2013 after an interview with Adams, Lesnicki, and others. (SUF ¶¶ 245–47.)[4]

In sum, Cabrera has "created only a weak issue of fact as to pretext and there is abundant and uncontroverted independent evidence that no discrimination has occurred." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000). Defendants are entitled to summary judgment on Augustine's and Cabrera's failure-to-promote claims.

### b. Brown's Failure-to-Promote Claim

To the extent that Brown relies on a failure-to-promote theory (*see* Dkt. No. 69 at 11), her claim also fails. She cannot establish a *prima facie* case because she never applied for a particular promotion. *See Brown*, 163 F.3d at 709–10. The only promotional opportunity that she alleges was discriminatorily denied to her was the manager position for which Killion was eventually hired. (Dkt. No. 65-37 at 172.) But it is undisputed that when she saw that position

---

[4]     It is worth noting that between 2010 and 2017, five employees were promoted to level-6 positions in the anesthesiology department, and four of those promotions went to non-white employees. (SUF ¶ 569.)

posted on the website, she decided not to apply for it.  (SUF ¶ 140.)  Under *Brown*, this is fatal to her failure-to-promote claim.

### c.  Smith's Failure-to-Promote Claim

Like Brown, Smith never applied for a promotion that was posted on the career website or any other position that was open to all employees.  (SUF ¶ 408; Dkt. No. 65-46 at 129–30.) This precludes her from making out a *prima facie* case of a traditional failure-to-promote claim. *See Brown*, 163 F.3d at 709.

### 2.  Failure to Increase Pay Based on Job Description Duties

The second variety of disparate treatment alleged by Plaintiffs generally relates to Weill Cornell's practice of promoting employees to a higher pay grade if there was "a significant increase in duties and responsibilities in the same position."  (Dkt. No. 69 at 6.)  Plaintiffs allege that they performed extra job duties but that their extra work was "ignored" and any potential promotional opportunities were denied to them.  (SAC ¶ 22; Dkt. No. 69 at 11–12 (Brown and Cabrera), 16 (Smith).)  Meanwhile, white employees' job descriptions allegedly included duties and tasks that they did not actually perform, which made those white employees eligible for promotion.  (SAC ¶ 22.)  Here too, the Court applies the three-step *McDonnell-Douglas* framework to determine whether summary judgment is warranted.

Brown, Cabrera, and Smith claim that they were discriminatorily denied a pay increase, despite the fact that they requested an update to their respective job descriptions to reflect additional duties they had each assumed.  (Dkt. No. 69 at 11.)  As with the failure-to-promote claims, in order to survive summary judgment, each plaintiff must establish a *prima facie* case by adducing evidence that "(i) she was a member of 'a protected class'; (ii) she was qualified 'for the job benefit at issue' [i.e., the pay increase]; (iii) "she was subjected to adverse employment actions"; and (iv) "these actions were taken under circumstances giving rise to an inference of

discrimination." *Crawley v. Macy's Retail Holdings, Inc.*, No. 15 Civ. 2228, 2016 WL 6993777, at \*7 (S.D.N.Y. Nov. 29, 2016) (quoting *Gregory v. Daly*, 243 F.3d 687, 695 (2d Cir. 2001)).

Plaintiffs have failed to adduce sufficient evidence to satisfy the fourth element of their *prima facie* case: there is no evidence giving rise to an inference of discrimination. "The Court's task, at this stage, is to consider 'whether a finder of fact could reasonably determine that [the plaintiff] has proffered evidence of circumstances supporting an inference of discrimination.'" *Ghorpade v. MetLife, Inc.*, No. 14 Civ. 4379, 2016 WL 3951183, at \*3 (S.D.N.Y. July 20, 2016) (quoting *Delville v. Firmenich, Inc.*, 920 F. Supp. 2d 446, 460 (S.D.N.Y. 2013)). Often, the inference is established "'by showing that a similarly situated individual not in [plaintiff's] protected group . . . was treated differently.'" *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 140–41 (E.D.N.Y. 2002) (alteration in original) (quoting *Tramble v. Columbia Univ.*, 1999 WL 61826, at \*5 (S.D.N.Y. Feb. 10, 1999). The burden on Plaintiffs is low at this stage, *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996); nonetheless, they cannot rely "upon conclusory statements or mere allegations." *Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001).

Plaintiffs identify the following white comparators whose job descriptions allegedly contained duties that they did not actually perform, thus making them more appealing candidates for an increase in pay grade: (1) Lacy Ferraro,[5] (2) Kelsi Welter, (3) Maria Killion, and (4)

---

[5] It is undisputed that supervisory duties were included in Ferraro's job description because she was actually expected to supervise the training of new staff. (SUF ¶¶ 443.) The inclusion of these supervisory duties was the only basis for Plaintiff Smith's belief that Ferraro was treated preferentially due to race. (SUF ¶ 424.) The only other support for the allegation that Ferraro was treated better because of her race is Francis's conclusory statement Ferraro had a job duty in her description that she did not in fact perform. (Dkt. No. 65-43 at 187.) Such conclusory allegations are insufficient, without any specifics about what other job duties Ferraro was not actually performing, to survive summary judgment. *Woods*, 8 F. App'x at 42.

Marisa Matarazzo.  (*See* Dkt. No. 69 at 13, 15.)  Although Plaintiffs testified that these four

white employees' job descriptions were broader than their actual duties, the evidence in the

record establishes that the overbroad job descriptions were an endemic issue in the department,

irrespective of the race of employee.[6]  For example, it is undisputed that Plaintiff Smith's job

description at times contained duties she did not actually perform.  (SUF ¶ 467.)  Similarly,

Plaintiff Francis testified that at times, Maria Killion performed work that was actually in the job

description of Tina McLean, a black employee.  (Dkt. No. 65-43 at 182–83.)  The evidence

simply does not support an inference that the prevalent overbreadth in job descriptions was the

result of racial discrimination in drafting.

Plaintiffs could perhaps support an inference of discrimination if they were able to show

that these overbroad descriptions were used to the benefit of only white employees, even if

employees of all races sometimes had duties in their descriptions beyond those they actually

performed.  The evidence in the record, however, fails to support an inference that the overbroad

job descriptions were used to discriminatorily promote white employees.  Plaintiffs are simply

unable to identify any adequate white comparators who received such a job benefit.  First,

Matarazzo was never promoted.  (SUF ¶ 560.)  And second, any claims based on Welter's or

---

[6]    As a threshold manner, the Court notes that the mere fact that the job descriptions of some similarly situated white employees contained duties they did not actually perform does not necessarily raise an inference of discrimination without something more—i.e., without some evidence that these white comparators actually received an increase in pay grade.  The Court is skeptical as to whether an artificially inflated job description qualifies, in and of itself, as a "job benefit," if no positive consequences (e.g., a raise) actually flow from that enhancement.  *See, e.g.*, *DeJesus v. Allstate Ins. Co.*, No. 96 Civ. 6073, 2001 WL 1006653, at *5 (S.D.N.Y. Aug. 30, 2001) (identifying the third element of *prima facie* case as whether a "job benefit was denied").  Nonetheless, even assuming that an inflated description alone constitutes a "job benefit" for purposes of Title VII, there is insufficient evidence that such enhancements were doled out in a racially discriminatory manner, as explained below.

Ferraro's 2009 promotions are time-barred, *see Augustine*, 2015 WL 3740077, at *1 n.1, and there is insufficient evidence that Ferraro's duties were actually enhanced.[7]

That leaves Plaintiffs' job-description claims resting solely upon the promotion of Killion. But as explained above, Defendants proffered a legitimate, nondiscriminatory reason for Killion's promotion (namely, her Excel skills), and Plaintiffs have offered neither direct nor circumstantial evidence of pretext. Defendants are therefore entitled to summary judgment on Plaintiffs' claims related to artificial enhancement of job descriptions.

### 3. Failure to Update Job Description

Brown, Cabrera, and Smith allege a third theory of discrimination: that they assumed extra job duties, but that as a result of discrimination, neither their job descriptions nor their compensations were updated to reflect those new responsibilities. (Dkt. No. 69 at 11, 13–14.) Plaintiffs have again failed to make out a *prima facie* case because they have not adduced evidence sufficient to support an inference of discrimination.

Neither Brown, nor Cabrera, nor Smith identifies a single similarly situated white employee whose job description was updated or whose pay grade was increased after she assumed extra duties. The only comparator evidence Plaintiffs offer is Cabrera's generalized, conclusory assertion that white employees "either [got] compensated for . . . additional tasks or they receive[d] a promotion for taking on those additional tasks." (Dkt. No. 65-40 at 231.) These "purely conclusory allegations of discrimination, absent any concrete particulars" are

---

[7]     In addition, with respect to promotional opportunities, neither Welter nor Ferraro is similarly situated to Plaintiffs. Both purported comparators were promoted to level-5 positions (SUF ¶¶ 555, 557), which would have been lateral moves, rather than promotions, for all relevant Plaintiffs. *See Roa v. Mineta*, 51 F. App'x 896, 899 (2d Cir. 2002) (explaining that plaintiff and comparators were "not similarly situated because their duties and responsibilities were materially different").

insufficient to establish a *prima facie* case. *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 393 (S.D.N.Y. 2012) (quoting *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985)); *see also Lumhoo*, 229 F. Supp. 2d at 147 (concluding that a similar set of generalized allegations that white employees were promoted instead of black employees over a period of time was insufficient, without specific examples, to support a *prima facie* case).

Brown points to one more piece of evidence in an effort to raise an inference of discriminatory motive: she avers that when she asked her supervisor, Karina Rustia, about getting her job description updated to reflect the new tasks she had taken on, Rustia "laughed at [her] and informed [her] that [Defendant] Adams explicitly told her [Brown] 'won't be getting anything.'" (Dkt. No. 68-24 ¶ 4.) Given that even a racially tinged "stray remark" would be insufficient to survive summary judgment, *see, e.g.*, *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998), Adams's comment, which does not necessarily reflect any racial animus, is likewise insufficient.

### 4. Failure to Make Minority Employees Aware of Promotional Opportunities

Plaintiffs' next theory of employment discrimination is that white employees were promoted to positions of which minority employees were never informed. (Dkt. No. 69 at 7.) Again, Plaintiffs fail to identify sufficient evidence to support a *prima facie* case on this theory.

Augustine testified that minority employees never knew about "the majority of promotions," and "only heard [about them] after the person got promoted." (Dkt. No. 65-33 at 166.) Specifically, she identified Rachel Reese, Alexandra Iosso, and Cary Donohue as white employees who were promoted to opportunities not advertised to minority employees. (Dkt. No. 65-34 at 168, 171.)

But neither Reese, nor Iosso, nor Donahue is a proper comparator for any of the Plaintiffs. It is undisputed that Augustine was not interested in Reese's or Iosso's promotions. (SUF ¶ 79, 82; Dkt. No. 65-32 at 122, 129.) Similarly, Smith had no interest in Iosso's or Donahue's promotions. (SUF ¶ 433, 438.) There is no allegation or indication that any other plaintiff was interested in either of these promotions. Plaintiffs' disinterest in these three promotional opportunities is wholly unsurprising: They all would have been lateral moves, rather than promotions, for Plaintiffs Augustine, Cabrera, Brown, and Smith. (SUF ¶¶ 48 (Augustine), 125 (Brown), 201 (Cabrera), 395 (Smith), 556 (Reese), 558 (Iosso), 559 (Donahue), 594 (Augustine), 659 (Smith).)[8] Put another way, none of the three white comparators was "similarly situated in all material respects" to Plaintiffs. *Redfern-Wallace v. Buffalo News*, 688 F. App'x 96, 97 (2d Cir. 2017) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014)).[9]

Finally, Brown claims that Kathryn Koval, another white employee, was made aware of two promotional opportunities that were kept secret from minority employees. (SUF ¶ 599.) It is true that Koval was promoted in 2008 to a level-6 position (SUF ¶ 553), but nonetheless, her promotion cannot support an inference of discrimination. First, the Court has already dismissed as time-barred any claim that Brown would have applied for such a promotion in 2008 had she

---

[8]     Meanwhile, Plaintiff Francis disclaims that she suffered any discriminatory failure to promote. (SUF ¶ 304.)

[9]     Moreover, Plaintiffs' lack of any legitimate interest in these positions is itself fatal to their discrimination claims. The normal requirement "that a plaintiff alleging failure to promote ordinarily must show that he or she applied for the specific job or jobs at issue" is excused if "the plaintiff indicated to the employer an interest in being promoted to a *particular class of positions*, but was unaware of specific available positions because the employer never posted them." *Mauro v. S. New England Telecommunications, Inc.*, 208 F.3d 384, 387 (2d Cir. 2000) (emphasis added). But *Mauro*'s exception does not apply where a plaintiff is not at all interested in the promotions in question, even if she was unaware of the opportunity because it was never publically posted. *See id.* Thus, absent any evidence of interest in the comparators' positions, the employer's failure to advertise the opportunity cannot support a *prima facie* case of discrimination.

been made aware of it. *Augustine*, 2015 WL 3740077, at *1 n.1. Second, Brown admits that she has no personal knowledge to support the allegation that "Adams intentionally secreted the position to which Kathryn Koval was promoted." (SUF ¶ 144.) Thus, Plaintiffs cannot rely on Brown's allegations alone to establish their *prima facie* case based on this particular theory of discrimination. *See Lumhoo*, 229 F. Supp. 2d at 147 ("Allegations of disparate treatment made without personal knowledge and unsupported by admissible evidence do not satisfy even the minimal burden which a plaintiff faces at the *prima facie* stage of proceedings.") (quoting *Wang v. N.Y.C. Dep't of Finance*, 1999 WL 529550, at *14 (E.D.N.Y. July 21, 1999)).

Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims that minority employees were discriminatorily kept unaware of certain promotional opportunities.

### 5.     Disparate Responses to White Employees' Threats to Resign

Plaintiffs next claim that "when black employees expressed discontent at the lack of opportunities or threatened to quit," Adams invited their resignations, but that "when white employees expressed discontent and/or threatened to leave," they were promoted. (Dkt. No. 69 at 7–8.)

Again, Plaintiffs fail to identify any adequate comparators to support an inference of discriminatory treatment. Plaintiffs try to contrast Adams's response to Cabrera's interest in promotions with Adams's treatment of Donohue and Deanna Gallavan, who were promoted after expressing an intention to leave WCMC. (Dkt. No. 69 at 8.) But as explained above, Donahue was not similarly situated to Cabrera. For the same reasons, Gallavan, who was promoted in 2005 to a level-4 position (SUF ¶ 554), was not similarly situated to Cabrera. Moreover, claims based on these two promotions are time-barred. *Augustine*, 2015 WL 3740077, at *1 n.1. The only evidence left supporting this claim is Cabrera's testimony that when she asked for a promotion, Adams told her, "If you're not happy you can leave, you can quit, and I will be more

than happy to write your letter of recommendation." (Dkt. No. 65-41 at 321–22.) By itself, this does not support an inference of discrimination.

Despite their various attempts, Plaintiffs have ultimately failed to offer a viable theory of disparate treatment. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' § 1981 and NYCHRL discrimination claims.

## B. Retaliation Claims

Plaintiffs next allege that Defendants retaliated against them in violation of § 1981 and the NYCHRL. (SAC at 32–33.)

"Retaliation claims made under 42 U.S.C. § 1981, like those made under Title VII, are evaluated using [the *McDonnell Douglas*] three-step burden-shifting analysis." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). At the first step, "[i]n order to establish such a *prima facie* case,"

> a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find (1) that [s]he engaged in protected [activity] under [the anti-discrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Id.* (alterations in original) (quoting *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205–06 (2d Cir. 2006)). An adequate *prima facie* showing "creates a 'presumption of retaliation,' which the defendant may rebut by 'articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action.'" *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (alterations in original) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "If the defendant provides such an explanation, 'the presumption of retaliation dissipates,' and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the

challenged employment action.'" *Id.* (first quoting *Jute*, 420 F.3d at 173, second quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013)).

The NYCHRL's retaliation provision is broader than § 1981 and Title VII. *Id.* at 76. "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible.'" *Id.* at 75 (quoting *Mihalik,* 715 F.3d at 112). "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d 102 at 112 (internal citations omitted)

Still, even under the NYCHRL, a version of the familiar burden-shifting framework applies:

> [T]he plaintiff must establish a prima facie case, and the defendant then has the opportunity to offer legitimate reasons for its actions. If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's "reasons were pretextual," or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least "in part on [retaliation]." In other words, summary judgment is appropriate if "the record establishes as a matter of law" that discrimination or retaliation "play[ed] no role' in the defendant's actions."

*Chen*, 805 F.3d at 75–76 (first and second quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 35, 41 (1st Dep't 2012), third and fourth quoting *Mihalik,* 715 F.3d at 110 n.8.)

### 1.    Brown's Retaliation Claim

Brown claims that Defendants gave her a negative annual performance review and placed her on a "corrective action plan" in retaliation for her complaining about racial discrimination. (Dkt. No. 69 at 27–28.)

Brown fails to establish a *prima facie* case. She has not produced sufficient evidence from which a reasonable jury could infer a causal connection between her complaints of discrimination in 2012 and her negative performance evaluation in 2013.[10] In an effort to support such an inference, Brown relies primarily on the timing of the relevant events. It is undisputed that, in December 2012 or January 2013, Defendant Adams became aware of the allegations against her of racial discrimination. (SUF ¶ 680.) Approximately five to six months later, in June 2013, Adams took adverse action against Brown by giving her a negative evaluation.[11] (SUF ¶¶ 689–90, 93.)

"[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (alteration in original) (quoting *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001)). In considering whether "a temporal relationship is too attenuated to establish causation" for purposes of a *prima facie* case, the Second Circuit has expressly declined to formulate a bright-line rule. *Id.* Under some circumstances, a gap of five months is not too long, *id.*, while in other cases "the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of

---

[10] Although Brown also participated in the drafting of the anonymous February 2013 letter (SUF ¶¶ 156, 407), she claims retaliation on the basis of her 2012 complaints only. (Dkt. No. 69 at 25.)

[11] Generally, a negative evaluation alone does not constitute adverse action under § 1981, and may not constitute adverse action even under the more liberal NYCHRL. *See Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 217 (E.D.N.Y. 2014) (collecting cases). Brown's negative evaluation, however, had further consequences, including precluding her from receiving a merit pay increase. (Dkt. No. 68-3; SUF ¶ 14.) Under these circumstances, the negative evaluation constituted a materially adverse action under § 1981 and the NYCHRL. *See Bowen-Hooks*, 13 F. Supp. 3d at 217 (explaining that a negative evaluation that affects "plaintiff's promotion opportunities or pay" may constitute materially adverse action).

causation" based on temporal proximity alone. *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (collecting cases). In any event, for "mere temporal proximity" to support an inference of causation, that "temporal proximity must be very close." *Campbell v. Home Depot U.S.A., Inc.*, No. 03 Civ. 1421, 2006 WL 839001, at *13 (S.D.N.Y. Mar. 30, 2006), *aff'd sub nom. Campbell v. Home Depot USA, Inc.*, 221 F. App'x 21 (2d Cir. 2007) (quoting *Clark County School Dist. v. Breeden,* 532 U.S. 268, 273 (2001)).

Here, the evidence of temporal proximity is weak: five to six months passed before any action was taken against Brown. Furthermore, even if the temporal link were stronger, the additional facts of this particular case preclude any inference of retaliatory motive. Plaintiffs' 2012 letter complaining of discrimination was signed "Anonymous Employees from the Department of Anesthesiology." (Dkt. No. 68-10.) Adams testified that there were 25 to 30 nonexempt staff members in the anesthesiology department at that time, and that she did not (during the relevant time) know who the anonymous authors of the letter were. (Dkt. No. 65-29 at 66.) Plaintiffs have produced no contrary evidence that would allow a reasonable juror to infer that Adams knew that Brown co-authored the letter and that Adams retaliated against her for that reason. *See Wrobel v. Cty. of Erie*, 692 F.3d 22, 32 (2d Cir. 2012) (noting the relevance of anonymity to the ultimate conclusion that "[a] reasonable jury could not find a causal connection between [the anonymous statements] and the conduct alleged to be retaliatory"); *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 373–74 (S.D.N.Y. 2005) (noting that the anonymous nature of plaintiff's complaint weakened his *prima facie* evidence of retaliation). In light of the five-to-six month gap and the anonymous nature of her complaints, Brown has failed to adduce sufficient evidence of retaliatory motive under § 1981 or the NYCHRL.

Brown's only other potential evidence in support of her *prima facie* case is the affidavit of her direct supervisor, Karina Rustia, who averred that Adams was "retaliating against [Brown.]" (Dkt. No 68-5 ¶ 15.) Rustia's deposition testimony, however, revealed this statement to be nothing more than a conclusory allegation based on a mere hunch and unsupported by any specific record evidence or personal knowledge. (*See* Dkt. No. 65-35 at 85–89.)[12] As such, Rustia's statements about retaliatory motive are insufficient to support an inference of retaliatory motive at summary judgment. *See Butler v. Raytel Med. Corp.*, 150 F. App'x 44, 47 (2d Cir. 2005) (disregarding claim of discrimination that "was not supported by other record evidence or by specific examples in [plaintiff's] own testimony"); *Farias v. Instructional Sys.,* 259 F.3d 91, 99 (2d Cir. 2001) (declining to accept "conclusory statements unsupported by the record" as grounds to deny summary judgment).

Furthermore, even if Brown had established a *prima facie* case, she has failed to provide sufficient evidence that Defendants' apparently legitimate non-retaliatory reasons for her low

---

[12]     Q: So what is your basis for suspecting that race or retaliation had anything to do with Keisha Brown's 2013 evaluation?

A: It's just how I was -- it was my perception that in the department things were always very -- seemed very procedure driven, you know, in terms of law and HR, but there was a lot of subversive stuff going on behind closed doors that you can't -- that then -- he said, she said, that can't be proven.

. . .

Q: So any other specific examples of the subversion that you've testified about?

A. Just hearsay around the department . . . .

Q. Hearsay from the plaintiffs in this lawsuit?

A. [Y]es.

. . .

Q. [A]nyone else?

A. No.

evaluation and corrective action plan were pretextual.[13]  Defendants proffer several shortcomings

in Brown's performance during fiscal year 2013, including her "failure to support the scheduling

desk," "not staying on top of her assignments for faculty," and submission of defective

reimbursement requests on behalf of the doctors she supported.  (Dkt. No. 65-2 ¶ 55, Dkt. No.

64-34 at 66.)

As discussed above, Brown relies in part on the temporal proximity between her

complaint and her evaluation to create an inference of retaliatory motive, but the connection is

somewhat attenuated.  And at the pretext step of the burden-shifting framework, "even a *close*

temporal connection between a complaint of discrimination and an adverse employment action is

insufficient" under the federal standard; similarly, even under the NYCHRL's more liberal

standard, Plaintiff needs more than just the relatively weak temporal evidence.[14]  *See Williams v.*

*Regus Mgmt. Grp.*, 836 F. Supp. 2d 159, 181 (S.D.N.Y. 2011).

In addition to the timing, Brown claims that Adams prompted Rustia to abandon the

"established protocol" of basing evaluations on faculty feedback, with the apparent implication

that this deviation indicates pretext.  (Dkt. No 69 at 25–26.)  It is true that "[w]here an

employer's "deviat[ion] from its normal decisionmaking procedures" resulted in the challenged

employment decision, an inference of pretext may arise.  *Weiss v. JPMorgan Chase & Co.*, 332

F. App'x 659, 664 (2d Cir. 2009) (second alteration in original) (quoting *Stern v. Trustees of*

*Columbia Univ.*, 131 F.3d 305, 313–14 (2d Cir. 1997)).  But in light of the record evidence,

---

[13]     The issuance of the corrective action plan by itself is not retaliatory, as it was triggered automatically whenever an employee scores below "3" on her evaluation.  (SUF ¶ 14.)

[14] "It is unclear whether sufficiently close temporal proximity, standing alone, would be sufficient under the NYCHRL."  *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 181 (S.D.N.Y. 2011).  The temporal nexus here, however, is not sufficiently close to survive summary judgment based on that proximity alone.

Brown's claims of irregular procedures are greatly exaggerated: there was no *significant* deviation from protocol here, and Brown has thus failed to raise an inference of pretext. *Cf. Stern*, 131 F.3d at 310, 312–13 (finding inference of discrimination because of "unprecedented" deviation from usual procedures); *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 251–52 (S.D.N.Y. 1999) (emphasis added) (finding inference of discrimination because employer "deviated *significantly*" from its ordinary promotion practices); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000) (explaining that not all "procedural irregularit[ies]" indicate pretext).

It is undisputed that Rustia initially drafted all of Brown's evaluations from 2010 onward, and that the evaluations were always subject to Adams's approval. (SUF ¶¶ 689, 693.) It is also undisputed that Rustia's normal evaluation procedure was to rely on the input of faculty for whom Brown worked, and that the faculty had "stellar reviews" of Brown in 2013. (Dkt. No 696.) Nonetheless, Adams directed Rustia to edit her first draft of Brown's 2013 evaluation to account for the fact that Brown was "not following protocol," even if the "faculty members may like her." (Dkt. No. 68-5 ¶ 5; SUF ¶ 697.)

Brown contends that this instruction constitutes a significant deviation from normal procedures that could support an inference of pretext. The Court disagrees for two reasons. First, the evidence in the record does not support Brown's characterization of normal procedures, but rather confirms that any deviation from normal practice was not significant. In fact, contrary to her previous characterization of Adams's participation and instructions as "bizarre" (Dkt. No 68-5 ¶ 5), Rustia's deposition testimony confirms that it was actually quite common for Adams to participate in this way: After a first draft was complete, "the practice was to sit with your immediate supervisor"—in this case, Adams—"to go over it," and to "discuss it with her." (Dkt.

No. 65-34 at 42–43.) "[Adams] would have input, and then [Rustia] would need to go back and redraft, or reedit, the document." (*Id.* at 43.) This practice was consistently followed for all of the evaluations Rustia completed for Adams. (*See* Dkt. *Id.* at 43–44.) In other words, there was nothing bizarre or irregular about Adams instructing Rustia to edit evaluations.[15]

And even if Adams's edits were irregular, there is insufficient evidence connecting them to any retaliatory motive. To start, Brown has "introduced no direct evidence of retaliatory animus" with respect to the edits. *Tori v. Marist Coll.*, 344 F. App'x 697, 701 (2d Cir. 2009). Furthermore, as explained above, there is no evidence in the record that Adams was even aware that Brown, rather than others in the department, was complaining of racial discrimination. Finally, Rustia was able to identify just one edit that Adams instructed her to make to her initial draft: namely, to note that Brown "needs to document assignments and implement the use of calendaring." (Dkt. No 65-35 at 92.) The Court concludes that a reasonable jury could not infer, based on the totality of the evidence, that this lone edit was made as a pretext for retaliation.

### 2. Cabrera's Retaliation Claim

Like Brown, Cabrera maintains that Adams retaliated against her on the basis of the anonymous August 2012 complaint, and that the retaliation took the form of a lower evaluation score. (Dkt. No. 69 at 28.) For many of the same reasons (i.e., failure to establish a causal

---

[15] Q: And was it common for [Adams] to have input into performance evaluations that you drafted?

A. She had input on everything.

Q. Including all the performance evaluations you drafted?

A. I had to review them with her, so, yes, she had input.

connection between her complaints and Defendant's actions), Cabrera's claim cannot survive summary judgment.[16]

Cabrera's claim is deficient in another respect: she has failed to identify any adverse action taken against her. Her evaluation score of 4 out of 5, a score high enough to qualify her for a merit pay increase, was the same score she received in 2012. (Dkt. No. 68-20; SUF ¶ 14.) Cabrera's contention that she should have gotten an even higher score of 4.5, and that her attendance score was unjustifiably lowered (Dkt. No. 69 at 29), are "trivial, insubstantial, or petty" and thus cannot satisfy even the NYCHRL's liberal adverse action standard. *See Williams*, 836 F. Supp. 2d at 175 (S.D.N.Y. 2011)); *see also Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 214 (E.D.N.Y. 2014) (noting that "[c]riticism of an employee in the course of evaluating and correcting her work is not, in itself, a materially adverse employment action" under the federal standard).

Cabrera also alleges adverse action in the form of unidentified "additional work," which was assigned at the "direct request [of] Adams." (Dkt. No. 69 at 29.) Under the federal standard, Cabrera's "allegation regarding additional work is far too conclusory to constitute an adverse employment action" because she alleges neither "the nature of the additional work," nor "that the additional work was outside of her general responsibilities," nor "that there was a radical change in the nature of her work responsibilities." *Kelly v. New York State Office of Mental Health*, 200 F. Supp. 3d 378, 397 (E.D.N.Y. 2016). Likewise, without more detail, the

---

[16]     For example, Cabrera testified that Rustia told her that "Adams would revise [Cabrera's] evaluation to a lower score" to establish the requisite causal connection. (Dkt. No. 69 at 28.) Rustia's deposition testimony, however, undermines Cabrera's testimony: Rustia was unable to identify a single edit to Cabrera's 2013 evaluation that was inserted pursuant to Adams' instructions. (Dkt. No 65-34 at 48.)

Court cannot conclude that the unidentified "additional work" would be reasonably likely to deter protected activity under the NYCHRL.

### 3. Francis's Retaliation Claim

Francis also claims retaliation in the form of a lower evaluation score for fiscal year 2013. (Dkt. No. 69 at 29; Dkt. No. 68-21.) That claim fails for the same reasons as Cabrera's: the 0.25-point difference between her 2012 and 2013 scores would not be "reasonably likely to deter a person from engaging in protected activity" under the NYCHRL, and, *a fortiori*, is insufficient under federal law.[17]

In addition, Francis contends that she was fired in September of 2013 in retaliation for her complaints in June of 2013 that "racial jokes and vulgar language" were being directed towards her. (Dkt. No. 69 at 30.) Defendants do not contest that Francis's firing constitutes *prima facie* retaliation, but put forth several legitimate non-retaliatory explanations for her termination, including (1) her repeated unprofessional behavior, (2) the "phasing out" of her position, and (3) her failure to obtain an insurance coding certificate. (Dkt. No. 71 at 7.) It is undisputed that, around July of 2013, Adams and Killion each informed Francis that her position would be phased out, and that Francis would need to obtain a coding certification to be eligible for the new position. (SUF ¶¶ 342–45.) Nonetheless, Francis did not take the coding exam until October 2013, after her position had been phased out. (SUF ¶ 346.)

Moreover, it is undisputed that, after the new position was posted in August 2013, several faculty and staff members complained to Adams and Killion that Francis was behaving

---

[17]     Although Plaintiffs' opposition apparently abandons the claim that Defendants sent Francis "nit-picking" e-mails for either discriminatory or retaliatory reasons (SUF ¶ 365), that claim likewise does not amount to sufficiently adverse action under municipal or federal law.

disruptively, and that Francis had a "very heated" altercation with Killion. (SUF ¶¶ 352, 349.) Francis was issued a written warning on September 6, 2013, regarding her disruptive behavior. (Dkt. No. 65-17.) Thus, there is undisputed record support for both of Defendants' proffered legitimate reasons for terminating Francis.

Francis's only evidence of pretext is the speed with which her September 10 termination followed her September 6 written warning. But this is not enough to permit a reasonable jury to infer pretext. *See Williams*, 836 F. Supp. 2d at 181. Even under the NYCHRL's liberal standard, a plaintiff cannot survive summary judgment at step three of the burden-shifting framework without *some* affirmative evidence, direct or circumstantial, that her termination was based on an impermissible motive.[18]

### 4. Smith's Retaliation Claim

Smith, like Cabrera, alleges that her performance evaluations were lower in 2013 than in 2012 due to retaliation. But like Cabrera, Smith's overall scores on her respective evaluations were identical (3.5), and had no adverse impact upon her employment status. (Dkt. No. 69 at 31.) For that reason, they do not constitute materially adverse action under federal law. Nor is there sufficient evidence to indicate that the minor difference between the two evaluations would deter a reasonable employee from protected activity under the NYCHRL, as it is undisputed that

---

[18]    Francis claims that the coding justification was pretextual because Defendants replaced her with someone who lacked a coding certification. (Dkt. No. 69 at 31.) Putting aside the fact that this does nothing to rebut Defendants' other legitimate reasons for firing her, Plaintiffs' opposition brief mischaracterizes Francis's testimony: she testified that Amber Wright, a temporary employee who did not have a coding certification, was her immediate replacement. (Dkt. No. 65-43 at 175–76.) But Francis did not know whether Wright was hired into the old "scheduling coordinator position" or the "new coding position." (Dkt. 65-33 at 176.) In fact, Francis testified that Jenny Chen was the "first hire" into the "new coding position." (Dkt. No. 65-33 at 176.) There is no evidence that Jenny Chen did not have the requisite coding certificate.

a rating of "'needs improvement' on a particular category . . . does not necessarily have a negative impact on overall appraisal or employment." (SUF ¶ 15.)[19]

Smith also claims that Adams assigned her significant additional duties without compensation and "micromanaged" her. (SUF ¶ 530.) Specifically, Smith claims that she was assigned to support a certain doctor, who was very dependent" and "not computer literate." (Dkt. No. 65-47 at 302–303.) Although it is true that "a disproportionately heavy workload" can constitute materially adverse action for retaliation purposes, *Feingold v. New York*, 366 F.3d 138, 153 (2d Cir. 2004), "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities" to qualify as materially adverse. *Shultz v. Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 304 (2d Cir. 2017) (quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)); *see also Young v. Rogers & Wells LLP.*, No. 00 Civ. 8019, 2002 WL 31496205, at *5 (S.D.N.Y. Nov. 6, 2002) ("Disproportionately heavy workload could perhaps be an adverse action, if the additional work significantly changed the employee's responsibilities so as to diminish that worker's role or status, or exposed the worker to dangerous or extreme conditions not appropriate to her job.").

Smith's assignment to support a dependent doctor is insufficient as a matter of law to constitute materially adverse action under the federal standard. *See Young*, 2002 WL 31496205, at *5 ("While [plaintiff] describes the work assigned to her as more tedious, she does not claim nor is there any evidence that the tasks were of a different kind than those she was hired to perform, nor does she even attempt to quantify the burden in such a way as to demonstrate that she was assigned an unusually heavy workload."). Nor does the record evidence permit the

---

[19]      Moreover, for the reasons already stated as to Cabrera and Brown, Smith has not introduced sufficient evidence of a causal connection between her protected activity and her evaluation scores.

conclusion that such an assignment would deter a reasonable employee from undertaking protected activity under the NYCHRL.[20]

The same is true for Smith's attempt to base her retaliation claim on "micromanagement" in the form of "weekly meetings" with Adams. (Dkt. No. 69 at 32.) These are not sufficiently adverse actions to establish a *prima facie* case under either federal or city law. *See Byra-Grzegorczyk v. Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 252 (D. Conn. 2008) ("There is nothing materially adverse about requiring employees to attend meetings. Meetings are part and parcel of a normal employer-employee relationship.").

In sum, none of the Plaintiffs have adduced sufficient evidence to survive summary judgment on their retaliation claims.[21]

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is directed to close the motion at Docket Number 63 and to close this case.

SO ORDERED.

Dated: March 26, 2018
New York, New York

_____
J. PAUL OETKEN
United States District Judge

---

[20] Moreover, Smith does not put forth any evidence of a causal connection between any protected activity and her assignment to that doctor, even if that assignment were materially adverse. (*See* Dkt. No. 65-47 at 307 ("Q. So you are just speculating about Kristen Adams'[s] motivation in assigning you to [the doctor]? A. That's my belief. Q. Right. But it's not based on anything other than speculation. A. Yes. Q. And, in fact, somebody would have to work with [him], correct? A. Yes.").)

[21] Because summary judgment is granted to Defendants on all claims, their application for severance under Federal Rules of Procedure 21 and 42 is denied as moot.